**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| EMERGENCY STAFFING | § | |
| SOLUTIONS, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:13cv309 |
| | § | (Judge Mazzant) |
| CAH ACQUISITION COMPANY #10, LLC, | § | |
| ET AL, | § | |
| | § | |
| Defendant. | § | |

**AFFIDAVIT OF SHONDA RUPE**

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF COLLIN | § |

BEFORE ME, the undersigned authority, on this day personally appeared Shonda Rupe, who, after being duly sworn upon her oath, stated as follows:

1.     My name is Shonda Rupe.  I am over the age of 18 years.  I am of sound mind.  I have never been convicted of a crime.  All statements contained herein are within my personal knowledge and are true and correct.  I am otherwise competent to make this affidavit.

2.     I am the Chief Operating Officer of Emergency Staffing Solutions, Inc. ("ESS").

3.     I am familiar with and involved in the daily operations of ESS. I am familiar with the ESS's contractual relationships with Defendants CAH Acquisition Company #1, LLC d/b/a Washington County Hospital ("CAH-Washington"), CAH Acquisition Company #10, LLC d/b/a Yadkin Valley Community Hospital ("CAH-Yadkin"), and CAH Acquisition Company #16, LLC d/b/a Haskell County Community Hospital ("CAH-Haskell") (collectively, the "Defendants") and the circumstances surrounding each contract.

**AFFIDAVIT OF SHONDA RUPE– Page 1**

4.      ESS specializes in the business of contracting with hospitals to provide, among other things, emergency department billing and physician staffing services.

5.      On or about June 1, 2012, ESS and CAH-Washington entered into a contract whereby ESS agreed to provide emergency department billing and physician staffing services to CAH-Washington in exchange for CAH-Washington's agreement to compensate ESS for those services (the "CAH-Washington Agreement").

6.      A true and correct copy of the CAH-Washington Agreement is attached hereto as Exhibit A-1 and incorporated herein by reference.

7.      On or about October 20, 2012, ESS and CAH-Washington executed an amendment to the Contract (the "2012 Amendment"). This 2012 Amendment increased the monthly subsidy to account for the lower than expected collections at CAH-Washington's hospital.

8.      A true and correct copy of the 2012 Amendment is attached hereto as Exhibit A-2 and incorporated herein by reference.

9.      ESS provided all services to CAH-Washington in compliance with the terms of the CAH-Washington Agreement and 2012 Amendment until May 16, 2013, when CAH-Washington unilaterally terminated the CAH-Washington Agreement, and ESS properly billed CAH-Washington for all those services. CAH-Washington unilaterally terminated by instructing ESS's physicians that had reported for work to go home and instructing ESS that they would no longer be using our services.

10.      After all payments and offsets, $122,881.79 remains due and owing by CAH-Washington under the CAH-Washington Agreement as reflected in CAH-Washington's account statement, a true and correct copy of which is attached hereto as Exhibit A-3. Pursuant to the

**AFFIDAVIT OF SHONDA RUPE**– Page 2

terms of the contract, CAH-Washington also owes $40,674.01 in finance charges that have accrued at an annual rate of 18% from the date the invoice was due, as reflected in the CAH-Washington Invoice #31760, a true and correct copy of which is attached hereto as Exhibit A-4.

11.     On or about August 1, 2012, ESS and CAH-Yadkin entered into a contract whereby ESS agreed to provide emergency department billing and physician staffing services to CAH-Yadkin in exchange for CAH-Yadkin's agreement to compensate ESS for those services (the "CAH-Yadkin Agreement").

12.     A true and correct copy of the CAH-Yadkin Agreement is attached hereto as Exhibit A-5 and incorporated herein by reference.

13.     ESS provided services to CAH-Yadkin in compliance with the terms of the CAH-Yadkin Agreement until May 16, 2013, when CAH-Yadkin unilaterally terminated the CAH-Yadkin Agreement, and ESS properly billed CAH-Yadkin for all those services. CAH-Yadkin unilaterally terminated by instructing ESS's physicians that had reported for work to go home and instructing ESS that they would no longer be using our services.

14.     After all payments and offsets, $107,917.57 remains due and owing by CAH-Yadkin under the CAH-Yadkin Agreement as reflected in CAH-Yadkin's account statement, a true and correct copy of which is attached hereto as Exhibit A-6. Pursuant to the terms of the contract, CAH-Yadkin also owes $35,843.11 in finance charges that have accrued at an annual rate of 18% from the date the invoice was due, as reflected in the CAH-Yadkin Invoice #31762, a true and correct copy of which is attached hereto as Exhibit A-7.

15.     On or about June 1, 2012, ESS and CAH-Haskell entered into a contract whereby ESS agreed to provide emergency department billing and physician staffing services to CAH-Haskell in exchange for CAH-Haskell's agreement to compensate ESS for those services (the

"CAH-Haskell Agreement").

16.     A true and correct copy of the CAH-Haskell Agreement is attached hereto as Exhibit A-8 and incorporated herein by reference.

17.     ESS provided services to CAH-Haskell in compliance with the terms of the CAH-Haskell Agreement, and ESS properly billed CAH-Haskell for all those services.

18.     After all payments and offsets, $86,467.16 remains due and owing by CAH-Haskell under the CAH-Haskell Agreement as reflected in CAH-Haskell's account statement, a true and correct copy of which is attached hereto as Exhibit A-9. Pursuant to the terms of the contract, CAH-Haskell also owes $12,384.50 in finance charges that have accrued at an annual rate of 18% from the date the invoice was due, as reflected in the CAH-Haskell Invoice #31761, a true and correct copy of which is attached hereto as Exhibit A-10.

19.     ESS has contacted all of the above Defendants, CAH-Washington, CAH-Yadkin, and CAH-Haskell, about their nonpayment and has demanded that they each pay ESS all past due amounts owed for services provided. Despite these attempts, not one of the Defendants has fulfilled its financial obligations it owes to ESS.

20.     As a result of the Defendants' actions, ESS was forced to hire the law firm Hanshaw Kennedy Marquis, PLLC ("HKM") to pursue its claims against the Defendants. ESS has incurred and paid attorney fees on an hourly basis throughout the course of this lawsuit."

FURTHER THE AFFIANT SAYETH NOT.

_____

SHONDA RUPE

**AFFIDAVIT OF SHONDA RUPE– Page 4**

SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned notary public, on the _13_ day of March, 2015.

Notary Public in and for the State of Texas

KATIE E. ECCLES
Notary Public, State of Texas
My Commission Expires
September 12, 2017

**AFFIDAVIT OF SHONDA RUPE**– **Page 5**

# Exhibit A-1

## EMERGENCY DEPARTMENT COVERAGE AND HOSPITALIST SERVICES AGREEMENT

**THIS EMERGENCY DEPARTMENT COVERAGE AND HOSPITALIST SERVICES** agreement ("Agreement"), effective June 1,, 2012 (the "Effective Date") is made and entered into by and between Emergency Staffing Solutions, Inc. ("Group") and CAH ACQUISITION COMPANY #1, LLC d/b/a Washington County Hospital ("Hospital").

## RECITALS

WHEREAS, Hospital is a critical access  hospital located at 958 US Highway 64 East, Plymouth, North Carolina  that provides health care services to patients in its community (including indigent patients) utilizing its facilities;

WHEREAS, Group is an emergency department and hospitalist management company that provides administrative services to hospitals, including arranging for Hospital's emergency department ("Department") and hospitalist management services;

WHEREAS, Group contracts with physicians who are duly licensed and registered to practice medicine in the State of North Carolina and are qualified to provide the Services (each, a "Physician" and collectively the "Physicians"); and

WHEREAS, Group desires to provide  coverage  for the Department and hospitalist management services to the Hospital ("Services"), and Hospital desires to contract with Group for such Services so that Hospital may better fulfill its mission of providing or arranging to provide certain health care services to patients (including indigent patients) utilizing Hospital's facilities.

NOW THEREFORE, in consideration of the mutual promises of the parties hereto, and of the covenants and conditions hereinafter expressed, the parties hereby agree and covenant, each with the other, as follows:

## 1. SPECIFIC DUTIES OF GROUP

1.1     Group and Group Physician Obligations.   Group's functions and duties under this Agreement are wholly administrative and relate exclusively to staffing the Department with Physicians who shall provide Services pursuant  to independent contractor agreements with Group, assuring Physicians' performance of their collective obligations herein, assuring Department coverage in accordance with the terms and conditions of **EXHIBIT A**, which is attached and incorporated by reference, assuring the provision of Medical Director Services in accordance with **EXHIBIT A** herein , scheduling Physicians' hours of service, assuring hospitalist service coverage in accordance with **EXHIBIT B**, which is attached and incorporated by reference, and performing the other administrative obligations required herein. Group shall assure that its Physicians shall provide medically necessary Services, diagnoses and treatment to patients as determined to be necessary by such Physicians and required by the Emergency Medical Treatment and Active Labor Act of 1986 ("EMTALA"), as amended from time to time. Each Physician approved for placement at Hospital shall accept such placement through his or her executed Statement 0of Acceptance which is attached as **EXHIBIT E** and incorporated by reference.  Any change in the scope of work set forth herein resulting in Group's compensation shall be evidenced by an amendment to this Agreement.

1.2     Hospital Approval. Notwithstanding the foregoing, Hospital shall have the right to approve each Physician that Group designates to provide Services in the Hospital, prior to the assignment

- 1 -

of any Physician to the Hospital.  Hospital agrees to require no more onerous provisions for acceptance of Group's Physicians than are applicable to other physicians in accordance with the rules, regulations and bylaws of the Medical Staff of Hospital. Hospital further agrees that it will grant temporary privileges to Group's Physicians as requested and as qualified.  In addition, after Physicians assigned to the Hospital are initially approved by the Hospital, Hospital shall, upon the occurrence of any of the following with respect to any Physician, have the right at any time (i) to insist on the immediate removal and replacement of any Physician that Group has assigned to provide Services under this Agreement in the Hospital, and (ii) upon prior notice to Group, to refuse any Physician permission to utilize any Hospital facility for purposes of providing Services under this Agreement, upon the occurrence of any of the following:

        (a)     Failure by such Physician to meet the qualifications required of the Physicians under this Agreement, including being approved for membership of the Medical Staff of the Hospital pursuant to the Medical Staff Bylaws;

        (b)     Death of Physician;

        (c)     Suspension, cessation or loss of Physician's (i) qualifications or unrestricted license to practice medicine in the State of North Carolina (including by reason of failure to meet continuing medical education requirements); (ii) state or federal authorization to administer or prescribe controlled substances;   (iii ) Hospital medical staff privileges; or (v) malpractice insurance coverage;

        (d)     Physician's debarment, suspension or exclusion from any federal or state program for the reimbursement of health care services;

        (e)     Permanent disability (ill health or other disability) of such Physician which prevents or makes inadvisable his or her continued practice of medicine as contemplated by this Agreement;

        (f)     Reasonable determination by Hospital that such Physician has , or continues to engage in conduct that constitutes a threat to the health, safety or welfare of any Hospital patient, employee or visitor; ;

        (g)     Conviction of such Physician of a felony;

        (h)     Violation by such Physician of any term of Hospital's policies or Medical Staff Bylaws as they exist from time to time following notification of such violation by Hospital to Group and the failure to cure the same within thirty (30) days thereafter; or

        (i)     Restrictions, sanctions or other actions by any regulatory, credentialing or certifying body or any insurance provider.

    1.3    <u>Representations and Warranties of Group</u>. Group hereby represents and warrants to Hospital as follows:

        (a)     <u>Physician Qualifications. .</u>  Each Physician providing Services hereunder shall  at all times during the term of this Agreement; (i) hold a valid and unrestricted license to practice medicine in the State of North Carolina; (ii) maintain proficiency through board certification, board eligibility, training and/or experience in the practice of emergency medicine; (iii) be a member of Hospital's Medical Staff  with all the attendant privileges and responsibilities of membership; (iv) maintain a DEA license to prescribe controlled substances and a similar state

-2-

registration; and maintain the insurance coverage required by Section 1.10 herein. With respect to each Physician, Group represents and warrants that such Physician's license to practice medicine and certificate to prescribe controlled substances in the State of North Carolina or in any other jurisdiction has never been denied, terminated, suspended, probated, revoked, voluntarily relinquished under threat of disciplinary action or restricted in any way.

(b)     <u>Medicare/Medicaid Participation.</u>  During the term of this Agreement, each Physician shall be authorized to participate in the Medicare and Medicaid Programs.

(c)     <u>Disclosure.</u>  Group and each Physician shall immediately notify Hospital in the event any representation concerning a Physician set forth in this Agreement within the knowledge of Group or such Physician shall no longer be true, correct or complete.

(d)     <u>Authority.</u>  Group represents and warrants to Hospital that Group has the power and authority to obligate the Physicians to perform the duties of the Physicians pursuant to this Agreement. Group agrees to so obligate the Physicians.

(e)     Group is a for-profit corporation duly organized and validly existing under the laws of the State of Texas that is authorized to conduct business in the State of North Carolina.

(f)     Group has all requisite corporate power and authority to enter into this Agreement and to perform its obligations under this Agreement. This Agreement has been duly authorized, executed and delivered by Group and is a legal, valid and binding obligation of Group, enforceable in accordance with its terms.

(h)     The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby by Group will not violate any provisions of, or constitute a default under, any contract or other agreement to which Group is a party or by which it is bound, or conflict with its Articles of Incorporation or bylaws.

(i)     Neither Group nor any of its officers, directors, partners or employees providing Services hereunder ("Group Parties") are now  listed by any federal agency or program (including but not limited to Medicare and Tricare) as debarred, suspended or excluded or is now debarred, suspended or excluded from any Medicaid program or any other state or local program for the reimbursement of health care services, Group and Group Parties acknowledge that this is an ongoing representation and warranty and agree to immediately notify Hospital in writing in the event that either  Group or a Group Party cease to be eligible or is debarred, suspended or is excluded from any of the aforementioned programs at which time this agreement may be immediately terminated by Hospital, in its sole discretion.

1.4     <u>Reports and Records.</u>  Group shall be responsible for assuring that each Physician providing services hereunder maintains or causes to be maintained accurate, legible and complete records and files of all required information pertaining to the clinical services they perform, including individual patient charts. All records and reports shall be prepared in accordance with Hospital's policies and procedures and the Bylaws, Rules and regulations of its Medical Staff. **Group shall assure that its Physicians put forth their best efforts to complete such records and reports immediately after services are performed; however, if such records and reports are not completed at the point of service or immediately thereafter, and absent a showing of good cause (e.g. illness, family emergency, short term disability) Group shall assure that such records are completed and delivered**

- 3 -

to Hospital's Medical Record Department no later than five (5) days after the date services are provided. **On those occasions where good cause has been shown, all such records shall be completed and submitted to Hospital within fifteen (15) days after the date of service.** The foregoing notwithstanding, in the event this Agreement is terminated by either party for any reason or is not renewed for any reason at the end of the term hereof, then all reports and records required hereunder shall be completed and delivered to the Hospital within thirty (30) days after the effective date of termination or the last date of the term, as applicable. Group shall cause to be prepared and filed such additional or supplementary reports as Hospital may reasonably request, including, but not limited to, any reports or records Hospital deems necessary to establish the value of the Services provided hereunder. All reports, records and supplementary documents prepared in connection with the Services provided hereunder (which shall include all documents relating to patient care but not Group's business records) shall be the sole property of and within the sole control of Hospital. Group agrees to make available on reasonable dates and at reasonable times and places any Physician providing Services hereunder and all documents reasonably related thereto for the purposes of any litigation, investigation or review with which Hospital may become involved.

      1.5    <u>Quality Assurance/Utilization Review and Peer Review Programs.</u> Group, through its Physicians shall have knowledge of and assist Hospital in developing, implementing, monitoring and reviewing the Hospital's quality assurance, utilization review, performance improvement and peer review programs, procedures, guidelines and policies which relate to the Hospital and as required by Hospital policies, by Medicare law and regulations, by the standards or reports of The Joint Commission, and/or other regulatory, licensing, or accrediting agencies. If any regulatory, accrediting, or licensing agency should determine that the Hospital does not meet or exceed the acceptable standards prescribed and which are the responsibility of Group to satisfy under this Agreement, any and all action necessary to effect compliance shall be taken by Group within a reasonable time (not to exceed thirty (30) days unless otherwise agreed) after the details of noncompliance and steps necessary to effect compliance are given by notice to Group. In addition to the foregoing, Group and its Physicians shall comply with any and all procedures, guidelines and policies relating to Hospital's quality assurance, utilization review, peer review, risk management and safety programs. Hospital shall have knowledge of and assist Group in developing, implementing, monitoring and reviewing Hospital's quality assurance, utilization review, performance improvement and peer review programs, procedures, guidelines and policies which relate to the Group in its provision of services to Hospital in accordance with Group policies provided to Hospital, Medicare laws and regulations and/or other regulating, licensing or accreditation agencies.

      1.6    <u>Reimbursement.</u> Group and each Physician shall cooperate with Hospital and its employees as reasonably requested in the completion of any forms necessary for third party reimbursement.

      1.7    <u>Education.</u> Group shall ensure that each Physician participates for reasonable periods of time in the educational programs conducted by Hospital and performs such other teaching functions within Hospital as Hospital reasonably deems necessary to assure Hospital's compliance with requirements of accrediting bodies.

      1.8    <u>Incurring Financial Obligation.</u> Group agrees and acknowledges that neither it nor any Physician has any right, power or authority to incur and will not incur any financial obligation, legal obligation or liability, or other obligation on behalf of, or binding upon, Hospital.

      1.9    <u>Professional Expenses.</u> Group shall be solely responsible for all personal and professional expenses incurred by it or any person provided by Group to render Services under this Agreement.

- 4 -

1.10    Liability Insurance.

(a)    Physicians' Coverage Requirements. Group shall obtain and maintain, and shall ensure that each Physician obtains and maintains, professional liability insurance with minimum limits of One Million and no/100 Dollars ($1,000,000.00) per occurrence and Three Million and no/100 Dollars ($3,000,000.00) annual aggregate. All policies described above shall provide that Hospital be given written notice no less than thirty (30) days prior to cancellation or material change of the policy. Group further agrees to provide evidence of the above coverage to Hospital either by providing copies of policies or certificates of insurance within thirty (30) days of the effective date of such coverage.

(b)    Tail Coverage.    Upon the termination or expiration of this Agreement, for the policy or policies obtained pursuant to this Section which are "claims made" insurance rather than "occurrence" insurance, Group shall either (i) purchase "tail" coverage to continue the liability insurance coverage in effect during the term hereof or (ii) continue in full force and effect the same level of liability insurance coverage on a claims made basis until the longest statute of limitations for professional and general liability for acts committed has expired (recognizing that the statute of limitations for minors is tolled until they reach the age of majority).   Group shall provide evidence of such coverage to Hospital within thirty (30) days of request by Hospital.

(b)    General Indemnity.    Except as may otherwise be provided in this Agreement, each party shall be responsible for its own acts and omissions and any and all claims , liabilities, injuries suits, demands and expenses of all kinds which may result or arise out of any alleged malpractice or neglect caused or alleged to have been caused by either party or their respective employees or representatives in the performance of their responsibilities hereunder.

1.11    Compliance Obligations.

(a)    Rules, Regulations, Policies and Directives.    As a continuing condition of this Agreement, Group and each Physician shall comply with and provide the Services in accordance with (i) the standards of The Joint Commission, (ii) the bylaws, rules, regulations and policies of Hospital; (iii) the Bylaws, Rules, Regulations and policies of the Medical Staff of the Hospital; and (iv) the Principles of Ethics adopted by the American Medical Association, as such principles are amended from time to time. Group hereby specifically acknowledges and agrees that pursuant to The Joint Commission standards, Hospital retains certain obligations regarding patient care and services within Hospital facilities.

(b)    Compliance with Law.    The Services shall be provided in accordance with all applicable provisions of law and other rules and regulations of any governmental authority relating to the activities contemplated by this Agreement, including, without limitation, EMTALA, as amended from time to time.

(c)    Corporate Compliance Program. Group acknowledges that Hospital and its parent organization, HMC/CAH Consolidated, Inc. ("HMC") have established a corporate compliance program ("Program"), the goal of which is to promote compliance with federal, state and local laws and regulations within all HMC organizations and affiliates. The program specifically focuses on risk identification and management, the promotion of good corporate citizenship, the commitment to upholding a high standard of ethical business practices and the prevention of misconduct. Group shall be responsible for ensuring that each Physician providing Services pursuant to this Agreement acknowledges Hospital's commitment to the Program and

- 5 -

agrees to conduct all business transactions required by this Agreement in accordance with the highest ethical standards and all applicable laws, regulations and statutes.

1.12   Physicians' Responsibilities with Respect to Patients. No Physician providing Services arranged pursuant to this Agreement is an employee of Hospital. Nothing herein shall be construed as giving that degree of control or direction on the part of Hospital that creates an employer-employee relationship between Hospital and any Physician. Hospital shall not control or direct the practice of medicine. All Physicians providing services in any Hospital facility shall:

(a)    Provide the necessary medical services in a manner so that the medical needs of each patient are met consistent with Hospital and medical staff bylaws, rules, regulations, and policies and patient expectations.

(b)    Be cognizant of the manner in which patients are received, the efforts to meet their needs, and other aspects of courtesy, compassion and sound nursing and medical care for every patient.

Notwithstanding anything contained herein to the contrary, no rule or regulation contained in this Agreement shall operate to delay medical treatment when immediate attention is required. The parties acknowledge the primary purpose of this Agreement is to make medical services available to the Hospital's patients in the Hospital (including indigent patients) at all times.

1.13   Notification of Investigation or Adverse Action. Group shall notify the chief Executive Officer of the Hospital, in writing, within seventy-two (72) hours of Group or any Physician providing Services hereunder receiving notice by any means of any change made, proposed or investigation relating to, or any adverse action taken with respect to: (i) the license of any Physician to practice in the State of North Carolina or any other state; (ii) any Physician's DEA or state controlled substance registration; (iii) the imposition of terms of probation or other limitation on Group or any Physician by any state or federal agency or program; (iv) the loss, suspension or restriction of medical staff membership or associated clinical privileges of any Physician at any other health care facility or organization; (v) an adverse determination by a peer review organization or third party payor with respect to Group or any Physician for reasons associated with quality of care; (vi) the commencement of a formal investigation with respect to or the filing of charges against Group or any Physician providing Services hereunder by the Department of Health and Human Services or any state Medicaid fraud control unit; (vii) the final debarment, suspension or exclusion of Group or any Physician providing Services hereunder from any federal or state program for the reimbursement of health care services; (viii) the filing of any claim alleging negligence and/or medical malpractice at Hospital. The failure to provide notice as required by this subsection shall be cause for immediate termination pursuant to Subsection 6.02(e)(iii) herein.

1.14   Substitute Coverage. Hospital acknowledges that Group's Physicians shall be entitled to absences from their duties hereunder due to illness, vacation, medical conferences and other professional and personal activities. However, it shall remain the responsibility of Group to manage and coordinate the schedules of each Physician, to the extent necessary, to assure that Services provided to Hospital are continuous and uninterrupted. To the extent Group utilizes any substitute physicians to provide Services hereunder, each must at all times meet the qualifications set forth in Subsection 1.3(a) and be approved in advance by Hospital's CEO.

1.15   Appointment of Medical Director for Hospital's Emergency Department and Hospitalist Services. Group shall appoint one (1) Physician to serve as medical director ("Medical Director") of both the Department and Hospitalist Services, subject to the prior approval of the Hospital, during the term of this Agreement and any subsequent renewal terms thereafter, such Medical Director serve in accordance with the terms and conditions set forth on **EXHIBIT A** and **EXHIBIT B.**

- 6 -

(a)      Absence. If Medical Director is unable for any treason to perform the duties prescribed on **EXHIBIT** A, Group shall appoint another Physician as acting Medical Director during any absence necessitated by Medical Director's inability to perform his or her prescribed duties. All references herein to the aforementioned Medical Director's responsibilities shall include any Physician serving as medical Director in the Medical Director's absence.

(b)      Initial Department and Hospitalist Services Medical Director.  As of the Effective Date of this Agreement Group  shall  appoint  William  Wise,  MD,  Regional  Medical Director for Group to serve as interim  Medical Director of the  Department  and  Hospitalist Services until a permanent appointment can be made.  Upon     Group's   appointment   of   a permanent Medical Director which shall be evidenced by an executed     Statement             of Acceptance any and all appointments thereafter, other than those to fill temporary absences, shall be evidenced by an amendment to this Agreement.

## 2.    HOSPITAL OBLIGATIONS

2.1    Space & Equipment. Hospital shall make available during the term of this Agreement the space and equipment it deems is reasonably necessary for the proper operation of the Hospital including the provision of Services by the Physicians. Such requirements shall, at a minimum, include, but not be limited to: sleep room for a Physician, desk, filing space, access to computer with internet access, and capabilities reasonably acceptable to Group. Hospital shall furnish Hospital with utilities, housekeeping, laundry and other services, as it deems reasonably necessary for the proper operation of the Hospital.

2.2    Supplies. Hospital shall purchase all supplies reasonably necessary for the proper operation of the Hospital, including the provision of Services.

2.3    Personnel Provided by Hospital. Hospital shall make available during the term of this Agreement such personnel that it deems reasonable and necessary for the effective operation of the Hospital, including nurses and other para-medical personnel, laboratory and x-ray technicians, and respiratory therapists. The selection and retention, as well as direction and control of such personnel in administrative matters, shall at all times rest solely with Hospital. Such personnel are employees, volunteers or contractors of Hospital.

2.4    Reimbursement. Hospital shall cooperate with Group and its employees or representatives as reasonably requested in the completion of any forms necessary for third party reimbursement.

2.5    Incurring Financial Obligation. Hospital agrees and acknowledges that neither it nor its officers, employees, contractors nor representatives of any kind have any right, power or authority to incur and will not incur any financial obligation, legal obligation or liability, or other obligation on behalf of, or binding upon, Group.

2.6    Quality Assurance/Utilization Review and Peer Review Programs. Hospital shall have knowledge of and assist Group in developing, implementing, monitoring and reviewing Hospital's quality assurance, utilization review, performance improvement and peer review programs, procedures, guidelines and policies which relate to the Group in its provision of services to Hospital in accordance with Medicare laws and regulations and/or other regulating, licensing or accreditation agencies.

3.   **COMPENSATION ARRANGEMENT**

3.1   <u>Compensation for Services.</u> In exchange for the performance by Group and the Physicians of the Services required under this Agreement, Hospital will compensate Group as set forth on **EXHIBIT B** and **EXHIBIT D** respectively which are attached hereto and incorporated herein by reference.

4.   **CONFIDENTIALITY**

4.1   <u>Agreement.</u> Group agrees to, and ensures that each Physician will, keep this Agreement and its contents confidential and not disclose this Agreement or its contents to any third party, other than its attorneys, accountants, and other engaged third parties, unless required by law, without the written consent of the Hospital. Hospital agrees to keep this Agreement and its contents confidential and not disclose this Agreement or its contents to any third party, other than its attorneys, accountants, and other engaged third parties, unless required by law, without the written consent of Group.

4.2   <u>Proprietary Information.</u> Group acknowledges that in connection with the performance of the Services under this Agreement, Group and the Physicians will be acquiring and making use of certain confidential information and trade secrets of Hospital which may include management reports, financial statements, internal memoranda, reports, patient and customer lists, confidential technology, business connections, payors, managed care strategies, reimbursement methodologies, past performance, future prospects, strategic initiatives and other materials, records and/or information of a proprietary nature ("<u>Hospital Confidential Information</u>"). Therefore, in order to protect the Hospital Confidential Information, Group and the Physicians shall not after the date hereof use the Hospital Confidential Information except in connection with the performance of the Services pursuant to this Agreement, or divulge the Hospital Confidential Information to any third party, unless Hospital consents in writing or such use or divulgence or disclosure is required by law. In the event Group or any Physician receives a request or demand for the disclosure of Hospital Confidential Information, the party receiving such request or demand shall immediately provide written notice to Hospital of such request or demand, including a copy of any written element of such request or demand. Upon termination of this Agreement, neither Group nor any Physician, will take or retain, without prior written authorization from Hospital, any papers, patient lists, fee books, patient records, files, or other documents or copies thereof or other Hospital Confidential Information of any kind belonging to Hospital. Without limiting other possible remedies for the breach of this covenant, the parties agree that injunctive or other equitable relief shall be available to enforce this covenant, such relief to be without the necessity of posting a bond, cash or otherwise.

Hospital acknowledges that in connection with the performance of the services under this Agreement, Hospital will be acquiring and making use of certain confidential information and trade secrets of Group which may include management reports, financial statements, internal memoranda, reports, patient and customer lists, confidential technology, business connections, payors, managed care strategies, reimbursement methodologies, past performance, future prospects, strategic initiatives and other materials, records and/or information of a proprietary nature (" <u>Group Confidential Information</u>"). Therefore, in order to protect Group Confidential Information, Hospital shall not after the date hereof use Group Confidential Information except in connection with the performance of the services pursuant to this Agreement, or divulge Group Confidential Information to any third party, unless Group consents in writing or such use or divulgence or disclosure is required by law. In the event Hospital receives a request or demand for the disclosure of Group Confidential Information, the party receiving such request or demand shall immediately provide written notice to Group of such request or demand, including a copy of any written element of such request or demand. Upon termination of this Agreement, neither Hospital nor any of its employees or agents will take or retain, without prior written authorization from Group, any

- 8 -

papers, patient lists, fee books, patient records, files, or other documents or copies thereof or other Group Confidential Information of any kind belonging to Group. Without limiting other possible remedies for the breach of this covenant, the parties agree that injunctive or other equitable relief shall be available to enforce this covenant, such relief to be without the necessity of posting a bond, cash or otherwise.

Hospital Confidential Information and Group Confidential Information shall not include information that Group or the Hospital can demonstrate by clear and convincing evidence: (a) at the time of disclosure by Hospital to Group or vice versa that the information was known to Group or the Hospital respectively as evidenced by its contemporaneous written records; (b) at the time of disclosure by disclosing party, was published or known publicly or otherwise was in the public domain; (c) after disclosure by disclosing party and other than as a result of a breach of either party's obligations under this Agreement, becomes published or publicly known or otherwise becomes part of the public domain; or (d) is disclosed to disclosing party in good faith by a third party who is not under obligation of confidence or secrecy to such party.

**5.      RECORDS**

5.1      <u>Patient and Physician Access to Records.</u>   The parties recognize that the patient has the legal right to have access to his or her medical records, that all staff physicians at Hospital have the right to consult those records to facilitate the continuity of proper care, and that such records are confidential and privileged under state and federal law. Hospital expressly agrees that Group and the Physicians shall have access, as permitted by applicable law, to such patient records at any time necessary for Group and the Physicians to fulfill their duties under this Agreement and for the provision of Group quality assurance, audit and billing requirements. Group acknowledges that in performing services hereunder, it shall be part of an "organized health care arrangement" with Hospital for purposes of the privacy and security rules of the Health Insurance Portability and Accountability Act of 1996 and the regulations promulgated thereunder ("HIPAA"). Group agrees to abide by Hospital's policies and procedures regarding HIPAA, including Hospital's Notice of Privacy Practices, and otherwise agrees to abide by all terms and conditions of HIPAA.

5.2      <u>Business Records and Reports.</u> In performing its duties hereunder, Group may generate business or financial records and reports relating to the costs and operation of the Hospital, risk management, and quality control.

5.3      <u>Access to Books and Records.</u> Each party agrees to comply with the following requirements governing the maintenance of documentation to verify the cost of services rendered under this Agreement:

5.3.1      <u>Availability of Records.</u> Until the expiration of four (4) years after the furnishing of services pursuant to this Agreement, each party shall make available, upon written request of the Secretary of Health & Human Services ("HHS"), or upon request of the Comptroller General of the United States, or any of their duly authorized representatives, this Agreement, and books, documents, and records of such party that are necessary to certify the nature and extent of such costs.

**6.      TERM AND TERMINATION**

6.1.      <u>Term</u>. The term of this Agreement shall commence on or before June 15, 2012 (the "Commencement Date"), and shall be for an initial term of three (3) years (the " <u>Term</u>"), unless sooner terminated as provided in this Agreement.

683223.2

6.2     Termination.  This Agreement shall terminate prior to its natural expiration date on or upon the occurrence of any of the following:

(a)     Termination by Agreement.  In the event Hospital and Group mutually agree in writing, this Agreement may be terminated on the terms and date stipulated therein.

(b)     Termination for Group's Breach.  If Group breaches any material provision of this Agreement , including, without limitation, failing to provide the Services enumerated in **EXHIBIT A** and **EXHIBIT B**, Hospital shall notify Group in writing specifying the breach and setting forth a cure period of fifteen (15) days from the date such notice is received ("Cure Period"). If Group fails to cure such breach or fails to cause such breach to be cured within the Cure period, Hospital, in its sole discretion, may terminate this Agreement immediately, upon the expiration of the Cure Period and written notice to Group. Notwithstanding the foregoing, if a breach is cured within the Cure Period but the same or substantially similar breach occurs within a six (6) month period following the expiration of the initial Cure Period, Hospital may immediately terminate  this Agreement without any further opportunity for cure being afforded to Group.

(c)     Termination for Hospital's Breach.   If Hospital breaches any of the material terms of this Agreement, other than for late or non-payment for Services provided (Group's remedies for such being set forth in **EXHIBIT B** and **EXHIBIT D** respectively), Group shall notify Hospital in writing specifying the breach and setting forth the Cure Period. Group, in its sole discretion, may terminate this Agreement immediately upon the expiration of the Cure Period. Notwithstanding the foregoing, if a breach is cured within the Cure Period but the same or substantially similar breach occurs within a six (6) month period following the expiration of the initial Cure Period, Group may immediately terminate this Agreement without any further opportunity for cure being afforded to Hospital.

(d)     Non-performance Due to Lack of Availability of Physicians.  Hospital may immediately terminate this Agreement upon making a good faith determination that Group, for any reason whatsoever, has failed and continues to fail to provide continuous   coverage of the Department and fulfill Group's obligations with respect to Hospitalist Services   after   having given Group written    notification of such a determination and Group's stated or demonstrated inability to restore continuous coverage of the Department  within seventy-two (72) hours of Group's receipt of such notification.

(e)     Immediate Termination.

(1)     Hospital may immediately terminate this Agreement by written notice to Group, without an opportunity for cure or appeal being afforded, upon written notice to Group, in the event: (i) Group fails to remove and replace any Physician as required by **Section 1.2** herein; (ii) Group or any member of the Group Party  is excluded from participation in any federal or state program for the reimbursement         of health care services and Hospital has invoked its right of termination in accordance with the provisions of **Subsection 1.3(i)**  herein; (iii) Group has failed to provide Hospital with the notification of adverse action required pursuant to **Section 1.13**; (iv) Group no longer maintains and/or is able to obtain the liability insurance coverage as required herein; (v) Any member of the Group's Party or any Physician is convicted of or pleads nolo contendere to  a felony; (vi) the  performance or attempted performance of any of Group's or any Physician's obligations   through any physician who does not have privileges on Hospital's Medical staff; or (vii)    closure of the Hospital.

(2)      Group may terminate this Agreement immediately upon written notice to Hospital upon either of the following occurrences: (i) loss of Hospital's licensure; or (ii) Hospital's exclusion from participation in Medicare or Medicaid.

(f)     <u>Not for Cause Termination.</u>  After the conclusion of the initial eighteen (18) months of this Agreement's term (November 30th, 2013) either party may terminate this Agreement, for any reason or no reason, upon the giving of sixty (60) days prior written notice to the other party.

6.3     <u>Post-Termination Obligations.</u> The termination of this Agreement shall not relieve either party of any obligation pursuant to this Agreement which arose on or before the date of termination, and those sections of this Agreement which by their terms extend beyond termination or expiration of this Agreement shall survive and continue in full force and effect after the expiration of the Term or any termination of this Agreement.

6.4     <u>Matters Relating to Medical Staff Membership and Due Process.</u>  Medical staff membership is a condition to the performance of Services under this Agreement. This Agreement is not, however, and shall not be construed as, any form of guarantee or assurance by Hospital that any Physician will obtain or retain medical staff membership or clinical privileges; those matters are governed solely by the bylaws, rules and regulations of the Medical Staff of the Hospital as in effect from time to time. Any due process or other requirements of the bylaws, rules or regulations of the medical staff at Hospital shall not apply to the termination of this Agreement or the removal by Hospital of any Physician from providing services to Hospital hereunder during the Term. Upon the termination of this Agreement, Medical Staff membership shall automatically terminate for all Physicians arranged for by Group.

## 7.     DISPUTE RESOLUTION

7.1     <u>Mediation.</u> Both parties agree, in good faith, to attempt to resolve any dispute which may arise under this Agreement by submitting such dispute for nonbinding mediation.

7.2     <u>Termination.</u> This Section shall not prevent either party from electing to terminate this Agreement in accordance with its termination provisions.

## 8.     RESTRICTIVE COVENANTS

<u>Non-solicitation of Personnel.</u> In recognition that Group expends substantial resources and efforts to make qualified physicians ( "Providers") available to serve as Providers, Hospital agrees during the term of this Agreement including any extensions thereof, and for a period of 24 months after the termination or expiration of this Agreement regardless of cause, Hospital will not directly or indirectly (including, without limitation, through a controlled affiliate) solicit, retain, employ, contract with or otherwise engage or be the beneficiary of the professional services of any Provider who (a) was presented to Hospital by Group as a prospective Provider or (b) provided either administrative or medical services to satisfy Group's obligations under this Agreement at Hospital. In addition, Hospital agrees it will not induce, persuade, or attempt to persuade any Emergency Physician or prospective Emergency Physician to refuse to provide services or terminate his or her relationship with Group, its agents or affiliates. Notwithstanding the provisions of Section 8, Group may, in its sole discretion, elect to waive the provisions of Section 8 for any Emergency Physician subject to such provision; provided however, that Group shall be compensated for each such Emergency Physician in the amount of Fifty Thousand Dollars ($50,000).

## 9.     GENERAL PROVISIONS

- 11 -

9.1     Patient Complaints. The parties agree to cooperate with each other in the resolution of any patient complaints arising out of the services provided hereunder. All patient complaints shall be resolved in accordance with any procedures established by Group and Hospital.

9.2     Corporate Practice of Medicine. Nothing contained herein is intended to constitute the use of a medical license for the practice of medicine by anyone other than a licensed physician, aid (?) Hospital or any other corporation to practice medicine when in fact such corporation is not licensed to practice medicine. The parties specifically acknowledge the following:

(a)     This Agreement contemplates nothing more than the delivery of administrative and coverage services by Group through Group's management and administrative staff, and Group's employed physicians, respectively, to Hospital. Group and the Physicians shall remain entirely independent of Hospital as to the diagnosis and treatment of patients and all other medical, professional and ethical affairs of the Physicians. Group shall ensure that the Physicians accept full responsibility to these patients for the nature and character of all professional medical services rendered.

(b)     There shall be no sharing of profits between Group and Hospital.

(c)     Hospital claims no right, title or interest in any of the assets of Group, none of which shall be used for the benefit of Hospital.

9.3     Relationship of Parties.

(a)     Independent Contractor Status. In performing their responsibilities pursuant to this Agreement, it is understood and agreed that the Physicians performing Services hereunder are at all times acting as independent contractors to the Hospital and that the Physicians are not partners, joint-venturers, or employees of the Hospital. As independent contractors, Hospital shall not be responsible for providing workers compensation insurance, the payment of unemployment fees or taxes, or any of other benefit provided to its employees. If required by the laws of the State of North Carolina, Group shall be responsible for procuring, providing and maintaining workers compensation insurance on a continual basis for the term of this agreement and provide Hospital with a certificate of said coverage. Hospital shall neither have nor exercise any control or direction over the medical judgment of the Physicians nor over the methods or manner by which the Physicians perform their work and functions under this Agreement as they relate to the diagnosis or treatment of any disease, disorder, physical deformity, or injury. Nothing in this Agreement shall alter or is intended to alter the physician-patient relationship. The interest and responsibility of the Hospital is to ensure that the services offered at the Hospital and covered by this Agreement shall be performed and rendered in a competent, efficient, and satisfactory manner. It is expressly agreed that the Physicians will not for any purpose be deemed to be agents, ostensible or apparent agents, or servants of Hospital, and the parties agree to take any and all such action as may be reasonably requested by Hospital to inform the public, patients of the Hospital, and others utilizing the professional services of the Physicians of such fact.

(b)     Compensation, Fringe Benefits, Taxes. Group hereby acknowledges and agrees and shall ensure that the Physicians understand and agree that: (i) each Physician shall not be entitled to any salary or other compensation from Hospital or to any employee benefits provided by Hospital, including, but not limited to disability, life insurance, pension and annuity benefits, educational allowances, professional membership dues, and sick, holiday, or vacation pay; (ii) Hospital will not withhold income taxes or pay Social Security or unemployment taxes for Physicians, such being the exclusive responsibility of Group, which Group agrees to discharge

- 12 -

fully; and (iii) Group shall indemnify and hold harmless the Hospital against any and all liability related to withholding or failure to withhold income taxes or paying or not paying Social Security or unemployment taxes for the Physicians. If the Internal Revenue Service or any other governmental agency challenges the independent contractor status of the Physicians, the parties agree that the Group and the Hospital shall have the right to participate in any discussion or negotiation that occurs in the course of such challenge.

9.4    Conformance with Law. The parties recognize that this Agreement is subject to, and agree to comply with, applicable local, state, and federal statutes, rules and regulations, including without limitation the Medicare and Medicaid Anti-Fraud and Abuse Amendments and applicable state laws and regulations. Group shall comply with all laws, rules and regulations relating to the confidentiality of patient information, including the applicable provisions of North Carolina law and the privacy regulations promulgated pursuant to HIPAA. Any provisions of applicable statutes, rules, or regulations that invalidate any term of this Agreement, that are inconsistent with any term of this Agreement, or that would cause one or both of the parties hereto to be in violation of law shall be deemed to have superseded the terms of this Agreement; provided, however, that the parties shall use their best efforts to accommodate the terms and intent of this Agreement to the greatest extent possible consistent with the requirements of applicable statutes, rules and regulations and negotiate in good faith toward amendment of this Agreement in such respect. In addition, in the event the legal counsel of Group or Hospital, in its reasonable opinion, determines that this Agreement or any material provision of this Agreement violates any federal or state law, rule or regulation, the parties shall negotiate in good faith to amend this Agreement or the relevant provision thereof to remedy such violation in a manner that will not be inconsistent with the intent of the parties or such provision. If the parties cannot reach an agreement on such amendment within 30 days of commencement of renegotiation, however, then either party may terminate this Agreement immediately. This section shall survive the termination of this Agreement.

9.5    Governing Law and Venue. This Agreement shall be construed and governed according to the laws of the State of North Carolina , without giving effect to its conflict of laws provisions.

9.6    No Referral. Nothing contained in this Agreement shall require (directly or indirectly, explicitly or implicitly) any party to refer any patients to any other party or to use any other party's facilities as a precondition to receiving the benefits set forth herein.

9.7    Rights in Property. Group acknowledges and agrees that this Agreement shall not be deemed to grant to Group any rights to Hospital real property, equipment or furnishings.

9.8    Notices. Any notice to a party hereto pursuant to this Agreement shall be given in writing by personal delivery, overnight delivery, or United States certified or registered mail, return receipt requested, addressed as follows:

If to Hospital:                                        If to Group:

Washington County Hospital                 Emergency Staffing Solutions
958 US Highway 64 East                        17304 Preston Road, Suite 1400
Plymouth, NC  27962                            Dallas, Texas 75252
Attn:  CEO                                            Attention: Ron Weiss, CEO

With a copy to:

HMC/CAH Consolidated, Inc.
1100 Main Street, Suite 2350

- 13 -

Kansas City, Missouri 64105
Attn.: Brent Lagergren, Esq.
  VP & Chief Compliance Officer

The parties shall hereafter notify each other in accordance herewith of any change of address to which notice is required to be sent. Notice shall be effective upon delivery.

9.9     Parties Bound. This Agreement and the rights and obligations hereunder shall be binding upon and inure to the benefit of the parties, and their respective heirs, personal representatives, and permitted assigns. This Agreement shall also bind and inure to the benefit of any successor of Hospital by merger or consolidation.

9.10    No Third-Party Beneficiaries. No provision of this Agreement is intended to benefit any person or entity, including, but not limited to any Physician who is not a party to this Agreement, nor shall any person or entity not a party to this Agreement have any right to seek to enforce or recover any right or remedy with respect hereto.

9.11    Non-Waiver. No waiver by either of the parties hereto of any failure by the other party to keep or perform any provision, covenant or condition of this Agreement shall be deemed to be a waiver of any preceding or succeeding breach of the same, or any other provision, covenant or condition.

9.12    Additional Documents. Each of the parties hereto agrees to execute any document or documents that may be reasonably requested from time to time by the other party to implement or complete such party's obligations pursuant to this Agreement.

9.13    Section Headings. The headings preceding the text of the several sections of this Agreement are inserted solely for convenience of reference and shall not constitute a part of this Agreement, nor shall they affect the meaning, construction, or effect of any section hereof.

9.14    Gender and Number. Whenever the context of this Agreement requires, the gender of all words herein shall include the masculine, feminine, and neuter, and the number of all words herein shall include the singular and plural.

9.15    Entire Agreement. This Agreement, including any exhibits or addenda identified and incorporated by reference herein, contains the entire understanding of the parties and supersedes any prior written or oral agreements or understandings between them concerning the subject matter set forth above. There are no representations, warranties, covenants, promises, agreements, arrangements or understandings, oral or written, express or implied among the parties hereto relating to the subject matter set forth above which have not been fully expressed herein.

9.16    Amendments. Only an instrument in writing signed by the parties can amend this Agreement. Amendments to this Agreement shall be effective as of the date stipulated therein.

9.17    Severability. The sections, paragraphs and individual provisions contained in this Agreement shall be considered severable from the remainder of this Agreement and in the event that any section, paragraph or other provision should be determined to be unenforceable as written for any reason, such determination shall not adversely affect the remainder of the sections, paragraphs or other provisions of this Agreement. It is agreed further, that in the event any section, paragraph or other provision is determined to be unenforceable, the parties shall use their best efforts to reach agreement on an amendment to the Agreement to supersede such severed section, paragraph or provision.

- 14 -

9.18   Counterparts. This document may be executed in multiple counterparts, each of which when taken together shall constitute but one and the same instrument.

EXECUTED as of the dates set forth below.

**HOSPITAL**                                              **GROUP**

**CAH ACQUISITION COMPANY #1, LLC**          **EMERGENCY STAFFING**
**d/b/a Washington County Hospital**              **SOLUTIONS, INC.**

By: _____               By: _____

Its: _____ C O O _____                 Its: _____ CEO _____

Date: ___ 4 – 16 – 12 ___                    Date: ___ 4/20/12 ___

- 15 -

**EXHIBIT A**
**Emergency Department Services**

   1. <u>Professional Services.</u>  Subject to the continuing approval of Hospital as described in this Agreement, Group agrees (a) to provide or arrange for emergency department coverage services in the Hospital through its contracted Physicians at the times and in the manner provided for in this Agreement; and (b) to make such Physicians available with respect to all Hospital patients (regardless of financial condition, insurance coverage, or ability to pay) who require emergency medical services in the Hospital. Group shall provide one (1) Physician to be on site at all times during the times set forth in this <u>Exhibit A</u>, for the timely and proper provision of medical services in the Hospital.

   2. <u>Emergency Department Coverage Services.</u>  Group, through its contracted Physicians, shall:

   (a) Examine and treat all persons who present themselves at the Hospital's emergency department (the "Emergency Department") for care or treatment in accordance with the Emergency Medical Treatment and Active Labor Act of 1986 ("EMTALA"), as amended from time to time.;

   (b) Provide timely and appropriate care to patients;

   (c) Respond in a timely manner to requests for needed assistance initiated by a house supervisor in life and/or limb threatening emergencies of hospitalized patients;

   (d) Provide coverage for inpatient cardiac and/or respiratory arrests provided that patients in the Hospital's Emergency Department are not requiring physician supervision and monitoring;

   (e) Communicate any admission to the patient's primary care physician;

   (f) Attend to persons injured in the facility and Hospital personnel with job related injuries, illness, or exposure;

   (g) Complete medical records prior to the end of their next shift worked.

   3. <u>Medical Director Services.</u>  Group will designate a Physician approved by Hospital to be Medical Director of the Emergency Department.  The Medical Director shall be responsible for managing Emergency Department issues on a day-to-day basis, including, without limitation, the following:

   (a) Coordinate the Emergency Department Physician coverage schedule;

   (b) Recommend policies and procedures to Hospital concerning the administration of the Emergency Department;

   (c) Address patient complaints involving Emergency Department Physicians; and

   (d) Act as a liaison among Group, members of the organized Medical Staff of Hospital ("Medical Staff"), and the Hospital.

   4. <u>Location.</u>  Group shall provide the Services at Washington County Hospital in Plymouth,

North Carolina.

5.     <u>Days and Hours; Schedule</u>. Group shall provide Emergency Department coverage twenty-four (24) hours per day, seven (7) days per week.  The schedule for coverage shall be arranged by the Group, approved by and submitted to the Hospital  CEO or its designee and Emergency Department at least five (5) days prior to the first day of each month.

6.     All Physicians covering the Emergency Department shall comply with all Bylaws, Policies, Rules and Regulations of the Hospital, the Medical Staff, and the Physician's department, as well as with all State and Federal laws and regulations regarding the transfer of patients and treatment of Emergency Department patients, including, without limitation, EMTALA.

**EXHIBIT B**
**Hospitalist Services**

1.      <u>Professional Services.</u>  Subject to the continuing approval of Hospital as described in this Agreement, Group agrees (a) to provide or arrange for hospitalist coverage services in the Hospital through its contracted Physicians at the times and in the manner provided for in this Agreement; and (b) to make such Physicians available with respect to all Hospital patients (regardless of financial condition, insurance coverage, or ability to pay) who require medical services in the Hospital. Group shall provide one (1) Physician to be on site or on call at all times during the times set forth in this <u>Exhibit B</u>, for the timely and proper provision of medical services in the Hospital.

2.      <u>Hospitalist Coverage Services.</u>  Group, through its contracted Physicians, shall:

(a)      Provide professional hospitalist on-call coverage services twenty-four (24) hours a day, seven (7) days a week, as scheduled, for all Emergency Department adult patients and all requests for transfers or inpatient referrals requiring specialty evaluation, treatment, consultation, admission, and/or follow-up;

(b)      Respond with a timeframe required by the patient's medical condition;

(c)      Respond within sixty (60) minutes or less, in person, when requested by the Emergency Department physician;

(d)      Respond within thirty (30) minutes by phone, if asked to respond by phone, to any request for Emergency Department patient phone consultation and subsequent follow-up;

(e)      Communicate any admission to the patient's primary care physician;

(f)      Perform an admission History and Physical;

(g)      Call in specialists, as needed;

(h)      Manage the patient's discharge summary and provide a copy to the patient's referring or primary care physician;

(i)      Communicate a patient's discharge to his or her primary care physician with a review of discharge orders;

(j)      Make daily rounds on inpatients assigned by Hospital and provide appropriate progress note documentation;

(k)      Make additional afternoon rounds for Hospital's Intensive Care Unit and seriously ill patients; and

(l)      Should Physician be unable to carry out his call responsibilities, Physician shall make arrangements for proper care of emergency patients until such time as Physician is able to personally attend to the patient's needs (arrangements for proper care of emergency patients must be made with a physician already credentialed at Hospital); and

(m)     Provide timely initial inpatient care for all patients (the local Physician on-call at the time of the referral shall provide follow-up care for such patients regardless of patient's ability to pay for services at the time of the first visit).

Hospital shall utilize a pager provided by the Hospital to each Physician as the primary method of contacting the Physician while on service.

3.     <u>Medical Director Services.</u>  Group will designate a Physician to be Medical Director of the Services provided under this Agreement.  The Medical Director shall be responsible for managing the Services on a day-to-day basis, including, without limitation, the following:

(a)     Present qualified physicians to become Hospitalist Physicians upon approval by Hospital;

(b)     Coordinate Hospitalist Physician coverage schedule;

(c)     Recommend policies and procedures to Hospital concerning administration of the Hospitalist Department;

(d)     Address patient complaints involving Hospitalist Physicians; and

(e)     Act as liaison among Group, Hospitalist Physicians, organized members of the Medical Staff of Hospital ("Medical Staff"), and administration of the Hospital ("Hospital Administration").

4.     <u>Location</u>.  Group shall provide the Services at Washington County Hospital in Plymouth, North Carolina.

5.     <u>Days and Hours; Schedule</u>. Group shall provide hospitalist coverage twenty-four (24) hours per day, seven (7) days per week.  The schedule for coverage shall be arranged by the Group and provided to the Hospital CEO or its designee at least five (5) days prior to the first day of each month. Onsite hospitalist coverage is provided daily from 7:00 a.m. to 5:00 p.m.

6.     All Physicians providing the Services shall comply with all Bylaws, Policies, Rules and Regulations of the Hospital, the Medical Staff, and the Physician's department, as well as with all State and Federal laws and regulations regarding the transfer of patients and treatment of patients.

7.     Physician shall accept direct admissions from physicians in the community with established clinic practices (the "<u>Community Physician</u>") on a direct physician to physician communication basis.  Community Physician may handoff hospitalized patients to Physician and Physician shall accept such handoff on a physician to physician communication basis only.

8.     Physician shall consult on any patient as requested by a Community Physician on a physician to physician communication basis.

9.     Group and Hospital agree that the Emergency Department physician providers shall be responsible for providing all services covered under this agreement.

**EXHIBIT C**
**Compensation for Emergency Department Services**

A.      Hospital agrees to pay Group $51,502.00 per month for Services related to ED coverage.

B.      Hospital shall have the right to bill and receive fees and/or reimbursement from patients and third party payors for all services provided in Hospital otherwise known as technical component services.

B.      Hospital will be billed twice monthly and agrees to pay invoice in full within 10 days of receipt of an invoice therefore.  Any invoice not paid within 15 days of receipt shall accrue interest on the unpaid amount at the annual rate of the 18%.  Notwithstanding any other provision in this Agreement, Group may immediately terminate this Agreement at any time without notice if payment for services is not received by the 45th day after the invoice is mailed.

C.      Minimum Volume Threshold  - During the term of this Agreement,  Group shall have the sole and exclusive right and responsibility for the billing and collection of all fees and reimbursement relating to all Professional Component Services rendered by the Group and its Physicians. In addition to the compensation set forth above, Hospital agrees  to compensate Group at the rate of Ninety-Eight and no/100 ($98.00) per patient per month for the difference between  the monthly Minimum Volume Threshold of Five Hundred Fifteen (515) patients  and the number of patients actually seen in any given month, if less, , averaged on a calendar quarter basis.

## EXHIBIT D
### Compensation for Hospitalist Services

Services related to hospitalist services provided by the Group that are professional physician services reimbursed by third party payors under a professional component shall be referred to herein as the "Professional Component Service(s)". The parties agree that the Group shall bill the responsible patients or third party payors for the Group's Professional Component Service charges and shall retain all proceeds of collections therefrom.

During the Term of this Agreement, the Group shall have the sole and exclusive right and responsibility for the billing and collection of all fees and reimbursement relating to all Professional Component Services rendered by the Group and its physicians.

Hospital shall have the right to bill and receive fees and/or reimbursement from patients and third party payors for all services provided in Hospital (Technical Component Services). Medical records of patients provided services pursuant to the Agreement are the property of Hospital.


Hospital agrees to pay Group $4000.00 per month.

A.     Hospital will be billed twice monthly and agrees to pay invoice in full within 10 days of receipt of an invoice therefore. Any invoice not paid within 15 days of receipt shall accrue interest on the unpaid amount at the annual rate of the 18%. Notwithstanding any other provision in this Agreement, Group may immediately terminate this Agreement at any time without notice if payment for services is not received by the 45th day after the invoice is mailed.

B.     During the term of this Agreement, The Group shall have the sole and exclusive right and responsibility for the billing and collection of all fees and reimbursement relating to all Professional Component Services rendered by the Group and its Physicians

**EXHIBIT E**

**STATEMENT OF ACCEPTANCE**

The undersigned Group Physicians hereby certify that they have been given a summary of the applicable provisions of the foregoing Emergency Department Coverage and Hospitalist Services Agreement ("Agreement") between Emergency Staffing Solutions, Inc. ("Group") and Washington County Hospital ("Hospital") and agree to observe and be bound in their individual capacity by all of the applicable terms, conditions and provisions set forth in the identified provisions of such Agreement. The undersigned also agree to adhere to all applicable Hospital and Medical Staff Bylaws, Rules, Regulations, policies and procedures during the term of this Agreement.

The undersigned specifically acknowledge that they have read the information provided above and understand their duties under the Agreement, including without limitation, Section 1.1, Group and Group Physician Obligations, Subsection 1.3(a), Physician Qualifications, Section 1.4, Reports and Records, Section 1.10 Liability Insurance, Section 1.2, Hospital Approval, Section 1.11 Compliance Obligations, Section 1.12, Physicians' Responsibilities with Respect to Patients, Section 1.13, Notification of Investigation or Adverse Action, Section 1.15, Appointment of Medical Director for Emergency Department and Hospitalist Services (if applicable) and accompanying **EXHIBITS A and B,** Section 1.16,  Section 4.2, Proprietary Information, and Section 6.4, Matters Relating to Medical Staff Membership and Due Process.

In addition to the covenants set forth above, the undersigned represent and warrant that they are not now listed by any federal or state agency or program (including, without limitation, Medicare, Medicaid and Tricare) as debarred, suspended or excluded from participation. The undersigned acknowledge that this is an ongoing representation and warranty and that they have an affirmative duty to notify Hospital if they subsequently become debarred, suspended or excluded from any of the aforementioned programs.

_____ Date: _____

_____ Date: _____

_____ Date: _____

_____ Date: _____

_____ Date: _____

1

# Exhibit A-2

## FIRST AMENDMENT

THIS FIRST AMENDMENT is made and entered into as of the 20th day of October, 2012, by and between EMERGENCY STAFFING SOLUTIONS, INC., (hereinafter referred to as "Group") and CAH ACQUISITION COMPANY #1, LLC d/b/a Washington County Hospital (hereinafter referred to as "Hospital").

### WITNESSETH:

WHEREAS, the parties entered into a certain Emergency Department Coverage and Hospitalist Services Agreement on or about the 1st day of June, 2012 (hereinafter referred to as "Agreement"); and

WHEREAS, the parties desire to amend the Agreement as set forth below.

NOW, THEREFORE, in consideration of the promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.      The following provision is added to EXHIBIT C of the Agreement, intending it to be effective for the period beginning June 1st, 2012 and expiring October 31st, 2012, and replaces item "A" as originally written which is hereby deleted in its entirety:

> "A.     Hospital agrees to pay Group $69,426.50 per month for Services related to ED coverage."

2.      The following provision is added to EXHIBIT C of the Agreement, intending it to be effective November 1st, 2012 and replaces item "A", as amended, which is hereby deleted in its entirety:

> "A.     Hospital agrees to pay Group $62, 464.25 per month for Services related to ED coverage."

3.      Effective November 1st, 2012, EXHIBIT B and EXHIBIT D and any references thereto in the Agreement are hereby removed and shall have no further effect.

4.      The following provision is added to the Agreement:

> "Physician Performance Overview. Effective November 1st, 2012, Group will produce and provide Hospital with the quarterly document known as "Physician Performance Overview" which will provide productivity measures and comparisons for each Group physician providing ED coverage services hereunder. In addition Group shall, upon Hospital's reasonable request, provide comparable information for any specific Group physician so identified by Hospital."

5.      The following provision is added to the Agreement and replaces Section 8. RESTRICTIVE COVENANTS, as originally written, which is hereby removed in its entirety:

> "Non-Solicitation of Personnel. In recognition that Group expends substantial resources and efforts to make qualified physicians ("Providers") available to serve as Providers, Hospital agrees during the term of this Agreement , including any extensions thereof, and for a period of 24 months after the termination or expiration of this Agreement, regardless of cause, Hospital will not directly or

indirectly (including, without limitation, through a controlled affiliate) solicit, retain, employ, contract with or otherwise engage or be the beneficiary of the professional services of any Provider who (a) was presented to Hospital by Group as a prospective Provider or (b) provided either administrative or medical services to satisfy Group's obligations under this Agreement at Hospital. In addition, Hospital agrees it will not induce, persuade, or attempt to persuade any Provider or prospective Provider to refuse to provided services or terminate his or her relationship with Group, its agents or affiliates. Group may, in its sole discretion, elect to waive the provisions of this restrictive covenant for any Emergency Physician subject to such provision; provided, however, that Group shall be compensated for each such Provider in the amount of Fifty Thousand and no/100 Dollars ($50,000.00). The foregoing notwithstanding, this provision shall not apply to those physicians who have had a previous relationship with Hospital, through employment, service contract and/or medical staff membership prior to the date of this Agreement and subsequently entered into a contractual relationship with Group."

6.      This Amendment will not be deemed accepted by either party unless and until it has been signed by a duly authorized representative of each party.

7.      Except as modified herein, the Agreement between the parties hereto is otherwise hereby ratified, confirmed and approved, and will remain in full force and effect in accordance with its terms.

IN WITNESS WHEREOF, the parties have hereby caused this Amendment to be executed by their authorized officers as of the day and year first set forth above.

CAH ACQUISITION COMPANY #1, LLC d/b/a
Washington County  Hospital

By: _____
    Trent Skaggs, Chief Operating Officer

EMERGENCY STAFFING SOLUTIONS, INC.

By: _____

2

# Exhibit A-3

**4:42 PM**

**10/16/13**

**Accrual Basis**

**Emergency Staffing Solutions, Inc.**
# Customer Open Balance
**All Transactions**

| Type | Date | Num | Memo | Due Date | Open Balance | Amount |
|------|------|-----|------|----------|-------------|--------|
| **Washington County Hospital** | | | | | | |
| Invoice | 9/30/2012 | 28590 | | 4/24/2013 | 8,962.25 | 8,962.25 |
| Invoice | 9/30/2012 | 28591 | | 5/24/2013 | 8,962.25 | 8,962.25 |
| Invoice | 3/31/2013 | 29421 | | 7/4/2013 | 10,672.20 | 10,672.20 |
| Invoice | 4/15/2013 | 29176 | | 4/25/2013 | 31,232.13 | 31,232.13 |
| Invoice | 4/30/2013 | 29232 | | 5/10/2013 | 31,232.12 | 31,232.12 |
| Invoice | 5/15/2013 | 29274 | | 5/25/2013 | 31,232.13 | 31,232.13 |
| Invoice | 5/31/2013 | 29337 | | 6/15/2013 | 588.71 | 588.71 |
| Total Washington County Hospital | | | | | 122,881.79 | 122,881.79 |
| **TOTAL** | | | | | **122,881.79** | **122,881.79** |

# Exhibit A-4



**Emergency Staffing Solutions, Inc.**
Dallas, Texas 75252
17304 Preston Road, Suite 1400

# Invoice

| Date | Invoice # |
|------|-----------|
| 3/16/2015 | 31760 |

Bill To

Washington County Hospital
958 U.S. Hwy 64 East
Plymouth, NC  27962

| Terms | Due Date |
|-------|----------|
| Net 10 Days | 3/26/2015 |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| Finance Charges on Overdue Balance - Interest accrued at annual rate of 18% from date invoice was due per contract | | 0.00 | 0.00 |
| Finance Charges on Overdue Balance: Invoice #28590 due 4/24/13 | | 3,058.46 | 3,058.46 |
| Finance Charges on Overdue Balance: Invoice #29176 due 4/25/13 | | 10,642.88 | 10,642.88 |
| Finance Charges on Overdue Balance: Invoice #29232 due 5/10/13 | | 10,411.85 | 10,411.85 |
| Finance Charges on Overdue Balance: Invoice #28591 due 5/24/13 | | 2,925.87 | 2,925.87 |
| Finance Charges on Overdue Balance: Invoice #29274 due 5/25/13 | | 10,180.82 | 10,180.82 |
| Finance Charges on Overdue Balance: Invoice #29337 due 6/15/13 | | 185.81 | 185.81 |
| Finance Charges on Overdue Balance: Invoice #29421 due 7/04/13 | | 3,268.32 | 3,268.32 |

| Phone No. | Fax No. |
|-----------|---------|
| (972)934-3200 x161 | (866)801-1126 |

| Email Address |
|---------------|
| ap@essdoc.com |

| | |
|---|---|
| **Total** | $40,674.01 |
| **Payments/Credits** | $0.00 |
| **Balance Due** | $40,674.01 |

# Exhibit A-5

## EMERGENCY DEPARTMENT COVERAGE AND HOSPITALIST SERVICES AGREEMENT

THIS EMERGENCY DEPARTMENT COVERAGE AND HOSPITALIST SERVICES agreement ("Agreement"), effective August 1st , 2012 (the "Effective Date") is made and entered into by and between Emergency Staffing Solutions, Inc. ("Group") and CAH  ACQUSITION COMPANY 10, LLC d/b/a Yadkin Valley Community Hospital ("Hospital").

## RECITALS

WHEREAS, Hospital is a critical access  hospital located at 624 West Main Street, Yadkinville, North Carolina 27055 that provides health care services to patients in its community (including indigent patients) utilizing its facilities;

WHEREAS, Group is an emergency department and hospitalist management company that provides administrative services to hospitals, including arranging for Hospital's emergency department ("Department") and hospitalist management services;

WHEREAS, Group contracts with physicians who are duly licensed and registered to practice medicine in the State of North Carolina and are qualified to provide the Services (each, a "Physician" and collectively the "Physicians"); and

WHEREAS, Group desires to provide  coverage  for the Department and hospitalist management services to the Hospital ("Services"), and Hospital desires to contract with Group for such Services so that Hospital may better fulfill its mission of providing or arranging to provide certain health care services to patients (including indigent patients) utilizing Hospital's facilities.

NOW THEREFORE, in consideration of the mutual promises of the parties hereto, and of the covenants and conditions hereinafter expressed, the parties hereby agree and covenant, each with the other, as follows:

## 1. SPECIFIC DUTIES OF GROUP

1.1     Group and Group Physician Obligations.   Group's functions and duties under this Agreement are wholly administrative and relate exclusively to staffing the Department with Physicians who shall provide Services pursuant  to independent contractor agreements with Group, assuring Physicians' performance of their collective obligations herein, assuring Department coverage in accordance with the terms and conditions of EXHIBIT A, which is attached and incorporated by reference, assuring the provision of Medical Director Services in accordance with EXHIBIT A herein , scheduling Physicians' hours of service, assuring hospitalist service coverage in accordance with EXHIBIT B, which is attached and incorporated by reference, and performing the other administrative obligations required herein. Group shall assure that its Physicians shall provide medically necessary Services, diagnoses and treatment to patients as determined to be necessary by such Physicians and required by the Emergency Medical Treatment and Active Labor Act of 1986 ("EMTALA"), as amended from time to time. Each Physician approved for placement at Hospital shall accept such placement through his or her executed Statement of Acceptance which is attached as EXHIBIT E and incorporated by reference.  Any change in the scope of work set forth herein resulting in Group's compensation shall be evidenced by an amendment to this Agreement.

1.2     Hospital Approval. Notwithstanding the foregoing, Hospital shall have the right to approve each Physician that Group designates to provide Services in the Hospital, prior to the assignment

- 1 -

of any Physician to the Hospital.  Hospital agrees to require no more onerous provisions for acceptance of Group's Physicians than are applicable to other physicians in accordance with the rules, regulations and bylaws of the Medical Staff of Hospital. Hospital further agrees that it will grant temporary privileges to Group's Physicians as requested and as qualified.  In addition, after Physicians assigned to the Hospital are initially approved by the Hospital, Hospital shall, upon the occurrence of any of the following with respect to any Physician, have the right at any time (i) to insist on the immediate removal and replacement of any Physician that Group has assigned to provide Services under this Agreement in the Hospital, and (ii) upon prior notice to Group, to refuse any Physician permission to utilize any Hospital facility for purposes of providing Services under this Agreement, upon the occurrence of any of the following:

(a)     Failure by such Physician to meet the qualifications required of the Physicians under this Agreement, including being approved for membership of the Medical Staff of the Hospital pursuant to the Medical Staff Bylaws;

(b)     Death of Physician;

(c)     Suspension, cessation or loss of Physician's (i) qualifications or unrestricted license to practice medicine in the State of North Carolina (including by reason of failure to meet continuing medical education requirements); (ii) state or federal authorization to administer or prescribe controlled substances;   (iii ) Hospital medical staff privileges; or (v) malpractice insurance coverage;

(d)     Physician's debarment, suspension or exclusion from any federal or state program for the reimbursement of health care services;

(e)     Permanent disability (ill health or other disability) of such Physician which prevents or makes inadvisable his or her continued practice of medicine as contemplated by this Agreement;

(f)     Reasonable determination by Hospital that such Physician has , or continues to engage in conduct that constitutes a threat to the health, safety or welfare of any Hospital patient, employee or visitor; ;

(g)     Conviction of such Physician of a felony;

(h)     Violation by such Physician of any term of Hospital's policies or Medical Staff Bylaws as they exist from time to time following notification of such violation by Hospital to Group and the failure to cure the same within thirty (30) days thereafter; or

(i)     Restrictions, sanctions or other actions by any regulatory, credentialing or certifying body or any insurance provider.

1.3     Representations and Warranties of Group. Group hereby represents and warrants to Hospital as follows:

(a)     Physician Qualifications. . Each Physician providing Services hereunder shall  at all times during the term of this Agreement; (i) hold a valid and unrestricted license to practice medicine in the State of North Carolina; (ii) maintain proficiency through board certification, board eligibility, training and/or experience in the practice of emergency medicine; (iii) be a member of Hospital's Medical Staff  with all the attendant privileges and responsibilities of membership; (iv) maintain a DEA license to prescribe controlled substances and a similar state

registration; and maintain the insurance coverage required by Section 1.10 herein.  With respect to each Physician, Group represents and warrants that such Physician's license to practice medicine and certificate to prescribe controlled substances in the State of North Carolina or in any other jurisdiction has never been denied, terminated, suspended, probated, revoked, voluntarily relinquished under threat of disciplinary action or restricted in any way.

      (b)    <u>Medicare/Medicaid Participation.</u>  During the term of this Agreement, each Physician shall be authorized to participate in the Medicare and Medicaid Programs.

      (c)    <u>Disclosure.</u>  Group and each Physician shall immediately notify Hospital in the event any representation concerning a Physician set forth in this Agreement within the knowledge of Group or such Physician shall no longer be true, correct or complete.

      (d)    <u>Authority.</u>  Group represents and warrants to Hospital that Group has the power and authority to obligate the Physicians to perform the duties of the Physicians pursuant to this Agreement. Group agrees to so obligate the Physicians.

      (e)    Group is a for-profit corporation duly organized and validly existing under the laws of the State of Texas that is authorized to conduct business in the State of North Carolina.

      (f)    Group has all requisite corporate power and authority to enter into this Agreement and to perform its obligations under this Agreement. This Agreement has been duly authorized, executed and delivered by Group and is a legal, valid and binding obligation of Group, enforceable in accordance with its terms.

      (h)    The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby by Group will not violate any provisions of, or constitute a default under, any contract or other agreement to which Group is a party or by which it is bound, or conflict with its Articles of Incorporation or bylaws.

      (i)    Neither Group nor any of its officers, directors, partners or employees providing Services hereunder ("Group Parties") are now  listed by any federal agency or program (including but not limited to Medicare and Tricare) as debarred, suspended or excluded or is now debarred, suspended or excluded from any Medicaid program or any other state or local program for the reimbursement of health care services, Group and Group Parties acknowledge that this is an ongoing representation and warranty and agree to immediately notify Hospital in writing in the event that either  Group or a Group Party cease to be eligible or is debarred, suspended or is excluded from any of the aforementioned programs at which time this agreement may be immediately terminated by Hospital, in its sole discretion.

1.4    <u>Reports and Records.</u>  Group shall be responsible for assuring that each Physician providing services hereunder maintains or causes to be maintained accurate, legible and complete records and files of all required information pertaining to the clinical services they perform, including individual patient charts. All records and reports shall be prepared in accordance with Hospital's policies and procedures and the Bylaws, Rules and regulations of its Medical Staff. **Group shall assure that its Physicians put forth their best efforts to complete such records and reports immediately after services are performed; however, if such records and reports are not completed at the point of service or immediately thereafter, and absent a showing of good cause (e.g. illness, family emergency, short term disability) Group shall assure that such records are completed and delivered**

to Hospital's Medical Record Department no later than five (5) days after the date services are provided. On those occasions where good cause has been shown, all such records shall be completed and submitted to Hospital within fifteen (15) days after the date of service. The foregoing notwithstanding, in the event this Agreement is terminated by either party for any reason or is not renewed for any reason at the end of the term hereof, then all reports and records required hereunder shall be completed and delivered to the Hospital within thirty (30) days after the effective date of termination or the last date of the term, as applicable. Group shall cause to be prepared and filed such additional or supplementary reports as Hospital may reasonably request, including, but not limited to, any reports or records Hospital deems necessary to establish the value of the Services provided hereunder. All reports, records and supplementary documents prepared in connection with the Services provided hereunder (which shall include all documents relating to patient care but not Group's business records) shall be the sole property of and within the sole control of Hospital. Group agrees to make available on reasonable dates and at reasonable times and places any Physician providing Services hereunder and all documents reasonably related thereto for the purposes of any litigation, investigation or review with which Hospital may become involved.

      1.5     <u>Quality Assurance/Utilization Review and Peer Review Programs.</u>  Group, through its Physicians shall have knowledge of and assist Hospital in developing, implementing, monitoring and reviewing the Hospital's quality assurance, utilization review, performance improvement and peer review programs, procedures, guidelines and policies which relate to the Hospital and as required by Hospital policies, by Medicare law and regulations, by the standards or reports of Det Norske Veritas Healthcare, Inc. ("DNV") , and/or other regulatory, licensing or accrediting agencies. If any regulatory, accrediting, or licensing agency should determine that the Hospital does not meet or exceed the acceptable standards prescribed and which are the responsibility of Group to satisfy under this Agreement, any and all action necessary to effect compliance shall be taken by Group within a reasonable time (not to exceed thirty (30) days unless otherwise agreed) after the details of noncompliance and steps necessary to effect compliance are given by notice to Group. In addition to the foregoing, Group and its Physicians shall comply with any and all procedures, guidelines and policies relating to Hospital's quality assurance, utilization review, peer review, risk management and safety programs. Hospital shall have knowledge of and assist Group in developing, implementing, monitoring and reviewing Hospital's quality assurance, utilization review, performance improvement and peer review programs, procedures, guidelines and policies which relate to the Group in its provision of services to Hospital in accordance with Group policies provided to Hospital, Medicare laws and regulations and/or other regulating, licensing or accreditation agencies.

      1.6     <u>Reimbursement.</u>  Group and each Physician shall cooperate with Hospital and its employees as reasonably requested in the completion of any forms necessary for third party reimbursement.

      1.7     <u>Education.</u>  Group shall ensure that each Physician participates for reasonable periods of time in the educational programs conducted by Hospital and performs such other teaching functions within Hospital as Hospital reasonably deems necessary to assure Hospital's compliance with requirements of accrediting bodies.

      1.8     <u>Incurring Financial Obligation.</u>  Group agrees and acknowledges that neither it nor any Physician has any right, power or authority to incur and will not incur any financial obligation, legal obligation or liability, or other obligation on behalf of, or binding upon, Hospital.

      1.9     <u>Professional Expenses.</u>  Group shall be solely responsible for all personal and professional expenses incurred by it or any person provided by Group to render Services under this Agreement.

- 4 -

1.10    Liability Insurance.

(a)    Physicians' Coverage Requirements. Group shall obtain and maintain, and shall ensure that each Physician obtains and maintains, professional liability insurance with minimum limits of One Million and no/100 Dollars ($1,000,000.00) per occurrence and Three Million and no/100 Dollars ($3,000,000.00) annual aggregate. All policies described above shall provide that Hospital be given written notice no less than thirty (30) days prior to cancellation or material change of the policy. Group further agrees to provide evidence of the above coverage to Hospital either by providing copies of policies or certificates of insurance within thirty (30) days of the effective date of such coverage.

(b)    Tail Coverage.  Upon the termination or expiration of this Agreement, for the policy or policies obtained pursuant to this Section which are "claims made" insurance rather than "occurrence" insurance, Group shall either (i) purchase "tail" coverage to continue the liability insurance coverage in effect during the term hereof or (ii) continue in full force and effect the same level of liability insurance coverage on a claims made basis until the longest statute of limitations for professional and general liability for acts committed has expired (recognizing that the statute of limitations for minors is tolled until they reach the age of majority).  Group shall provide evidence of such coverage to Hospital within thirty (30) days of request by Hospital.

(b)    General Indemnity.  Except as may otherwise be provided in this Agreement, each party shall be responsible for its own acts and omissions and any and all claims , liabilities, injuries suits, demands and expenses of all kinds which may result or arise out of any alleged malpractice or neglect caused or alleged to have been caused by either party or their respective employees or representatives in the performance of their responsibilities hereunder.

1.11    Compliance Obligations.

(a)    Rules, Regulations, Policies and Directives.   As a continuing condition of this Agreement, Group and each Physician shall comply with and provide the Services in accordance with (i) the standards of DNV , (ii) the bylaws, rules, regulations and policies of Hospital; (iii) the Bylaws, Rules, Regulations and policies of the Medical Staff of the Hospital; and (iv) the Principles of Ethics adopted by the American Medical Association, as such principles are amended from time to time. Group hereby specifically acknowledges and agrees that pursuant to The Joint Commission standards, Hospital retains certain obligations regarding patient care and services within Hospital facilities.

(b)    Compliance with Law.   The Services shall be provided in accordance with all applicable provisions of law and other rules and regulations of any governmental authority relating to the activities contemplated by this Agreement, including, without limitation, EMTALA, as amended from time to time.

(c)    Corporate Compliance Program. Group acknowledges that Hospital and its parent organization, HMC/CAH Consolidated, Inc. ("HMC") have established a corporate compliance program ("Program"), the goal of which is to promote compliance with federal, state and local laws and regulations within all HMC organizations and affiliates. The program specifically focuses on risk identification and management, the promotion of good corporate citizenship, the commitment to upholding a high standard of ethical business practices and the prevention of misconduct. Group shall be responsible for ensuring that each Physician providing Services pursuant to this Agreement acknowledges Hospital's commitment to the Program and

- 5 -

agrees to conduct all business transactions required by this Agreement in accordance with the highest ethical standards and all applicable laws, regulations and statutes.

1.12    Physicians' Responsibilities with Respect to Patients. No Physician providing Services arranged pursuant to this Agreement is an employee of Hospital. Nothing herein shall be construed as giving that degree of control or direction on the part of Hospital that creates an employer-employee relationship between Hospital and any Physician. Hospital shall not control or direct the practice of medicine. All Physicians providing services in any Hospital facility shall:

(a)    Provide the necessary medical services in a manner so that the medical needs of each patient are met consistent with Hospital and medical staff bylaws, rules, regulations, and policies and patient expectations.

(b)    Be cognizant of the manner in which patients are received, the efforts to meet their needs, and other aspects of courtesy, compassion and sound nursing and medical care for every patient.

Notwithstanding anything contained herein to the contrary, no rule or regulation contained in this Agreement shall operate to delay medical treatment when immediate attention is required. The parties acknowledge the primary purpose of this Agreement is to make medical services available to the Hospital's patients in the Hospital (including indigent patients) at all times.

1.13    Notification of Investigation or Adverse Action. Group shall notify the chief Executive Officer of the Hospital, in writing, within seventy-two (72) hours of Group or any Physician providing Services hereunder receiving notice by any means of any change made, proposed or investigation relating to, or any adverse action taken with respect to: (i) the license of any Physician to practice in the State of North Carolina or any other state; (ii) any Physician's DEA or state controlled substance registration; (iii) the imposition of terms of probation or other limitation on Group or any Physician by any state or federal agency or program; (iv) the loss, suspension or restriction of medical staff membership or associated clinical privileges of any Physician at any other health care facility or organization; (v) an adverse determination by a peer review organization or third party payor with respect to Group or any Physician for reasons associated with quality of care; (vi) the commencement of a formal investigation with respect to or the filing of charges against Group or any Physician providing Services hereunder by the Department of Health and Human Services or any state Medicaid fraud control unit; (vii) the final debarment, suspension or exclusion of Group or any Physician providing Services hereunder from any federal or state program for the reimbursement of health care services; (viii) the filing of any claim alleging negligence and/or medical malpractice at Hospital. The failure to provide notice as required by this subsection shall be cause for immediate termination pursuant to Subsection 6.02(e)(iii) herein.

1.14    Substitute Coverage. Hospital acknowledges that Group's Physicians shall be entitled to absences from their duties hereunder due to illness, vacation, medical conferences and other professional and personal activities. However, it shall remain the responsibility of Group to manage and coordinate the schedules of each Physician, to the extent necessary, to assure that Services provided to Hospital are continuous and uninterrupted. To the extent Group utilizes any substitute physicians to provide Services hereunder, each must at all times meet the qualifications set forth in Subsection 1.3(a) and be approved in advance by Hospital's CEO.

1.15    Appointment of Medical Director for Hospital's Emergency Department and Hospitalist Services. Group shall appoint one (1) Physician to serve as medical director ("Medical Director") of both the Department and Hospitalist Services, subject to the prior approval of the Hospital, during the term of this Agreement and any subsequent renewal terms thereafter, such Medical Director serve in accordance with the terms and conditions set forth on **EXHIBIT A** and **EXHIBIT B**.

- 6 -

(a)     Absence. If Medical Director is unable for any treason to perform the duties prescribed on **EXHIBIT A**, Group shall appoint another Physician as acting Medical Director during any absence necessitated by Medical Director's inability to perform his or her prescribed duties. All references herein to the aforementioned Medical Director's responsibilities shall include any Physician serving as medical Director in the Medical Director's absence.

(b)     Initial Department and Hospitalist Services Medical Director. As of the Effective Date of this Agreement Group    shall    appoint    William   Wise,   MD,   Regional   Medical Director for Group to serve as interim Medical Director of the    Department    and    Hospitalist Services until a permanent appointment can be made. Upon     Group's    appointment    of    a permanent Medical Director which shall be evidenced by an executed    Statement             of Acceptance any and all appointments thereafter, other than those to fill temporary absences, shall be evidenced by an amendment to this Agreement.

## 2.     HOSPITAL OBLIGATIONS

2.1     Space & Equipment. Hospital shall make available during the term of this Agreement the space and equipment it deems is reasonably necessary for the proper operation of the Hospital including the provision of Services by the Physicians. Such requirements shall, at a minimum, include, but not be limited to: sleep room for a Physician, desk, filing space, access to computer with internet access, and capabilities reasonably acceptable to Group. Hospital shall furnish Hospital with utilities, housekeeping, laundry and other services, as it deems reasonably necessary for the proper operation of the Hospital.

2.2     Supplies. Hospital shall purchase all supplies reasonably necessary for the proper operation of the Hospital, including the provision of Services.

2.3     Personnel Provided by Hospital. Hospital shall make available during the term of this Agreement such personnel that it deems reasonable and necessary for the effective operation of the Hospital, including nurses and other para-medical personnel, laboratory and x-ray technicians, and respiratory therapists. The selection and retention, as well as direction and control of such personnel in administrative matters, shall at all times rest solely with Hospital. Such personnel are employees, volunteers or contractors of Hospital.

2.4     Reimbursement. Hospital shall cooperate with Group and its employees or representatives as reasonably requested in the completion of any forms necessary for third party reimbursement.

2.5     Incurring Financial Obligation. Hospital agrees and acknowledges that neither it nor its officers, employees, contractors nor representatives of any kind have any right, power or authority to incur and will not incur any financial obligation, legal obligation or liability, or other obligation on behalf of, or binding upon, Group.

2.6     Quality Assurance/Utilization Review and Peer Review Programs. Hospital shall have knowledge of and assist Group in developing, implementing, monitoring and reviewing Hospital's quality assurance, utilization review, performance improvement and peer review programs, procedures, guidelines and policies which relate to the Group in its provision of services to Hospital in accordance with Medicare laws and regulations and/or other regulating, licensing or accreditation agencies.

- 7 -

3.      **COMPENSATION ARRANGEMENT**

3.1     <u>Compensation for Services.</u> In exchange for the performance by Group and the Physicians of the Services required under this Agreement, Hospital will compensate Group as set forth on **EXHIBIT C** and **EXHIBIT D** respectively which are attached hereto and incorporated herein by reference.

4.      **CONFIDENTIALITY**

4.1     <u>Agreement.</u> Group agrees to, and ensures that each Physician will, keep this Agreement and its contents confidential and not disclose this Agreement or its contents to any third party, other than its attorneys, accountants, and other engaged third parties, unless required by law, without the written consent of the Hospital. Hospital agrees to keep this Agreement and its contents confidential and not disclose this Agreement or its contents to any third party, other than its attorneys, accountants, and other engaged third parties, unless required by law, without the written consent of Group.

4.2     <u>Proprietary Information.</u> Group acknowledges that in connection with the performance of the Services under this Agreement, Group and the Physicians will be acquiring and making use of certain confidential information and trade secrets of Hospital which may include management reports, financial statements, internal memoranda, reports, patient and customer lists, confidential technology, business connections, payors, managed care strategies, reimbursement methodologies, past performance, future prospects, strategic initiatives and other materials, records and/or information of a proprietary nature ("<u>Hospital Confidential Information</u>"). Therefore, in order to protect the Hospital Confidential Information, Group and the Physicians shall not after the date hereof use the Hospital Confidential Information except in connection with the performance of the Services pursuant to this Agreement, or divulge the Hospital Confidential Information to any third party, unless Hospital consents in writing or such use or divulgence or disclosure is required by law. In the event Group or any Physician receives a request or demand for the disclosure of Hospital Confidential Information, the party receiving such request or demand shall immediately provide written notice to Hospital of such request or demand, including a copy of any written element of such request or demand. Upon termination of this Agreement, neither Group nor any Physician, will take or retain, without prior written authorization from Hospital, any papers, patient lists, fee books, patient records, files, or other documents or copies thereof or other Hospital Confidential Information of any kind belonging to Hospital. Without limiting other possible remedies for the breach of this covenant, the parties agree that injunctive or other equitable relief shall be available to enforce this covenant, such relief to be without the necessity of posting a bond, cash or otherwise.

Hospital acknowledges that in connection with the performance of the services under this Agreement, Hospital will be acquiring and making use of certain confidential information and trade secrets of Group which may include management reports, financial statements, internal memoranda, reports, patient and customer lists, confidential technology, business connections, payors, managed care strategies, reimbursement methodologies, past performance, future prospects, strategic initiatives and other materials, records and/or information of a proprietary nature (" <u>Group Confidential Information</u>"). Therefore, in order to protect Group Confidential Information, Hospital shall not after the date hereof use Group Confidential Information except in connection with the performance of the services pursuant to this Agreement, or divulge Group Confidential Information to any third party, unless Group consents in writing or such use or divulgence or disclosure is required by law. In the event Hospital receives a request or demand for the disclosure of Group Confidential Information, the party receiving such request or demand shall immediately provide written notice to Group of such request or demand, including a copy of any written element of such request or demand. Upon termination of this Agreement, neither Hospital nor any of its employees or agents will take or retain, without prior written authorization from Group, any

- 8 -

papers, patient lists, fee books, patient records, files, or other documents or copies thereof or other Group Confidential Information of any kind belonging to Group. Without limiting other possible remedies for the breach of this covenant, the parties agree that injunctive or other equitable relief shall be available to enforce this covenant, such relief to be without the necessity of posting a bond, cash or otherwise.

Hospital Confidential Information and Group Confidential Information shall not include information that Group or the Hospital can demonstrate by clear and convincing evidence: (a) at the time of disclosure by Hospital to Group or vice versa that the information was known to Group or the Hospital respectively as evidenced by its contemporaneous written records; (b) at the time of disclosure by disclosing party, was published or known publicly or otherwise was in the public domain; (c)  after disclosure by disclosing party and other than as a result of a breach of either party's obligations under this Agreement, becomes published or publicly known or otherwise becomes part of the public domain; or (d) is disclosed to disclosing party in good faith by a third party who is not under obligation of confidence or secrecy to such party.

**5.    RECORDS**

5.1    <u>Patient and Physician Access to Records.</u>  The parties recognize that the patient has the legal right to have access to his or her medical records, that all staff physicians at Hospital have the right to consult those records to facilitate the continuity of proper care, and that such records are confidential and privileged under state and federal law. Hospital expressly agrees that Group and the Physicians shall have access, as permitted by applicable law, to such patient records at any time necessary for Group and the Physicians to fulfill their duties under this Agreement and for the provision of Group quality assurance, audit and billing requirements. Group acknowledges that in performing services hereunder, it shall be part of an "organized health care arrangement" with Hospital for purposes of the privacy and security rules of the Health Insurance Portability and Accountability Act of 1996 and the regulations promulgated thereunder ("HIPAA"). Group agrees to abide by Hospital's policies and procedures regarding HIPAA, including Hospital's Notice of Privacy Practices, and otherwise agrees to abide by all terms and conditions of HIPAA.

5.2    <u>Business Records and Reports.</u> In performing its duties hereunder, Group may generate business or financial records and reports relating to the costs and operation of the Hospital, risk management, and quality control.

5.3    <u>Access to Books and Records.</u> Each party agrees to comply with the following requirements governing the maintenance of documentation to verify the cost of services rendered under this Agreement:

5.3.1    <u>Availability of Records.</u> Until the expiration of four (4) years after the furnishing of services pursuant to this Agreement, each party shall make available, upon written request of the Secretary of Health & Human Services ("HHS"), or upon request of the Comptroller General of the United States, or any of their duly authorized representatives, this Agreement, and books, documents, and records of such party that are necessary to certify the nature and extent of such costs.

**6.    TERM AND TERMINATION**

6.1.    <u>Term</u>. The term of this Agreement shall commence on or before October 1, 2012 at 7am Eastern Standard Time (the "<u>Commencement Date</u>"), and shall be for a    term of three (3) years (the " <u>Term</u>"), unless sooner terminated as provided in this Agreement.

683223.2

6.2   <u>Termination.</u>  This Agreement shall terminate prior to its natural expiration date on or upon the occurrence of any of the following:

(a)   <u>Termination by Agreement.</u>  In the event Hospital and Group mutually agree in writing, this Agreement may be terminated on the terms and date stipulated therein.

(b)   <u>Termination for Group's Breach.</u>  If Group breaches any material provision of this Agreement , including, without limitation, failing to provide the Services enumerated in **EXHIBIT A** and **EXHIBIT B,** Hospital shall notify Group in writing specifying the breach and setting forth a cure period of fifteen (15) days from the date such notice is received ("Cure Period"). If Group fails to cure such breach or fails to cause such breach to be cured within the Cure period, Hospital, in its sole discretion, may terminate this Agreement immediately, upon the expiration of the Cure Period and written notice to Group. Notwithstanding the foregoing, if a breach is cured  within the Cure Period but the same or substantially similar breach occurs within a six (6) month period  following  the  expiration  of  the  initial  Cure  Period,  Hospital  may immediately terminate  this Agreement without any further opportunity for cure being afforded to Group.

(c)   <u>Termination for Hospital's Breach.</u>  If Hospital breaches any of the material terms of this Agreement, other than for late or non-payment for Services provided (Group's remedies for such being set forth in **EXHIBIT C** and **EXHIBIT D** respectively), Group shall notify Hospital in writing specifying the breach and setting forth the Cure Period. Group, in its sole discretion, may terminate this Agreement immediately upon the expiration of the Cure Period. Notwithstanding the foregoing, if a breach is cured within the Cure Period but the same or substantially similar breach occurs within a six (6) month period following the expiration of the initial Cure Period, Group may immediately terminate this Agreement without any further opportunity for cure being afforded to Hospital.

(d)   <u>Non-performance Due to Lack of Availability of Physicians.</u>  Hospital may immediately terminate this Agreement upon making a good faith determination that Group, for any reason whatsoever, has failed and continues to fail to provide continuous  coverage of the Department and fulfill Group's obligations with respect to Hospitalist Services  after  having given Group written  notification of such a determination and Group's stated or demonstrated inability to restore continuous coverage of the Department  within seventy-two (72) hours of Group's receipt of such notification.

(e)   <u>Immediate Termination.</u>

(1)   Hospital may immediately terminate this Agreement by written notice to Group, without an opportunity for cure or appeal being afforded, upon written notice to Group, in the event: (i) Group fails to remove and replace any Physician as required by **Section 1.2** herein; (ii) Group or any member of the Group Party  is excluded from participation in any federal or state program for the reimbursement         of health care services and Hospital has invoked its right of termination in accordance with the provisions of **Subsection 1.3(i)**  herein; (iii) Group has failed to provide Hospital with the notification of adverse action required pursuant to **Section 1.13**; (iv) Group no longer maintains and/or is able to obtain the liability insurance coverage as required herein; (v) Any member of the Group's Party or any Physician is convicted of or pleads nolo contendere to  a felony; (vi) the  performance or attempted performance of any of Group's or any Physician's obligations  through any physician who does not have privileges on Hospital's Medical staff; or (vii)    closure of the Hospital.

- 10 -

(2)     Group may terminate this Agreement immediately upon written notice to Hospital upon either of the following occurrences: (i) loss of Hospital's licensure; or (ii) Hospital's exclusion from participation in Medicare or Medicaid.

(f)     Not for Cause Termination.  After the conclusion of the initial eighteen (18) months of this Agreement's term either party may terminate this Agreement, for any reason or no reason, upon the giving of sixty (60) days prior written notice to the other party.

6.3     Post-Termination Obligations. The termination of this Agreement shall not relieve either party of any obligation pursuant to this Agreement which arose on or before the date of termination, and those sections of this Agreement which by their terms extend beyond termination or expiration of this Agreement shall survive and continue in full force and effect after the expiration of the Term or any termination of this Agreement.

6.4     Matters Relating to Medical Staff Membership and Due Process.  Medical staff membership is a condition to the performance of Services under this Agreement. This Agreement is not, however, and shall not be construed as, any form of guarantee or assurance by Hospital that any Physician will obtain or retain medical staff membership or clinical privileges; those matters are governed solely by the bylaws, rules and regulations of the Medical Staff of the Hospital as in effect from time to time. Any due process or other requirements of the bylaws, rules or regulations of the medical staff at Hospital shall not apply to the termination of this Agreement or the removal by Hospital of any Physician from providing services to Hospital hereunder during the Term. Upon the termination of this Agreement, Medical Staff membership shall automatically terminate for all Physicians arranged for by Group.

7.     **DISPUTE RESOLUTION**

7.1     Mediation. Both parties agree, in good faith, to attempt to resolve any dispute which may arise under this Agreement by submitting such dispute for nonbinding mediation.

7.2     Termination. This Section shall not prevent either party from electing to terminate this Agreement in accordance with its termination provisions.

8.     **RESTRICTIVE COVENANTS**

Non-solicitation of Personnel. In recognition that Group expends substantial resources and efforts to make qualified physicians ( "Providers") available to serve as Providers, Hospital agrees during the term of this Agreement including any extensions thereof, and for a period of 24 months after the termination or expiration of this Agreement regardless of cause, Hospital will not directly or indirectly (including, without limitation, through a controlled affiliate) solicit, retain, employ, contract with or otherwise engage or be the beneficiary of the professional services of any Provider who (a) was presented to Hospital by Group as a prospective Provider or (b) provided either administrative or medical services to satisfy Group's obligations under this Agreement at Hospital. In addition, Hospital agrees it will not induce, persuade, or attempt to persuade any Emergency Physician or prospective Emergency Physician to refuse to provide services or terminate his or her relationship with Group, its agents or affiliates. Notwithstanding the provisions of Section 8, Group may, in its sole discretion, elect to waive the provisions of Section 8 for any Emergency Physician subject to such provision; provided however, that Group shall be compensated for each such Emergency Physician in the amount of Fifty Thousand Dollars ($50,000).

9.     **GENERAL PROVISIONS**

9.1     Patient Complaints. The parties agree to cooperate with each other in the resolution of any patient complaints arising out of the services provided hereunder. All patient complaints shall be resolved in accordance with any procedures established by Group and Hospital.

9.2     Corporate Practice of Medicine. Nothing contained herein is intended to constitute the use of a medical license for the practice of medicine by anyone other than a licensed physician, aid (?) Hospital or any other corporation to practice medicine when in fact such corporation is not licensed to practice medicine. The parties specifically acknowledge the following:

(a)     This Agreement contemplates nothing more than the delivery of administrative and coverage services by Group through Group's management and administrative staff, and Group's employed physicians, respectively, to Hospital. Group and the Physicians shall remain entirely independent of Hospital as to the diagnosis and treatment of patients and all other medical, professional and ethical affairs of the Physicians. Group shall ensure that the Physicians accept full responsibility to these patients for the nature and character of all professional medical services rendered.

(b)     There shall be no sharing of profits between Group and Hospital.

(c)     Hospital claims no right, title or interest in any of the assets of Group, none of which shall be used for the benefit of Hospital.

9.3     Relationship of Parties.

(a)     Independent Contractor Status. In performing their responsibilities pursuant to this Agreement, it is understood and agreed that the Physicians performing Services hereunder are at all times acting as independent contractors to the Hospital and that the Physicians are not partners, joint-venturers, or employees of the Hospital. As independent contractors, Hospital shall not be responsible for providing workers compensation insurance, the payment of unemployment fees or  taxes, or any of other benefit provided to its employees. If required by the laws of the State of North Carolina, Group shall be responsible for procuring, providing and maintaining workers compensation insurance on a continual basis for the term of this agreement and provide Hospital with a certificate of said coverage. Hospital shall neither have nor exercise any control or direction over the medical judgment of the Physicians nor over the methods or manner by which the Physicians perform their work and functions under this Agreement as they relate to the diagnosis or treatment of any disease, disorder, physical deformity, or injury. Nothing in this Agreement shall alter or is intended to alter the physician-patient relationship. The interest and responsibility of the Hospital is to ensure that the services offered at the Hospital and covered by this Agreement shall be performed and rendered in a competent, efficient, and satisfactory manner. It is expressly agreed that the Physicians will not for any purpose be deemed to be agents, ostensible or apparent agents, or servants of Hospital, and the parties agree to take any and all such action as may be reasonably requested by Hospital to inform the public, patients of the Hospital, and others utilizing the professional services of the Physicians of such fact.

(b)     Compensation, Fringe Benefits, Taxes. Group hereby acknowledges and agrees and shall ensure that the Physicians understand and agree that: (i) each Physician shall not be entitled to any salary or other compensation from Hospital or to any employee benefits provided by Hospital, including, but not limited to disability, life insurance, pension and annuity benefits, educational allowances, professional membership dues, and sick, holiday, or vacation pay; (ii) Hospital will not withhold income taxes or pay Social Security or unemployment taxes for Physicians, such being the exclusive responsibility of Group, which Group agrees to discharge

- 12 -

fully; and (iii) Group shall indemnify and hold harmless the Hospital against any and all liability related to withholding or failure to withhold income taxes or paying or not paying Social Security or unemployment taxes for the Physicians. If the Internal Revenue Service or any other governmental agency challenges the independent contractor status of the Physicians, the parties agree that the Group and the Hospital shall have the right to participate in any discussion or negotiation that occurs in the course of such challenge.

9.4     Conformance with Law. The parties recognize that this Agreement is subject to, and agree to comply with, applicable local, state, and federal statutes, rules and regulations, including without limitation the Medicare and Medicaid Anti-Fraud and Abuse Amendments and applicable state laws and regulations. Group shall comply with all laws, rules and regulations relating to the confidentiality of patient information, including the applicable provisions of North Carolina law and the privacy regulations promulgated pursuant to HIPAA. Any provisions of applicable statutes, rules, or regulations that invalidate any term of this Agreement, that are inconsistent with any term of this Agreement, or that would cause one or both of the parties hereto to be in violation of law shall be deemed to have superseded the terms of this Agreement; provided, however, that the parties shall use their best efforts to accommodate the terms and intent of this Agreement to the greatest extent possible consistent with the requirements of applicable statutes, rules and regulations and negotiate in good faith toward amendment of this Agreement in such respect. In addition, in the event the legal counsel of Group or Hospital, in its reasonable opinion, determines that this Agreement or any material provision of this Agreement violates any federal or state law, rule or regulation, the parties shall negotiate in good faith to amend this Agreement or the relevant provision thereof to remedy such violation in a manner that will not be inconsistent with the intent of the parties or such provision. If the parties cannot reach an agreement on such amendment within 30 days of commencement of renegotiation, however, then either party may terminate this Agreement immediately. This section shall survive the termination of this Agreement.

9.5     Governing Law and Venue. This Agreement shall be construed and governed according to the laws of the State of North Carolina , without giving effect to its conflict of laws provisions.

9.6     No Referral. Nothing contained in this Agreement shall require (directly or indirectly, explicitly or implicitly) any party to refer any patients to any other party or to use any other party's facilities as a precondition to receiving the benefits set forth herein.

9.7     Rights in Property. Group acknowledges and agrees that this Agreement shall not be deemed to grant to Group any rights to Hospital real property, equipment or furnishings.

9.8     Notices. Any notice to a party hereto pursuant to this Agreement shall be given in writing by personal delivery, overnight delivery, or United States certified or registered mail, return receipt requested, addressed as follows:

If to Hospital:

Yadkin Valley Community Hospital
624 West Main Street
Yadkinville, NC 27055
Attn:  CEO

With a copy to:

HMC/CAH Consolidated, Inc.
1100 Main Street, Suite 2350

If to Group:

Emergency Staffing Solutions
17304 Preston Road, Suite 1400
Dallas, Texas 75252
Attention: Ron Weiss, CEO

- 13 -

Kansas City, Missouri 64105
Attn.: Brent Lagergren, Esq.
      VP & Chief Compliance Officer

The parties shall hereafter notify each other in accordance herewith of any change of address to which notice is required to be sent. Notice shall be effective upon delivery.

9.9    Parties Bound. This Agreement and the rights and obligations hereunder shall be binding upon and inure to the benefit of the parties, and their respective heirs, personal representatives, and permitted assigns. This Agreement shall also bind and inure to the benefit of any successor of Hospital by merger or consolidation.

9.10    No Third-Party Beneficiaries. No provision of this Agreement is intended to benefit any person or entity, including, but not limited to any Physician who is not a party to this Agreement, nor shall any person or entity not a party to this Agreement have any right to seek to enforce or recover any right or remedy with respect hereto.

9.11    Non-Waiver. No waiver by either of the parties hereto of any failure by the other party to keep or perform any provision, covenant or condition of this Agreement shall be deemed to be a waiver of any preceding or succeeding breach of the same, or any other provision, covenant or condition.

9.12    Additional Documents. Each of the parties hereto agrees to execute any document or documents that may be reasonably requested from time to time by the other party to implement or complete such party's obligations pursuant to this Agreement.

9.13    Section Headings. The headings preceding the text of the several sections of this Agreement are inserted solely for convenience of reference and shall not constitute a part of this Agreement, nor shall they affect the meaning, construction, or effect of any section hereof.

9.14    Gender and Number. Whenever the context of this Agreement requires, the gender of all words herein shall include the masculine, feminine, and neuter, and the number of all words herein shall include the singular and plural.

9.15    Entire Agreement. This Agreement, including any exhibits or addenda identified and incorporated by reference herein, contains the entire understanding of the parties and supersedes any prior written or oral agreements or understandings between them concerning the subject matter set forth above. There are no representations, warranties, covenants, promises, agreements, arrangements or understandings, oral or written, express or implied among the parties hereto relating to the subject matter set forth above which have not been fully expressed herein.

9.16    Amendments. Only an instrument in writing signed by the parties can amend this Agreement. Amendments to this Agreement shall be effective as of the date stipulated therein.

9.17    Severability. The sections, paragraphs and individual provisions contained in this Agreement shall be considered severable from the remainder of this Agreement and in the event that any section, paragraph or other provision should be determined to be unenforceable as written for any reason, such determination shall not adversely affect the remainder of the sections, paragraphs or other provisions of this Agreement. It is agreed further, that in the event any section, paragraph or other provision is determined to be unenforceable, the parties shall use their best efforts to reach agreement on an amendment to the Agreement to supersede such severed section, paragraph or provision.

- 14 -

9.18     Counterparts. This document may be executed in multiple counterparts, each of which when taken together shall constitute but one and the same instrument.

EXECUTED as of the dates set forth below.

**HOSPITAL**                                              **GROUP**

**CAH ACQUISITION COMPANY 10, LLC**      **EMERGENCY STAFFING**
**d/b/a Yadkin Valley Community Hospital**     **SOLUTIONS, INC.**

By: _____             By: _____

Its: _Corporate COO_                    Its: _____

Date: _7-25-12_                         Date: _____

- 15 -

**EXHIBIT A**
**Emergency Department Services**

1.      <u>Professional Services.</u> Subject to the continuing approval of Hospital as described in this Agreement, Group agrees (a) to provide or arrange for emergency department coverage services in the Hospital through its contracted Physicians at the times and in the manner provided for in this Agreement; and (b) to make such Physicians available with respect to all Hospital patients (regardless of financial condition, insurance coverage, or ability to pay) who require emergency medical services in the Hospital. Group shall provide one (1) Physician to be on site at all times during the times set forth in this <u>Exhibit A</u>, for the timely and proper provision of medical services in the Hospital.

2.      <u>Emergency Department Coverage Services.</u>  Group, through its contracted Physicians, shall:

    (a)     Examine and treat all persons who present themselves at the Hospital's emergency department (the "Emergency Department") for care or treatment in accordance with the Emergency Medical Treatment and Active Labor Act of 1986 ("EMTALA"), as amended from time to time.;

    (b)     Provide timely and appropriate care to patients;

    (c)     Respond in a timely manner to requests for needed assistance initiated by a house supervisor in life and/or limb threatening emergencies of hospitalized patients;

    (d)     Provide coverage for inpatient cardiac and/or respiratory arrests provided that patients in the Hospital's Emergency Department are not requiring physician supervision and monitoring;

    (e)     Communicate any admission to the patient's primary care physician;

    (f)     Attend to persons injured in the facility and Hospital personnel with job related injuries, illness, or exposure;

    (g)     Complete medical records prior to the end of their next shift worked.

3.      <u>Medical Director Services.</u> Group will designate a Physician approved by Hospital to be Medical Director of the Emergency Department.  The Medical Director shall be responsible for managing Emergency Department issues on a day-to-day basis, including, without limitation, the following:

    (a)     Coordinating the Emergency Department Physician coverage schedule;

    (b)     Recommending policies and procedures to Hospital concerning the administration of the Emergency Department;

    (c)     Addressing patient complaints involving Emergency Department Physicians; and

    (d)     Acting as a liaison among Group, members of the organized Medical Staff of Hospital ("Medical Staff"), and the Hospital.

4.      <u>Location.</u>  Group shall provide the Services at Yadkin Valley Community Hospital in

Yadkinville, North Carolina.

5.      <u>Days and Hours; Schedule</u>. Group shall provide Emergency Department coverage twenty-four (24) hours per day, seven (7) days per week.  The schedule for coverage shall be arranged by the Group, approved by and submitted to the Hospital  CEO or its designee and Emergency Department at least five (5) days prior to the first day of each month.

6.      All Physicians covering the Emergency Department shall comply with all Bylaws, Policies, Rules and Regulations of the Hospital, the Medical Staff, and the Physician's department, as well as with all State and Federal laws and regulations regarding the transfer of patients and treatment of Emergency Department patients, including, without limitation, EMTALA.

**EXHIBIT B**
**Hospitalist Services**

1.      Professional Services. Subject to the continuing approval of Hospital as described in this Agreement, Group agrees (a) to provide or arrange for hospitalist coverage services in the Hospital through its contracted Physicians at the times and in the manner provided for in this Agreement; and (b) to make such Physicians available with respect to all Hospital patients (regardless of financial condition, insurance coverage, or ability to pay) who require medical services in the Hospital. Group shall provide one (1) Physician to be on site or on call at all times during the times set forth in this Exhibit B , for the timely and proper provision of medical services in the Hospital.

2.      Hospitalist Coverage Services. Group, through its contracted Physicians, shall:

(a)     Provide professional hospitalist on-call coverage services twenty-four (24) hours a day, seven (7) days a week, as scheduled, for all Emergency Department adult patients and all requests for transfers or inpatient referrals requiring specialty evaluation, treatment, consultation, admission, and/or follow-up;

(b)     Respond with a timeframe required by the patient's medical condition;

(c)     Respond within sixty (60) minutes or less, in person, when requested by the Emergency Department physician;

(d)     Respond within thirty (30) minutes by phone, if asked to respond by phone, to any request for Emergency Department patient phone consultation and subsequent follow-up;

(e)     Communicate any admission to the patient's primary care physician;

(f)     Perform an admission History and Physical;

(g)     Call in specialists, as needed;

(h)     Manage the patient's discharge summary and provide a copy to the patient's referring or primary care physician;

(i)     Communicate a patient's discharge to his or her primary care physician with a review of discharge orders;

(j)     Make daily rounds on inpatients assigned by Hospital and provide appropriate progress note documentation;

(k)     Make additional afternoon rounds for Hospital's Intensive Care Unit and seriously ill patients; and

(l)     Should Physician be unable to carry out his call responsibilities, Physician shall make arrangements for proper care of emergency patients until such time as Physician is able to personally attend to the patient's needs (arrangements for proper care of emergency patients must be made with a physician already credentialed at Hospital); and

(m)     Provide timely initial inpatient care for all patients (the local Physician on-call at the time of the referral shall provide follow-up care for such patients regardless of patient's ability to pay for services at the time of the first visit).

Hospital shall utilize a pager provided by the Hospital to each Physician as the primary method of contacting the Physician while on service.

3.     <u>Medical Director Services.</u> Group will designate a Physician to be Medical Director of the Services provided under this Agreement. The Medical Director shall be responsible for managing the Services on a day-to-day basis, including, without limitation, the following:

(a)     Present qualified physicians to become Hospitalist Physicians upon approval by Hospital;

(b)     Coordinate Hospitalist Physician coverage schedule;

(c)     Recommend policies and procedures to Hospital concerning administration of the Hospitalist Department;

(d)     Address patient complaints involving Hospitalist Physicians; and

(e)     Act as liaison among Group, Hospitalist Physicians, organized members of the Medical Staff of Hospital ("Medical Staff"), and administration of the Hospital ("Hospital Administration").

4.     <u>Location</u>. Group shall provide the Services at **Yadkin Valley Community Hospital in Yadkinville, North Carolina.**

5.     <u>Days and Hours; Schedule</u>. Group shall provide hospitalist coverage twenty-four (24) hours per day, seven (7) days per week. The schedule for coverage shall be arranged by the Group and provided to the Hospital CEO or its designee at least five (5) days prior to the first day of each month. Onsite hospitalist coverage is provided daily from 7:00 a.m. to 5:00 p.m.

6.     All Physicians providing the Services shall comply with all Bylaws, Policies, Rules and Regulations of the Hospital, the Medical Staff, and the Physician's department, as well as with all State and Federal laws and regulations regarding the transfer of patients and treatment of patients.

7.     Physician shall accept direct admissions from physicians in the community with established clinic practices (the "Community Physician") on a direct physician to physician communication basis.  Community Physician may handoff hospitalized patients to Physician and Physician shall accept such handoff on a physician to physician communication basis only.

8.     Physician shall consult on any patient as requested by a Community Physician on a physician to physician communication basis.

9.     Group and Hospital agree that initially the Emergency Department physician providers shall be responsible for providing all hospitalist services covered under this agreement. However, the parties acknowledge that beyond a certain ED volume level and the anticipated growth in admissions this arrangement may not be workable. Accordingly, at such time, if ever, that inpatient volumes justify the need to add staff to provide hospitalist services, as determined by mutual agreement of the parties, such services may be provided by physicians or mid-level practitioners working within their scope of practice and at the direction of a supervising physician.

**EXHIBIT C**
**Compensation for Emergency Department Services**

A.    Hospital agrees to pay Group $56,298 per month for Services related to ED coverage.

B.    Hospital shall have the right to bill and receive fees and/or reimbursement from patients and third party payors for all services provided in Hospital otherwise known as technical component services.

B.    Hospital will be billed twice monthly and agrees to pay invoice in full within 10 days of receipt of an invoice therefore.  Any invoice not paid within 15 days of receipt shall accrue interest on the unpaid amount at the annual rate of the 18%.  Notwithstanding any other provision in this Agreement, Group may immediately terminate this Agreement at any time without notice if payment for services is not received by the 45th day after the invoice is mailed.

C.    Minimum Volume Threshold - During the term of this Agreement,  Group shall have the sole and exclusive right and responsibility for the billing and collection of all fees and reimbursement relating to all Professional Component Services rendered by the Group and its Physicians. In addition to the compensation set forth above, Hospital agrees  to compensate Group at the rate of Eighty-Nine and no/100 ($89.00) per patient per month for the difference between  the monthly Minimum Volume Threshold of Five Hundred Fifteen (515) patients  and the number of patients actually seen in any given month, if less, averaged on a calendar quarter basis.

**EXHIBIT D**
**Compensation for Hospitalist Services**

Services related to hospitalist services provided by the Group that are professional physician services reimbursed by third party payors under a professional component shall be referred to herein as the "Professional Component Service(s)". The parties agree that the Group shall bill the responsible patients or third party payors for the Group's Professional Component Service charges and shall retain all proceeds of collections therefrom.

During the Term of this Agreement, the Group shall have the sole and exclusive right and responsibility for the billing and collection of all fees and reimbursement relating to all Professional Component Services rendered by the Group and its physicians.

Hospital shall have the right to bill and receive fees and/or reimbursement from patients and third party payors for all services provided in Hospital (Technical Component Services). Medical records of patients provided services pursuant to the Agreement are the property of Hospital.

Hospital agrees to pay Group $4000.00 per month.

A.    Hospital will be billed twice monthly and agrees to pay invoice in full within 10 days of receipt of an invoice therefore. Any invoice not paid within 15 days of receipt shall accrue interest on the unpaid amount at the annual rate of the 18%. Notwithstanding any other provision in this Agreement, Group may immediately terminate this Agreement at any time without notice if payment for services is not received by the 45th day after the invoice is mailed.

B.    During the term of this Agreement, The Group shall have the sole and exclusive right and responsibility for the billing and collection of all fees and reimbursement relating to all Professional Component Services rendered by the Group and its Physicians

# Exhibit A-6

**Emergency Staffing Solutions, Inc.**

**4:43 PM**

## Customer Open Balance

**10/16/2013**

**All Transactions**

**Accrual Basis**

| | Type | Date | Num | Memo | Due Date | Open Balance | Amount |
|---|---|---|---|---|---|---|---|
| **Yadkin Valley Community Hospital** | | | | | | | |
| | Invoice | 12/31/2012 | 29148 | | 04/19/2013 | 8,843.04 | 8,843.04 |
| | Invoice | 03/31/2013 | 29352 | | 06/10/2013 | 14,097.60 | 14,097.60 |
| | Invoice | 04/15/2013 | 29178 | | 04/25/2013 | 28,149.00 | 28,149.00 |
| | Invoice | 04/30/2013 | 29234 | | 05/10/2013 | 28,149.00 | 28,149.00 |
| | Invoice | 05/15/2013 | 29276 | | 05/25/2013 | 28,149.00 | 28,149.00 |
| | Invoice | 05/31/2013 | 29339 | | 06/15/2013 | 529.93 | 529.93 |
| Total Yadkin Valley Community Hospital | | | | | | 107,917.57 | 107,917.57 |
| **TOTAL** | | | | | | 107,917.57 | 107,917.57 |

# Exhibit A-7



**ESS** Emergency Staffing Solutions, Inc.
Dallas, Texas 75252
17304 Preston Road, Suite 1400

# Invoice

| Date | Invoice # |
|------|-----------|
| 3/16/2015 | 31762 |

Bill To

Yadkin Valley Community Hospital
624 West Main Street
Yadkinville, NC 27055

| Terms | Due Date |
|-------|----------|
| Net 10 Days | 3/26/2015 |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| Finance Charges on Overdue Balance - Interest accrued at annual rate of 18% from date invoice was due per contract | | | |
| Finance Charges on Overdue Balance: Invoice #29148 due 4/19/13 | | 3,039.58 | 3,039.58 |
| Finance Charges on Overdue Balance: Invoice #29178 due 4/25/13 | | 9,592.25 | 9,592.25 |
| Finance Charges on Overdue Balance: Invoice #29234 due 5/10/13 | | 9,384.03 | 9,384.03 |
| Finance Charges on Overdue Balance: Invoice #29276 due 5/25/13 | | 9,175.80 | 9,175.80 |
| Finance Charges on Overdue Balance: Invoice #29352 due 6/10/13 | | 4,484.20 | 4,484.20 |
| Finance Charges on Overdue Balance: Invoice #29339 due 6/15/13 | | 167.25 | 167.25 |

| Phone No. | Fax No. |
|-----------|---------|
| (972)934-3200 x161 | (866)801-1126 |

| Email Address |
|---------------|
| ap@essdoc.com |

| | |
|--|--|
| **Total** | $35,843.11 |
| **Payments/Credits** | $0.00 |
| **Balance Due** | $35,843.11 |

# Exhibit A-8

EMERGENCY DEPARTMENT COVERAGESERVICES AGREEMENT

**THIS EMERGENCY DEPARTMENT COVERAGESERVICES** agreement ("Agreement"), effective September 1st , 2012 (the "Effective Date") is made and entered into by and between Emergency Staffing Solutions, Inc. ("Group") and CAH  ACQUSITION COMPANY 10, LLC d/b/a  Haskell County Community Hospital  ("Hospital").

RECITALS

WHEREAS, Hospital is a critical access  hospital located at 401 NW H Street, Stigler, OK  74462 that provides health care services to patients in its community (including indigent patients) utilizing its facilities;

WHEREAS, Group is an emergency department and hospitalist management company that provides administrative services to hospitals, including arranging for coverage of Hospital's emergency department ("Department")  and related management services;

WHEREAS, Group contracts with physicians and mid-level practitioners who are duly licensed and registered to practice medicine in the State of Oklahoma  and are qualified to provide the Services (each, a "Provider " and collectively the "Providers "); and

WHEREAS, Group desires to provide  coverage  for the Department and related administrative services  to the Hospital ("Services"), and Hospital desires to contract with Group for such Services so that Hospital may better fulfill its mission of providing or arranging to provide certain health care services to patients (including indigent patients) utilizing Hospital's facilities.

NOW THEREFORE, in consideration of the mutual promises of the parties hereto, and of the covenants and conditions hereinafter expressed, the parties hereby agree and covenant, each with the other, as follows:

## 1. SPECIFIC DUTIES OF GROUP

1.1      Group and Group Provider  Obligations.  Group's functions and duties under this Agreement are wholly administrative and relate exclusively to staffing the Department with Providers who shall provide Services pursuant  to independent contractor agreements with Group, assuring Providers'' performance of  their collective obligations herein, assuring Department coverage in accordance with the terms and conditions of **EXHIBIT A,** which is attached and incorporated by reference, assuring the provision of Medical Director Services and Supervising Physician Services in accordance with **EXHIBIT A** herein , scheduling Providers' ' hours of service, and performing the other administrative obligations required herein. Group shall assure that its Providers  shall provide medically necessary Services, diagnoses and treatment to patients as determined to be necessary by such Providers and required by the Emergency Medical Treatment and Active Labor Act of 1986 ("EMTALA"), as amended from time to time. Each Provider  approved for placement at Hospital shall accept such placement through his or her executed Statement of Acceptance which is attached as **EXHIBIT C** and incorporated by reference.  Any change in the scope of work set forth herein resulting in Group's compensation shall be evidenced by an amendment to this Agreement.

1.2      Hospital Approval. Notwithstanding the foregoing, Hospital shall have the right to approve each  Provider that Group designates to provide Services in the Hospital, prior to the assignment of any Provider  to the Hospital. Hospital agrees to require no more onerous provisions for *acceptance* of

- 1 -

683223.2

Group's Providers than are applicable to other similarly situated providers  in accordance with the rules, regulations and bylaws of the Medical Staff of Hospital. Hospital further agrees that it will grant temporary privileges to Group's Providers as requested and as qualified.  In addition, after Providers s assigned to the Hospital are initially approved by the Hospital, Hospital shall, upon the occurrence of any of the following with respect to any Provider, have the right at any time (i) to insist on the immediate removal and replacement of any Provider that Group has assigned to provide Services under this Agreement in the Hospital, and (ii) upon prior notice to Group, to refuse any Provider permission to utilize any Hospital facility for purposes of providing Services under this Agreement, upon the occurrence of any of the following:

> (a)     Failure by such Provider to meet the qualifications required of the  Providers under this Agreement, including being approved for membership on the Medical Staff of the Hospital or the awarding of clinical privileges pursuant to the Medical Staff Bylaws;

> (b)     Death of Provider;

> (c)     Suspension, cessation, loss or inability to provide evidence of Provider's (i) qualifications or unrestricted license to practice medicine in the State of Oklahoma (including by reason of failure to meet continuing medical education requirements); (ii) state or federal authorization to administer or prescribe controlled substances;  (iii ) Hospital medical staff privileges; or (v) malpractice insurance coverage;

> (d)     Provider's debarment, suspension or exclusion from any federal or state program for the reimbursement of health care services;

> (e)     Permanent disability (ill health or other disability) of such Provider which prevents or makes inadvisable his or her continued practice of medicine as contemplated by this Agreement;

> (f)     Reasonable determination by Hospital that such Provider has , or continues to engage in conduct that constitutes a threat to the health, safety or welfare of any Hospital patient, employee or visitor;

> (g)     Conviction of such Provider of a felony;

> (h)     Violation by such Provider of any term of Hospital's policies or Medical Staff Bylaws as they exist from time to time following notification of such violation by Hospital to Group and the failure to cure the same within thirty (30) days thereafter; or

> (i)     Restrictions, sanctions or other actions by any regulatory, credentialing or certifying body or any insurance provider.

1.3     <u>Representations and Warranties of Group</u>. Group hereby represents and warrants to Hospital as follows:

> (a)     <u>Provider Qualifications. .</u> Each Provider providing Services hereunder shall  at all times during the term of this Agreement; (i) hold a valid and unrestricted license to practice medicine in the State of Oklahoma; (ii) maintain proficiency through board certification, board eligibility, training and/or experience in the practice of emergency medicine; (iii) be a member of Hospital's Medical Staff  with all the attendant privileges and responsibilities of  membership or granted clinical privileges in the allied health category; (iv) maintain a DEA license to prescribe

-2-

controlled substances and a similar state registration; and maintain the insurance coverage required by Section 1.10 herein.  With respect to each Provider, Group represents and warrants that such Provider's license to practice medicine and certificate to prescribe controlled substances in the State of Oklahoma or in any other jurisdiction has never been denied, terminated, suspended, probated, revoked, voluntarily relinquished under threat of disciplinary action or restricted in any way.

(b)    Medicare/Medicaid Participation.  During the term of this Agreement, each Provider shall be authorized to participate in the Medicare and Medicaid Programs.

(c)    Disclosure.  Group and each Provider shall immediately notify Hospital in the event any representation concerning a Provider set forth in this Agreement within the knowledge of Group or such Provider shall no longer be true, correct or complete.

(d)    Authority.  Group represents and warrants to Hospital that Group has the power and authority to obligate the Providers to perform the duties of the Providers pursuant to this Agreement. Group agrees to so obligate the Providers.

(e)    Group is a for-profit corporation duly organized and validly existing under the laws of the State of Texas that is authorized to conduct business in the State of Oklahoma.

(f)    Group has all requisite corporate power and authority to enter into this Agreement and to perform its obligations under this Agreement. This Agreement has been duly authorized, executed and delivered by Group and is a legal, valid and binding obligation of Group, enforceable in accordance with its terms.

(h) The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby by Group will not violate any provisions of, or constitute a default under, any contract or other agreement to which Group is a party or by which it is bound, or conflict with its Articles of Incorporation or bylaws.

(i)    Neither Group nor any of its officers, directors, partners or employees providing Services hereunder ("Group Parties") are now  listed by any federal agency or program (including but not limited to Medicare and Tricare) as debarred, suspended or excluded or is now debarred, suspended or excluded from any Medicaid program or any other state or local program for the reimbursement of health care services, Group and Group Parties acknowledge that this is an ongoing representation and warranty and agree to immediately notify Hospital in writing in the event that either  Group or a Group Party cease to be eligible or is debarred, suspended or is excluded from any of the aforementioned programs at which time this agreement may be immediately terminated by Hospital, in its sole discretion.

1.4    Reports and Records.  Group shall be responsible for assuring that each Provider providing services hereunder maintains or causes to be maintained accurate, legible and complete records and files of all required information pertaining to the clinical services they perform, including individual patient charts. All records and reports shall be prepared in accordance with Hospital's policies and procedures and the Bylaws, Rules and regulations of its Medical Staff. **Group shall assure that its Providers put forth their best efforts to complete such records and reports immediately after services are performed; however, if such records and reports are not completed at the point of service or immediately thereafter, and absent a showing of good cause (e.g. illness, family emergency, short term disability) Group shall assure that such records are completed and delivered to Hospital's Medical Record Department no later than five (5) days after the date services are**

- 3 -

provided. **On those occasions where good cause has been shown, all such records shall be completed and submitted to Hospital within fifteen (15) days after the date of service.** The foregoing notwithstanding, in the event this Agreement is terminated by either party for any reason or is not renewed for any reason at the end of the term hereof, then all reports and records required hereunder shall be completed and delivered to the Hospital within thirty (30) days after the effective date of termination or the last date of the term, as applicable. Group shall cause to be prepared and filed such additional or supplementary reports as Hospital may reasonably request, including, but not limited to, any reports or records Hospital deems necessary to establish the value of the Services provided hereunder. All reports, records and supplementary documents prepared in connection with the Services provided hereunder (which shall include all documents relating to patient care but not Group's business records) shall be the sole property of and within the sole control of Hospital. Group agrees to make available on reasonable dates and at reasonable times and places any Provider providing Services hereunder and all documents reasonably related thereto for the purposes of any litigation, investigation or review with which Hospital may become involved.

      1.5     Quality Assurance/Utilization Review and Peer Review Programs. Group, through its Providers shall have knowledge of and assist Hospital in developing, implementing, monitoring and reviewing the Hospital's quality assurance, utilization review, performance improvement and peer review programs, procedures, guidelines and policies which relate to the Hospital and as required by Hospital policies, by Medicare law and regulations, by the standards or reports of Det Norske Veritas Healthcare, Inc. ("DNV") , if applicable, and/or other regulatory, licensing, or accrediting agencies. If any regulatory, accrediting, or licensing agency should determine that the Hospital does not meet or exceed the acceptable standards prescribed and which are the responsibility of Group to satisfy under this Agreement, any and all action necessary to effect compliance shall be taken by Group within a reasonable time (not to exceed thirty (30) days unless otherwise agreed) after the details of noncompliance and steps necessary to effect compliance are given by notice to Group. In addition to the foregoing, Group and its Providers shall comply with any and all procedures, guidelines and policies relating to Hospital's quality assurance, utilization review, peer review, risk management and safety programs. Hospital shall have knowledge of and assist Group in developing, implementing, monitoring and reviewing Hospital's quality assurance, utilization review, performance improvement and peer review programs, procedures, guidelines and policies which relate to the Group in its provision of services to Hospital in accordance with Group policies provided to Hospital, Medicare laws and regulations and/or other regulating, licensing or accreditation agencies.

      1.6     Reimbursement. Group and each Provider shall cooperate with Hospital and its employees as reasonably requested in the completion of any forms necessary for third party reimbursement.

      1.7     Education. Group shall ensure that each Provider participates for reasonable periods of time in the educational programs conducted by Hospital and performs such other teaching functions within Hospital as Hospital reasonably deems necessary to assure Hospital's compliance with requirements of accrediting bodies.

      1.8     Incurring Financial Obligation. Group agrees and acknowledges that neither it nor any Provider has any right, power or authority to incur and will not incur any financial obligation, legal obligation or liability, or other obligation on behalf of, or binding upon, Hospital.

      1.9     Professional Expenses. Group shall be solely responsible for all personal and professional expenses incurred by it or any person provided by Group to render Services under this Agreement.

- 4 -

1.10   Liability Insurance.

(a)   Providers' Coverage Requirements. Group shall obtain and maintain, and shall ensure that each Provider obtains and maintains, professional liability insurance with minimum limits of One Million and no/100 Dollars ($1,000,000.00) per occurrence and Three Million and no/100 Dollars ($3,000,000.00) annual aggregate. All policies described above shall provide that Hospital be given written notice no less than thirty (30) days prior to cancellation or material change of the policy. Group further agrees to provide evidence of the above coverage to Hospital either by providing copies of policies or certificates of insurance within thirty (30) days of the effective date of such coverage.

(b)   Tail Coverage. Upon the termination or expiration of this Agreement, for the policy or policies obtained pursuant to this Section which are "claims made" insurance rather than "occurrence" insurance, Group shall either (i) purchase "tail" coverage to continue the liability insurance coverage in effect during the term hereof or (ii) continue in full force and effect the same level of liability insurance coverage on a claims made basis until the longest statute of limitations for professional and general liability for acts committed has expired (recognizing that the statute of limitations for minors is tolled until they reach the age of majority). Group shall provide evidence of such coverage to Hospital within thirty (30) days of request by Hospital.

(b)   General Indemnity. Except as may otherwise be provided in this Agreement, each party shall be responsible for its own acts and omissions and any and all claims , liabilities, injuries suits, demands and expenses of all kinds which may result or arise out of any alleged malpractice or neglect caused or alleged to have been caused by either party or their respective employees or representatives in the performance of their responsibilities hereunder.

1.11   Compliance Obligations.

(a)   Rules, Regulations, Policies and Directives.   As a continuing condition of this Agreement, Group and each Provider shall comply with and provide the Services in accordance with (i) the standards of DNV, if applicable, (ii) the bylaws, rules, regulations and policies of Hospital; (iii) the Bylaws, Rules, Regulations and policies of the Medical Staff of the Hospital; and (iv) the Principles of Ethics adopted by the American Medical Association, as such principles are amended from time to time. Group hereby specifically acknowledges and agrees that pursuant to DNV standards, Hospital retains certain obligations regarding patient care and services within Hospital facilities.

(b)   Compliance with Law.   The Services shall be provided in accordance with all applicable provisions of law and other rules and regulations of any governmental authority relating to the activities contemplated by this Agreement, including, without limitation, EMTALA, as amended from time to time.

(c)   Corporate Compliance Program. Group acknowledges that Hospital and its parent organization, HMC/CAH Consolidated, Inc. ("HMC") have established a corporate compliance program ("Program"), the goal of which is to promote compliance with federal, state and local laws and regulations within all HMC organizations and affiliates. The program specifically focuses on risk identification and management, the promotion of good corporate citizenship, the commitment to upholding a high standard of ethical business practices and the prevention of misconduct. Group shall be responsible for ensuring that each Provider providing Services pursuant to this Agreement acknowledges Hospital's commitment to the Program and

- 5 -

agrees to conduct all business transactions required by this Agreement in accordance with the highest ethical standards and all applicable laws, regulations and statutes.

1.12    Providers' Responsibilities with Respect to Patients. No Provider providing Services arranged pursuant to this Agreement is an employee of Hospital. Nothing herein shall be construed as giving that degree of control or direction on the part of Hospital that creates an employer-employee relationship between Hospital and any Provider. Hospital shall not control or direct the practice of medicine. All Providers providing services in any Hospital facility shall:

(a)    Provide the necessary medical services in a manner so that the medical needs of each patient are met consistent with Hospital and medical staff bylaws, rules, regulations, and policies and patient expectations.

(b)    Be cognizant of the manner in which patients are received, the efforts to meet their needs, and other aspects of courtesy, compassion and sound nursing and medical care for every patient.

Notwithstanding anything contained herein to the contrary, no rule or regulation contained in this Agreement shall operate to delay medical treatment when immediate attention is required. The parties acknowledge the primary purpose of this Agreement is to make medical services available to the Hospital's patients in the Hospital (including indigent patients) at all times.

1.13    Notification of Investigation or Adverse Action. Group shall notify the chief Executive Officer of the Hospital, in writing, within seventy-two (72) hours of Group or any Provider providing Services hereunder receiving notice by any means of any change made, proposed or investigation relating to, or any adverse action taken with respect to: (i) the license of any Provider to practice in the State of Oklahoma or any other state; (ii) any Provider's DEA or state controlled substance registration; (iii) the imposition of terms of probation or other limitation on Group or any Provider by any state or federal agency or program; (iv) the loss, suspension or restriction of medical staff membership or associated clinical privileges of any Provider at any other health care facility or organization; (v) an adverse determination by a peer review organization or third party payor with respect to Group or any Provider for reasons associated with quality of care; (vi) the commencement of a formal investigation with respect to or the filing of charges against Group or any Provider providing Services hereunder by the Department of Health and Human Services or any state Medicaid fraud control unit; (vii) the final debarment, suspension or exclusion of Group or any Provider providing Services hereunder from any federal or state program for the reimbursement of health care services; (viii) the filing of any claim alleging negligence and/or medical malpractice at Hospital. The failure to provide notice as required by this subsection shall be cause for immediate termination pursuant to Subsection 6.02(e)(iii) herein.

1.14    Substitute Coverage. Hospital acknowledges that Group's Providers shall be entitled to absences from their duties hereunder due to illness, vacation, medical conferences and other professional and personal activities. However, it shall remain the responsibility of Group to manage and coordinate the schedules of each Provider, to the extent necessary, to assure that Services provided to Hospital are continuous and uninterrupted. To the extent Group utilizes any substitute providers to provide Services hereunder, each must at all times meet the qualifications set forth in Subsection 1.3(a) and be approved in advance by Hospital's CEO.

1.15    Appointment of Medical Director for Hospital's Emergency Department.. Group shall appoint one (1) Physician to serve as medical director ("Medical Director") of the Department , subject to the prior approval of the Hospital, during the term of this Agreement and any subsequent renewal terms thereafter, such Medical Director  serve in accordance with the terms and conditions set forth on **EXHIBIT A.**

- 6 -

(a)    Absence. If Medical Director is unable for any reason to perform the duties prescribed on **EXHIBIT A**, Group shall appoint another Physician as acting Medical Director during any absence necessitated by Medical Director's inability to perform his or her prescribed duties. All references herein to the aforementioned Medical Director's responsibilities shall include any Physician serving as medical Director in the Medical Director's absence.

(b)    Initial Department Medical Director. As of the Effective        Date   of   this Agreement Group shall appoint William Wise, MD, Regional Medical   Director  for  Group  to serve as interim  Medical Director of the Department and  until a permanent appointment can be made.  Upon     Group's appointment of a permanent Medical Director, which shall be evidenced by an executed  Statement of Acceptance, any and all appointments thereafter, other than those to fill temporary absences, shall      be evidenced by an amendment to this Agreement.

(c)    Supervisory Services.   Group, through its physician Provider(s) rendering Services hereunder,  shall provide supervisory services for each and every mid-level Provider that it assigns to cover the Department in accordance with all applicable laws      and regulations, including, without limitation, conforming to the following requirements:

      i.       Overseeing and accepting responsibility for the health care services performed by a physician assistant as required by § 519.2 *et seq* of the Oklahoma Physician Assistant Act;

      ii.       Assuring that for each physician assistant providing services hereunder, a completed application to practice has been filed with the Oklahoma State Board of Medical Licensure & Supervision and signed by both the physician assistant and the primary supervising physician, as required by Subchapter 3, Chapter 15. Physician Assistants, Title 435 of the Oklahoma Administrative Code.

## 2.    HOSPITAL OBLIGATIONS

2.1    Space & Equipment. Hospital shall make available during the term of this Agreement the space and equipment it deems is reasonably necessary for the proper operation of the Hospital including the provision of Services by the Providers. Such requirements shall, at a minimum, include, but not be limited to: sleep room for a Provider, desk, filing space, access to computer with internet access, and capabilities reasonably acceptable to Group. Hospital shall furnish Hospital with utilities, housekeeping, laundry and other services, as it deems reasonably necessary for the proper operation of the Hospital.

2.2    Supplies. Hospital shall purchase all supplies reasonably necessary for the proper operation of the Hospital, including the provision of Services.

2.3    Personnel Provided by Hospital. Hospital shall make available during the term of this Agreement such personnel that it deems reasonable and necessary for the effective operation of the Hospital, including nurses and other para-medical personnel, laboratory and x-ray technicians. The selection and retention, as well as direction and control of such personnel in administrative matters, shall at all times rest solely with Hospital. Such personnel are employees, volunteers or contractors of Hospital.

2.4    Reimbursement. Hospital shall cooperate with Group and its employees or representatives as reasonably requested in the completion of any forms necessary for third party reimbursement.

- 7 -

2.5     Incurring Financial Obligation. Hospital agrees and acknowledges that neither it nor its officers, employees, contractors nor representatives of any kind have any right, power or authority to incur and will not incur any financial obligation, legal obligation or liability, or other obligation on behalf of, or binding upon, Group.

2.6     Quality Assurance/Utilization Review and Peer Review Programs. Hospital shall have knowledge of and assist Group in developing, implementing, monitoring and reviewing Hospital's quality assurance, utilization review, performance improvement and peer review programs, procedures, guidelines and policies which relate to the Group in its provision of services to Hospital in accordance with Medicare laws and regulations and/or other regulating, licensing or accreditation agencies.

## 3.     COMPENSATION ARRANGEMENT

3.1     Compensation for Services. In exchange for the performance by Group and the Providers of the Services required under this Agreement, Hospital will compensate Group as set forth on **EXHIBIT B** respectively which are attached hereto and incorporated herein by reference.

## 4.     CONFIDENTIALITY

4.1     Agreement. Group agrees to, and ensures that each Provider will, keep this Agreement and its contents confidential and not disclose this Agreement or its contents to any third party, other than its attorneys, accountants, and other engaged third parties, unless required by law, without the written consent of the Hospital. Hospital agrees to keep this Agreement and its contents confidential and not disclose this Agreement or its contents to any third party, other than its attorneys, accountants, and other engaged third parties, unless required by law, without the written consent of Group.

4.2     Proprietary Information. Group acknowledges that in connection with the performance of the Services under this Agreement, Group and the Providers will be acquiring and making use of certain confidential information and trade secrets of Hospital which may include management reports, financial statements, internal memoranda, reports, patient and customer lists, confidential technology, business connections, payors, managed care strategies, reimbursement methodologies, past performance, future prospects, strategic initiatives and other materials, records and/or information of a proprietary nature ("Hospital Confidential Information"). Therefore, in order to protect the Hospital Confidential Information, Group and the Providers shall not after the date hereof use the Hospital Confidential Information except in connection with the performance of the Services pursuant to this Agreement, or divulge the Hospital Confidential Information to any third party, unless Hospital consents in writing or such use or divulgence or disclosure is required by law. In the event Group or any Provider receives a request or demand for the disclosure of Hospital Confidential Information, the party receiving such request or demand shall immediately provide written notice to Hospital of such request or demand, including a copy of any written element of such request or demand. Upon termination of this Agreement, neither Group nor any Provider, will take or retain, without prior written authorization from Hospital, any papers, patient lists, fee books, patient records, files, or other documents or copies thereof or other Hospital Confidential Information of any kind belonging to Hospital. Without limiting other possible remedies for the breach of this covenant, the parties agree that injunctive or other equitable relief shall be available to enforce this covenant, such relief to be without the necessity of posting a bond, cash or otherwise.

Hospital acknowledges that in connection with the performance of the services under this Agreement, Hospital will be acquiring and making use of certain confidential information and trade secrets of Group which may include management reports, financial statements, internal memoranda, reports, patient and customer lists, confidential technology, business connections, payors, managed care

- 8 -

strategies, reimbursement methodologies, past performance, future prospects, strategic initiatives and other materials, records and/or information of a proprietary nature (" Group Confidential Information"). Therefore, in order to protect Group Confidential Information, Hospital shall not after the date hereof use Group Confidential Information except in connection with the performance of the services pursuant to this Agreement, or divulge Group Confidential Information to any third party, unless Group consents in writing or such use or divulgence or disclosure is required by law. In the event Hospital receives a request or demand for the disclosure of Group Confidential Information, the party receiving such request or demand shall immediately provide written notice to Group of such request or demand, including a copy of any written element of such request or demand. Upon termination of this Agreement, neither Hospital nor any of its employees or agents will take or retain, without prior written authorization from Group, any papers, patient lists, fee books, patient records, files, or other documents or copies thereof or other Group Confidential Information of any kind belonging to Group. Without limiting other possible remedies for the breach of this covenant, the parties agree that injunctive or other equitable relief shall be available to enforce this covenant, such relief to be without the necessity of posting a bond, cash or otherwise.

Hospital Confidential Information and Group Confidential Information shall not include information that Group or the Hospital can demonstrate by clear and convincing evidence: (a) at the time of disclosure by Hospital to Group or vice versa that the information was known to Group or the Hospital respectively as evidenced by its contemporaneous written records; (b) at the time of disclosure by disclosing party, was published or known publicly or otherwise was in the public domain; (c) after disclosure by disclosing party and other than as a result of a breach of either party's obligations under this Agreement, becomes published or publicly known or otherwise becomes part of the public domain; or (d) is disclosed to disclosing party in good faith by a third party who is not under obligation of confidence or secrecy to such party.

## 5.    RECORDS

5.1    Patient and Provider Access to Records. The parties recognize that the patient has the legal right to have access to his or her medical records, that all staff physicians at Hospital have the right to consult those records to facilitate the continuity of proper care, and that such records are confidential and privileged under state and federal law. Hospital expressly agrees that Group and the Providers shall have access, as permitted by applicable law, to such patient records at any time necessary for Group and the Providers to fulfill their duties under this Agreement and for the provision of Group quality assurance, audit and billing requirements. Group acknowledges that in performing services hereunder, it shall be part of an "organized health care arrangement" with Hospital for purposes of the privacy and security rules of the Health Insurance Portability and Accountability Act of 1996 and the regulations promulgated thereunder ("HIPAA"). Group agrees to abide by Hospital's policies and procedures regarding HIPAA, including Hospital's Notice of Privacy Practices, and otherwise agrees to abide by all terms and conditions of HIPAA.

5.2    Business Records and Reports. In performing its duties hereunder, Group may generate business or financial records and reports relating to the costs and operation of the Hospital, risk management, and quality control.

5.3    Access to Books and Records. Each party agrees to comply with the following requirements governing the maintenance of documentation to verify the cost of services rendered under this Agreement:

5.3.1    Availability of Records. Until the expiration of four (4) years after the furnishing of services pursuant to this Agreement, each party shall make available, upon written request of the Secretary of Health & Human Services ("HHS"), or upon request of the Comptroller General of the

United States, or any of their duly authorized representatives, this Agreement, and books, documents, and records of such party that are necessary to certify the nature and extent of such costs.

**6.**     **TERM AND TERMINATION**

6.1.     Term. The term of this Agreement shall commence on or before September 1, 2012 at 7am CentralStandard Time (the "Commencement Date"), and shall be for a   term of three (3) years ( the " Term"), unless sooner terminated as provided in this Agreement.

6.2     Termination.  This Agreement shall terminate prior to its natural expiration date on or upon the occurrence of any of the following:

(a)     Termination by Agreement.  In the event Hospital and Group mutually agree in writing, this Agreement may be terminated on the terms and date stipulated therein.

(b)     Termination for Group's Breach.  If Group breaches any material provision of this Agreement , including, without limitation, failing to provide the Services enumerated in **EXHIBIT A,** Hospital shall notify Group in writing specifying the breach and   setting  forth  a cure period of fifteen (15) days from the date such notice is received ("Cure      Period").     If Group fails to cure such breach or fails to cause such breach to be cured within the      Cure period, Hospital, in its sole discretion, may terminate this Agreement immediately, upon the expiration of the Cure Period and written notice to Group. Notwithstanding the foregoing, if a breach is cured within the Cure Period but the same or substantially similar breach occurs within a six (6) month period  following  the  expiration  of  the  initial  Cure  Period, Hospital may immediately terminate   this Agreement without any further opportunity for cure being afforded to Group.

(c)     Termination for Hospital's Breach.  If Hospital breaches any of the material terms of this Agreement, other than for late or non-payment for Services provided (Group's remedies for such being set forth in **EXHIBIT B**), Group shall    notify    Hospital    in    writing specifying the breach and setting forth the Cure Period. Group, in its      sole      discretion,      may terminate this Agreement immediately upon the expiration of the Cure     Period. Notwithstanding the foregoing, if a breach is cured within the Cure Period but the same or substantially      similar breach occurs within a six (6) month period following the expiration of the             initial      Cure Period, Group may immediately terminate this Agreement without any further      opportunity for cure being afforded to Hospital.

(d)     Non-performance Due to Lack of Availability of Providers.  Hospital may immediately terminate this Agreement upon making a good faith determination that Group, for any reason whatsoever, has failed and continues to fail to provide continuous      coverage of the Department      after having      given Group written notification of such a determination and Group's stated or demonstrated  inability  to  restore  continuous  coverage  of  the  Department within forty-eight (48)   hours of Group's receipt of such notification.

(e)     Immediate Termination.

(1)     Hospital may immediately terminate this Agreement by written notice to Group, without an opportunity for cure or appeal being afforded, upon written notice to Group, in the event: (i) Group fails to remove and replace any Provider as required by **Section 1.2** herein; (ii) Group or any member of the Group Party  is excluded from participation in any federal or state program for the reimbursement           of health care

- 10 -

services and Hospital has invoked its right of termination in accordance with the provisions of **Subsection 1.3(i)** herein; **(iii)** Group has failed to provide Hospital with the notification of adverse action required pursuant to **Section 1.13**; (iv) Group no longer maintains and/or is able to obtain the liability insurance coverage as required herein; (v) Any member of the Group's Party or any Provider is convicted of or pleads nolo contendere to a felony; (vi) the performance or attempted performance of any of Group's or any Provider's obligations   through any provider who does not have privileges on Hospital's Medical staff; or **(vii)**   closure of the Hospital.

(2)   Group may terminate this Agreement immediately upon written notice to Hospital upon either of the following occurrences: (i) loss of Hospital's licensure; or (ii) Hospital's exclusion from participation in Medicare or Medicaid.

(f)   <u>Not for Cause Termination.</u>   After the conclusion of the initial eighteen (18) months of this Agreement's term either party may terminate this Agreement, for any reason or no reason, upon the giving of sixty (60) days prior written notice to the other party.

6.3   <u>Post-Termination Obligations.</u> The termination of this Agreement shall not relieve either party of any obligation pursuant to this Agreement which arose on or before the date of termination, and those sections of this Agreement which by their terms extend beyond termination or expiration of this Agreement shall survive and continue in full force and effect after the expiration of the Term or any termination of this Agreement.

6.4   <u>Matters Relating to Medical Staff Membership and Due Process.</u> Medical staff membership is a condition to the performance of Services under this Agreement. This Agreement is not, however, and shall not be construed as, any form of guarantee or assurance by Hospital that any Provider will obtain or retain medical staff membership or clinical privileges; those matters are governed solely by the bylaws, rules and regulations of the Medical Staff of the Hospital as in effect from time to time. Any due process or other requirements of the bylaws, rules or regulations of the medical staff at Hospital shall not apply to the termination of this Agreement or the removal by Hospital of any Provider from providing services to Hospital hereunder during the Term. Upon the termination of this Agreement, Medical Staff membership shall automatically terminate for all Providers arranged for by Group.

**7.   DISPUTE RESOLUTION**

7.1   <u>Mediation.</u> Both parties agree, in good faith, to attempt to resolve any dispute which may arise under this Agreement by submitting such dispute for nonbinding mediation.

7.2   <u>Termination.</u> This Section shall not prevent either party from electing to terminate this Agreement in accordance with its termination provisions.

**8.   RESTRICTIVE COVENANTS**

<u>Non-solicitation of Personnel.</u> In recognition that Group expends substantial resources and efforts to make qualified personnel available to serve as Providers, Hospital agrees during the term of this Agreement including any extensions thereof, and for a period of 24 months after the termination or expiration of this Agreement regardless of cause, Hospital will not directly or indirectly (including, without limitation, through a controlled affiliate) solicit, retain, employ, contract with or otherwise engage or be the beneficiary of the professional services of any Provider who (a) was presented to Hospital by Group as a prospective Provider or (b) provided either administrative or medical services to satisfy Group's obligations under this Agreement at Hospital. In addition, Hospital agrees it will not induce,

persuade, or attempt to persuade any Provider or prospective Provider to refuse to provide services or terminate his or her relationship with Group, its agents or affiliates. Notwithstanding the provisions of Section 8, Group may, in its sole discretion, elect to waive the provisions of Section 8 for any Provider subject to such provision.; provided however, that Group shall be compensated for each such Emergency Provider in the amount of Fifty Thousand Dollars ($50,000). The foregoing notwithstanding, this provision shall not apply to any Providers currently or previously credentialed by Hospital and who were not at the time considered to be part of Group's program.

## 9.   GENERAL PROVISIONS

9.1    Patient Complaints. The parties agree to cooperate with each other in the resolution of any patient complaints arising out of the services provided hereunder. All patient complaints shall be resolved in accordance with any procedures established by Group and Hospital.

9.2    Corporate Practice of Medicine. Nothing contained herein is intended to constitute the use of a medical license for the practice of medicine by anyone other than a licensed physician, mid-level practitioner or Hospital. The parties specifically acknowledge the following:

(a)    This Agreement contemplates nothing more than the delivery of administrative and coverage services by Group through Group's management and administrative staff, and Group's employed Providers, respectively, to Hospital. Group and the Providers shall remain entirely independent of Hospital as to the diagnosis and treatment of patients and all other medical, professional and ethical affairs of the Providers. Group shall ensure that the Providers accept full responsibility to these patients for the nature and character of all professional medical services rendered.

(b)    There shall be no sharing of profits between Group and Hospital.

(c)    Hospital claims no right, title or interest in any of the assets of Group, none of which shall be used for the benefit of Hospital.

9.3    Relationship of Parties.

(a)    Independent Contractor Status. In performing their responsibilities pursuant to this Agreement, it is understood and agreed that the Providers performing Services hereunder are at all times acting as independent contractors to the Hospital and that the Providers are not partners, joint-venturers, or employees of the Hospital. As independent contractors, Hospital shall not be responsible for providing workers compensation insurance, the payment of unemployment fees or  taxes, or any of other benefit provided to its employees. If required by the laws of the State of Oklahoma, Group shall be responsible for procuring, providing and maintaining workers compensation insurance on a continual basis for the term of this agreement and provide Hospital with a certificate of said coverage. Hospital shall neither have nor exercise any control or direction over the medical judgment of the Providers nor over the methods or manner by which the Providers perform their work and functions under this Agreement as they relate to the diagnosis or treatment of any disease, disorder, physical deformity, or injury. Nothing in this Agreement shall alter or is intended to alter the physician-patient relationship. The interest and responsibility of the Hospital is to ensure that the services offered at the Hospital and covered by this Agreement shall be performed and rendered in a competent, efficient, and satisfactory manner. It is expressly agreed that the Providers will not for any purpose be deemed to be agents, ostensible or apparent agents, or servants of Hospital, and the parties agree to take

- 12 -

any and all such action as may be reasonably requested by Hospital to inform the public, patients of the Hospital, and others utilizing the professional services of the Providers of such fact.

(b)     Compensation, Fringe Benefits, Taxes. Group hereby acknowledges and agrees and shall ensure that the Providers understand and agree that: (i) each Provider shall not be entitled to any salary or other compensation from Hospital or to any employee benefits provided by Hospital, including, but not limited to disability, life insurance, pension and annuity benefits, educational allowances, professional membership dues, and sick, holiday, or vacation pay; (ii) Hospital will not withhold income taxes or pay Social Security or unemployment taxes for Providers, such being the exclusive responsibility of Group, which Group agrees to discharge fully; and (iii) Group shall indemnify and hold harmless the Hospital against any and all liability related to withholding or failure to withhold income taxes or paying or not paying Social Security or unemployment taxes for the Providers. If the Internal Revenue Service or any other governmental agency challenges the independent contractor status of the Providers, the parties agree that the Group and the Hospital shall have the right to participate in any discussion or negotiation that occurs in the course of such challenge.

9.4     Conformance with Law. The parties recognize that this Agreement is subject to, and agree to comply with, applicable local, state, and federal statutes, rules and regulations, including without limitation the Medicare and Medicaid Anti-Fraud and Abuse Amendments and applicable state laws and regulations. Group shall comply with all laws, rules and regulations relating to the confidentiality of patient information, including the applicable provisions of Oklahoma law and the privacy regulations promulgated pursuant to HIPAA. Any provisions of applicable statutes, rules, or regulations that invalidate any term of this Agreement, that are inconsistent with any term of this Agreement, or that would cause one or both of the parties hereto to be in violation of law shall be deemed to have superseded the terms of this Agreement; provided, however, that the parties shall use their best efforts to accommodate the terms and intent of this Agreement to the greatest extent possible consistent with the requirements of applicable statutes, rules and regulations and negotiate in good faith toward amendment of this Agreement in such respect. In addition, in the event the legal counsel of Group or Hospital, in its reasonable opinion, determines that this Agreement or any material provision of this Agreement violates any federal or state law, rule or regulation, the parties shall negotiate in good faith to amend this Agreement or the relevant provision thereof to remedy such violation in a manner that will not be inconsistent with the intent of the parties or such provision. If the parties cannot reach an agreement on such amendment within 30 days of commencement of renegotiation, however, then either party may terminate this Agreement immediately. This section shall survive the termination of this Agreement.

9.5     Governing Law and Venue. This Agreement shall be construed and governed according to the laws of the State of Oklahoma , without giving effect to its conflict of laws provisions.

9.6     No Referral. Nothing contained in this Agreement shall require (directly or indirectly, explicitly or implicitly) any party to refer any patients to any other party or to use any other party's facilities as a precondition to receiving the benefits set forth herein.

9.7     Rights in Property. Group acknowledges and agrees that this Agreement shall not be deemed to grant to Group any rights to Hospital real property, equipment or furnishings.

9.8     Notices. Any notice to a party hereto pursuant to this Agreement shall be given in writing by personal delivery, overnight delivery, or United States certified or registered mail, return receipt requested, addressed as follows:

If to Hospital:                              If to Group:

- 13 -

Haskell County Community Hospital      Emergency Staffing Solutions
401 NW H Street      17304 Preston Road, Suite 1400
Stigler, Oklahoma, 74462      Dallas, Texas  75250
Attn.: Davie Lloyd, CEO      Attn.: Ron Weiss, CEO

With a copy to:

HMC/CAH Consolidated, Inc.
1100 Main Street, Suite 2350
Kansas City, Missouri  64105
Attn.: Brent Lagergren, Esq.
      VP & Chief Compliance Officer

The parties shall hereafter notify each other in accordance herewith of any change of address to which notice is required to be sent. Notice shall be effective upon delivery.

9.9     <u>Parties Bound.</u> This Agreement and the rights and obligations hereunder shall be binding upon and inure to the benefit of the parties, and their respective heirs, personal representatives, and permitted assigns. This Agreement shall also bind and inure to the benefit of any successor of Hospital by merger or consolidation.

9.10     <u>No Third-Party Beneficiaries.</u> No provision of this Agreement is intended to benefit any person or entity, including, but not limited to any Provider who is not a party to this Agreement, nor shall any person or entity not a party to this Agreement have any right to seek to enforce or recover any right or remedy with respect hereto.

9.11     <u>Non-Waiver.</u>  No waiver by either of the parties hereto of any failure by the other party to keep or perform any provision, covenant or condition of this Agreement shall be deemed to be a waiver of any preceding or succeeding breach of the same, or any other provision, covenant or condition.

9.12     <u>Additional Documents.</u> Each of the parties hereto agrees to execute any document or documents that may be reasonably requested from time to time by the other party to implement or complete such party's obligations pursuant to this Agreement.

9.13     <u>Section Headings.</u> The headings preceding the text of the several sections of this Agreement are inserted solely for convenience of reference and shall not constitute a part of this Agreement, nor shall they affect the meaning, construction, or effect of any section hereof.

9.14     <u>Gender and Number.</u> Whenever the context of this Agreement requires, the gender of all words herein shall include the masculine, feminine, and neuter, and the number of all words herein shall include the singular and plural.

9.15     <u>Entire Agreement.</u> This Agreement, including any exhibits or addenda identified and incorporated by reference herein, contains the entire understanding of the parties and supersedes any prior written or oral agreements or understandings between them concerning the subject matter set forth above. There are no representations, warranties, covenants, promises, agreements, arrangements or understandings, oral or written, express or implied among the parties hereto relating to the subject matter set forth above which have not been fully expressed herein.

- 14 -

9.16    Amendments.   Only an instrument in writing signed by the parties can amend this Agreement. Amendments to this Agreement shall be effective as of the date stipulated therein.

9.17    Severability. The sections, paragraphs and individual provisions contained in this Agreement shall be considered severable from the remainder of this Agreement and in the event that any section, paragraph or other provision should be determined to be unenforceable as written for any reason, such determination shall not adversely affect the remainder of the sections, paragraphs or other provisions of this Agreement. It is agreed further, that in the event any section, paragraph or other provision is determined to be unenforceable, the parties shall use their best efforts to reach agreement on an amendment to the Agreement to supersede such severed section, paragraph or provision.

9.18    Counterparts. This document may be executed in multiple counterparts, each of which when taken together shall constitute but one and the same instrument.

EXECUTED as of the dates set forth below.

**HOSPITAL**

**CAH ACQUISITION COMPANY 10, LLC**
**d/b/a Haskell County Community Hospital**

By: _____
        Larry Arthur
Its: President

Date: 27 Aug 12

**GROUP**

**EMERGENCY STAFFING**
**SOLUTIONS, INC**

By: _____
Its: ___CEO_____
Date: ___8|31|12_____

683223.2

**EXHIBIT A**
**Emergency Department Services**

1.      <u>Professional Services.</u>  Subject to the continuing approval of Hospital as described in this Agreement, Group agrees (a) to provide or arrange for emergency department coverage services in the Hospital through its contracted Physicians at the times and in the manner provided for in this Agreement; and (b) to make such Physicians available with respect to all Hospital patients (regardless of financial condition, insurance coverage, or ability to pay) who require emergency medical services in the Hospital. Group shall provide one (1) Physician to be on site at all times during the times set forth in this <u>Exhibit A</u>, for the timely and proper provision of medical services in the Hospital.

2.      <u>Emergency Department Coverage Services.</u>  Group, through its contracted Physicians, shall:

(a)     Examine and treat all persons who present themselves at the Hospital's emergency department (the "Emergency Department") for care or treatment in accordance with the Emergency Medical Treatment and Active Labor Act of 1986 ("EMTALA"), as amended from time to time.;

(b)     Provide timely and appropriate care to patients;

(c)     Respond in a timely manner to requests for needed assistance initiated by a house supervisor in life and/or limb threatening emergencies of hospitalized patients;

(d)     Provide coverage for inpatient cardiac and/or respiratory arrests provided that patients in the Hospital's Emergency Department are not requiring physician supervision and monitoring;

(e)     Communicate any admission to the patient's primary care physician;

(f)     Attend to persons injured in the facility and Hospital personnel with job related injuries, illness, or exposure;

(g)     Complete medical records prior to the end of their next shift worked.

3.      <u>Medical Director Services.</u>  Group will designate a Physician approved by Hospital to be Medical Director of the Emergency Department.  The Medical Director shall be responsible for managing Emergency Department issues on a day-to-day basis, including, without limitation, the following:

(a)     Coordinating the Emergency Department Physician coverage schedule;

(b)     Recommending policies and procedures to Hospital concerning the administration of the Emergency Department;

(c)     Addressing patient complaints involving Emergency Department Physicians; and

(d)     Acting as a liaison among Group, members of the organized Medical Staff of Hospital ("Medical Staff"), and the Hospital.

4.      <u>Location</u>.  Group shall provide the Services at Haskell County Healthcare System in

Stigler, Oklahoma.

      5.    <u>Days and Hours; Schedule</u>. Group shall provide Emergency Department coverage twenty-four (24) hours per day, seven (7) days per week.  The schedule for coverage shall be arranged by the Group, approved by and submitted to the Hospital  CEO or its designee and Emergency Department at least five (5) days prior to the first day of each month.

      6.    All Physicians covering the Emergency Department shall comply with all Bylaws, Policies, Rules and Regulations of the Hospital, the Medical Staff, and the Physician's department, as well as with all State and Federal laws and regulations regarding the transfer of patients and treatment of Emergency Department patients, including, without limitation, EMTALA.

**EXHIBIT B**
**Compensation for Emergency Department Services**

A.   Hospital agrees to pay Group $50,942 per month for Services related to ED coverage.

B.   Hospital shall have the right to bill and receive fees and/or reimbursement from patients and third party payors for all services provided in Hospital otherwise known as technical component services.

B.   Hospital will be billed twice monthly and agrees to pay invoice in full within 10 days of receipt of an invoice therefore.  Any invoice not paid within 15 days of receipt shall accrue interest on the unpaid amount at the annual rate of the 18%.  Notwithstanding any other provision in this Agreement, Group may immediately terminate this Agreement at any time without notice if payment for services is not received by the 45th day after the invoice is mailed.

C.   Minimum Volume Threshold - During the term of this Agreement,  Group shall have the sole and exclusive right and responsibility for the billing and collection of all fees and reimbursement relating to all Professional Component Services rendered by the Group and its Physicians. In addition to the compensation set forth above, Hospital agrees  to compensate Group at the rate of Seventy-Seven and no/100 ($77.00) per patient per month for the difference between  the monthly Minimum Volume Threshold of Three Hundred Fifty (350) billable patients  and the number of patients actually seen in any given month, if less, averaged on a calendar quarter basis.

# Exhibit A-9

**1:44 PM**

**03/11/15**

**Accrual Basis**

# Emergency Staffing Solutions, Inc.
## Customer Open Balance
### January through May 2014

| Type | Date | Num | Memo | Due Date | Open Balance | Amount |
|---|---|---|---|---|---|---|
| **Haskell County Community Hospital** | | | | | | |
| Invoice | 3/31/2014 | 30690 | | 6/16/2014 | 4,312.00 | 4,312.00 |
| Invoice | 4/15/2014 | 30488 | | 4/25/2014 | 25,471.00 | 25,471.00 |
| Invoice | 4/30/2014 | 30535 | | 5/10/2014 | 25,471.00 | 25,471.00 |
| Invoice | 4/30/2014 | 30858 | | 7/27/2014 | 24,640.00 | 24,640.00 |
| Invoice | 5/4/2014 | 30590 | | 5/22/2014 | 6,573.16 | 6,573.16 |
| Total Haskell County Community Hospital | | | | | 86,467.16 | 86,467.16 |
| **TOTAL** | | | | | **86,467.16** | **86,467.16** |

# Exhibit A-10



**Emergency Staffing Solutions, Inc.**
**Dallas, Texas 75252**
**17304 Preston Road, Suite 1400**

# Invoice

| Date | Invoice # |
|------|-----------|
| 3/16/2015 | 31761 |

Bill To

Haskell Community Hospital
401 NW "H" Street
Stigler, OK 74462

| Terms | Due Date |
|-------|----------|
| Net 10 Days | 3/26/2015 |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| Finance Charges on Overdue Balance - Interest accrued at annual rate of 18% from date invoice was due per contract | | | |
| Finance Charges on Overdue Balance: Invoice #30690 due 6/16/14 | | 582.65 | 582.65 |
| Finance Charges on Overdue Balance: Invoice #30488 due 4/25/14 | | 4,094.90 | 4,094.90 |
| Finance Charges on Overdue Balance: Invoice #30535 due 5/10/14 | | 3,906.48 | 3,906.48 |
| Finance Charges on Overdue Balance: Invoice #30858 due 7/27/14 | | 2,831.24 | 2,831.24 |
| Finance Charges on Overdue Balance: Invoice #30590 due 5/22/14 | | 969.23 | 969.23 |

| Phone No. | Fax No. |
|-----------|---------|
| (972)934-3200 x161 | (866)801-1126 |

| Email Address |
|---------------|
| ap@essdoc.com |

| | |
|---|---|
| **Total** | $12,384.50 |
| **Payments/Credits** | $0.00 |
| **Balance Due** | $12,384.50 |