# United States District Court

**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| EMERGENCY STAFFING SOLUTIONS, INC. | § § § § | |
| v. | § § § | CASE NO. 4:13-CV-309 Judge Mazzant LEAD |
| CAH ACQUISITION COMPANY #10, LLC, ET AL | § § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

On the 13th, 14th, and 15th days of July, 2015, the Parties appeared before the Court for a bench trial of this case, at which time the Court heard evidence and argument of counsel. The Court now enters its Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52. Any finding of fact which constitutes a conclusion of law shall be deemed a conclusion of law, and any conclusion of law which constitutes a finding of fact shall be deemed a finding of fact. Briefs were filed by the Parties prior to trial and after trial (Dkts. #83, #84, #105, #106).

The Court makes the following findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52(a).

## FINDINGS OF FACT

1. CAH Acquisition Company #1, LLC d/b/a Washington County Hospital ("CAH-Washington") is a Critical Access Hospital located in Plymouth, North Carolina.

2. CAH Acquisition Company #10, LLC d/b/a Yadkin Valley Community Hospital ("CAH-Yadkin") is a Critical Access Hospital located in Yadkinville, North Carolina.

3. CAH Acquisition Company #16, LLC d/b/a Haskell County Community Hospital ("CAH-Haskell") is a Critical Access Hospital located in Stigler, Oklahoma.

4. HMC/CAH Consolidated, Inc. ("HMC/CAH") is the parent corporation of certain Critical Access Hospitals, including CAH-Washington, CAH-Yadkin, and CAH-Haskell.

5. Emergency Staffing Solutions ("ESS") is in the business of contracting with hospitals to provide, among other things, emergency department billing and physician staffing services. ESS utilizes Intermedix Corporation ("Intermedix") for its emergency department billing services, and did so for the three hospitals in the present case. The compensation received by ESS under its emergency department contracts is based upon two primary revenue streams: collections on medical services provided to the patients visiting the emergency department of a contracting hospital, and a monthly subsidy charged to the contracting hospital. ESS's forecast of expected collections is based on a number of variables, including: 1) the number of patients to be seen in the emergency department of the contracting hospital, 2) a breakdown of the payer mix, or the method of payment to be used by the patients, and 3) a breakdown of the acuity mix (collectively, the "Compensation Variables"). ESS uses the Compensation Variables to determine the monthly subsidy to charge the contracting hospital. Acuity is determined by the hospital's own reporting, and determines the sickness of the patient population in the emergency department. Payer mix shows the percentages of the types of insurances that the patients use for paying the hospital.

6. Before entering a contract, ESS sends out a questionnaire to the contracting hospital requesting the Compensation Variables for its emergency department for the prior twelve-month period. When ESS receives the questionnaire back from the hospital, it forwards the questionnaire to Intermedix to calculate an estimated collection per patient. Based upon

ESS's experience, Intermedix's projections have a typical variance of approximately 1-2% compared to the actual collections. Then, ESS subtracts the hospital's costs from Intermedix's projected collections, which typically results in a negative number. ESS sets the monthly subsidy at the number that will balance out the equation.

7. On February 10, 2012, ESS's Director of New Business Development, Alicia Cassidy ("Cassidy"), contacted Gordon Docking ("Docking"), HMC/CAH's Chief Operating Officer ("COO"), about the possibility of ESS staffing HMC/CAH's hospitals with emergency department and hospitalist physicians (Tr. Ex. 5). At that time, Cassidy mentioned that ESS had just signed a contract with CAH-Haskell pertaining to emergency department services (Tr. Ex. 5). Docking expressed his interest in using ESS because CAH-Washington and CAH-Yadkin had pressing hospitalist and emergency department needs (Tr. Ex. 5). On or about February 21, 2012, Docking met with ESS's representatives to discuss the possibility of ESS providing physicians to CAH-Washington and CAH-Yadkin for the hospitals' emergency department and hospitalist programs.

8. On February 22, 2012, Docking sent an email to Harley Smith ("Smith"), the Chief Executive Officer ("CEO") of CAH-Washington, and Fred Soule ("Soule"), the CEO of CAH-Yadkin, informing them that Cassidy would be emailing them to request the hospitals' operating data (Tr. Ex. 8). Docking stated Cassidy needed the information to put together her proposal (Tr. Ex. 8).

*CAH-Washington's Relationship with ESS*

9. Shortly after February 22, 2012, Cassidy requested hospital information from Smith for ESS's questionnaire. The questionnaire included information pertaining to CAH-Washington's payer mix, patient volumes, and patient acuity mix. On February 29, 2012,

CAH-Washington provided ESS with a completed questionnaire (Tr. Ex 14). In the completed questionnaire, CAH-Washington's payer mix over the last twelve months was reported to be 13% Blue Cross Blue Shield ("BCBS"), 14% Medicaid, 55% Medicare, 5.6% Commercial Insurance, 0.8% Workers Compensation, 10% Self-Pay, and 2% HMO/PPO (Tr. Ex. 14). Smith testified that as the CEO of CAH-Washington, Docking, as COO of HMC/CAH, was his boss. Smith also testified that the information provided in CAH-Washington's questionnaire came from HMC/CAH, because he believed that CAH-Washington would not have had access to that type of information. He stated that he believed that HMC/CAH was the primary contact with ESS when negotiating CAH-Washington's contract, and CAH-Washington's payments to ESS were made directly from HMC/CAH. Smith believed CAH-Washington would have needed HMC/CAH's approval before entering into a contract with ESS. Additionally, Cassidy testified that, from ESS's viewpoint, HMC/CAH was involved in the process. She believed that HMC/CAH was the decision-maker, as Docking told her he had chosen ESS for CAH-Washington's emergency room staffing and hospitalist needs, and HMC/CAH representatives had negotiated the CAH-Washington contract.

10. ESS used the Compensation Variables provided by CAH-Washington to determine its collection projection, and to set the monthly subsidy for CAH-Washington. Cassidy testified that all three variables were important for determining the proposed collections amount. She believed that if one value was significantly off, the subsidy would be skewed.

11. On March 2, 2012, Dan Pope ("Pope"), who worked for Intermedix, contacted Cassidy because "something [struck him] as unusual" about CAH-Washington's numbers (Tr. Ex. 13). Pope requested that Cassidy verify the payer mix numbers of 55% Medicare, 10% Self-

Pay, and 14% Medicaid before he submitted CAH-Washington's proposal to ESS (Tr. Ex. 13). On March 5, 2012, Cassidy informed Pope that she had confirmed the payer mix numbers with Smith. She stated that Smith told her that the "self-pay [was] low." (Tr. Ex. 13). Cassidy testified that she believed Smith's representations that the numbers provided within the CAH-Washington questionnaire were correct.

12. On March 8, 2012, Cassidy submitted ESS's proposal for the staffing and management of CAH-Washington's emergency department and hospitalist programs to Smith and Docking (Tr. Ex. 21). The proposal included a monthly subsidy of $51,502 for emergency department services, and an additional monthly subsidy of $4,000 for hospitalist services (Tr. Ex. 21). The proposed subsidies were based off of the information that was provided to ESS from CAH-Washington within the questionnaire.

13. On March 8, 2012, Smith sent the proposal to Al Arrowood ("Arrowood"), Vice President of Operations at HMC/CAH, because Docking wanted Arrowood to review the proposal (Tr. Ex. 21). Smith requested that Arrowood review the proposal before he met with ESS representatives at his hospital on March 13, 2012 (Tr. Ex. 21).

14. On March 15, 2012, Cassidy sent Docking and Smith a proposed contract for the staffing and management of CAH-Washington by ESS. Docking then sent the proposed contract to Brent Lagergren ("Lagergren"), an attorney for HMC/CAH, for his review (Tr. Ex. 36). Docking stated that the agreement should be similar to the one entered into by ESS and CAH-Haskell, which Lagergren prepared (Tr. Ex. 36). On April 1, 2012, Lagergren provided Cassidy with the changes to the CAH-Washington contract (Tr. Ex. 40).

15. On or about June 1, 2012, ESS and CAH-Washington entered into a contract whereby ESS agreed to provide emergency department billing and physician staffing services to CAH-

Washington in exchange for CAH-Washington's agreement to compensate ESS for those services (the "CAH-Washington Agreement"). The agreement also stated the obligations that ESS owed to CAH-Washington, and the obligations that CAH-Washington owed to ESS. It included a monthly subsidy of $51,502, and a fee for the hospitalist program of $4,000 per month (Tr. Ex. 47). The compensation provision stated that CAH-Washington must pay each invoice in full within ten days of receipt, and any invoice not paid within fifteen days of receipt would accrue interest at an annual rate of 18% (Tr. Ex. 47). Additionally, it contained a choice of law provision, which stated that the agreement would be controlled by North Carolina law (Tr. Ex. 47). The agreement was signed for CAH-Washington by HMC/CAH through its COO Docking (Tr. Ex. 47). After CAH-Washington and ESS entered into the CAH-Washington Agreement, ESS began providing physicians to staff CAH-Washington's emergency department and hospitalist programs. Cassidy testified that there was an extensive contract negotiation between ESS and CAH-Washington, with HMC/CAH taking the lead in negotiations through Docking and Lagergren. However, Cassidy believed that CAH-Washington and HMC/CAH wanted the contract to be rushed because they wanted to get rid of the group who was providing CAH-Washington hospitalist services at that time, and therefore, ESS was required to start the program in a quicker time period than it usually started its programs.

16. On June 6, 2012, Smith contacted Cassidy regarding concerns he had about the staffing of CAH-Washington (Tr. Ex. 58). Cassidy responded to Smith that day, addressed his concerns, and told him to call her if there were any further problems (Tr. Ex. 58). Cassidy testified that addressing hospital concerns after entering into a contract was not a part of her regular duties for ESS. However, she addressed the concerns for CAH-Washington and

CAH-Yadkin because of her relationship with HMC/CAH, specifically her relationships with Docking and Lagergren. Smith testified that he had issues with ESS regarding the hospitalist program; however, the emergency department staffing program matched his expectation. He testified that although he had to report concerns to ESS more than one time, ESS always responded to his concerns very quickly.

17. A few months after entering into the CAH-Washington Agreement, ESS, through Intermedix, learned that the actual collections from the CAH-Washington emergency department were different from their projected collections. Intermedix discovered the irregularities because it had access to the actual total collections in the CAH-Washington emergency department.

18. On September 18, 2012, ESS requested an increased monthly payment to cover the cost of providing emergency department services at the hospital, and requested CAH-Washington to draft an amendment to the agreement (Tr. Ex. 77). ESS stated that it would need an additional monthly subsidy of $17,924.50 to cover the cost of the CAH-Washington program (Tr. Ex. 77). Cassidy testified that Shonda Rupe ("Rupe"), the COO of ESS, had recalculated the numbers and learned that the payer mix values were inaccurate. Cassidy believed that HMC/CAH told ESS the values were inaccurate, and informed Rupe that it had provided information for the entire hospital, not only the numbers for the emergency department. Cassidy did not believe that either HMC/CAH or CAH-Washington ever expressed confusion about the "ED" designation within the questionnaire.

19. On October 12, 2012, Cassidy wrote to Arrowood requesting that HMC/CAH send over a copy of the signed amendment (Tr. Ex. 83). Cassidy stated that "[ESS has] been working in the red since [it] took over [the] account in July [due] to the shortfall on the monthly

subsidy." (Tr. Ex. 83). Arrowood responded that Lagergren would send ESS the amendment later that day (Tr. Ex. 83).

20. On October 19, 2012, Dennis Davis ("Davis"), who worked for HMC/CAH, sent the amendment to Ron Weiss ("Weiss"), ESS's CEO, and Rupe (Tr. Ex. 84). At that time, Davis stated that HMC/CAH did "recognize that the payor [sic] mix provided originally did not reflect the payor [sic] mix for the ER, but rather the payor [sic] mix for the hospital." (Tr. Ex. 84). Rupe testified that she believed CAH-Washington, through HMC/CAH, was agreeing to a concession that obligated them to pay an established amount for the period between June 1, 2012, and October 31, 2012, for the services rendered, in addition to the $4,000 for hospitalist services. She stated that the purpose of the amendment was for ESS to be paid its promised subsidy. However, the terms of the amendment were based on a negotiated figure because ESS was aware that HMC/CAH was involved in a bankruptcy proceeding.

21. On October 20, 2012, ESS and CAH-Washington executed an amendment to the CAH-Washington Agreement (the "2012 Amendment"). The 2012 Amendment provided for an increased monthly payment to ESS for the emergency department physicians. The amendment stated,

> The following provision is added to **Exhibit C** of the Agreement, intending it to be effective for the period beginning June 1st, 2012 and expiring October 31st, 2012, and replaces item "A" as originally written which is hereby deleted in its entirety:
> **A.** Hospital agrees to pay Group $69,426.50 per month for Services related to ED coverage.
> The following provision is added to **Exhibit C** of the Agreement, intending it to be effective November 1st, 2012 and replaces item "A," as amended, which is hereby deleted in its entirety.
> **A.** Hospital agrees to pay Group $62,464.25 per month for Services related to ED coverage.
> Effective November 1st, 2012, **Exhibit B** and **Exhibit D** and any references thereto in the Agreement are hereby removed and shall have no further effect.

(Tr. Ex. 86). The 2012 Amendment also stated, "[e]xcept as modified herein, the Agreement between the Parties hereto is otherwise hereby ratified, confirmed and approved, and will remain in full force and effect in accordance with its terms." (Tr. Ex. 86). Rupe testified that she believed the amendment did not override the original contract, and the Parties were still bound by the terms of the original CAH-Washington Agreement.

22. Between October 20, 2012, and May 15, 2013, CAH-Washington, through HMC/CAH, worked with ESS to bring its account balance current (Tr. Exs. 89, 92, 93, 94, 98). On October 24, 2012, Theresa Flores ("Flores") at HMC/CAH sent an email to Carrie O'Brien ("O'Brien") at ESS, and stated that HMC/CAH would provide payments for CAH-Washington, CAH-Yadkin, and CAH-Haskell (Tr. Ex. 89). On January 16, 2013, Flores emailed O'Brien, and stated that HMC/CAH would be able to make a $75,000 payment on the hospitals' invoices (Tr. Ex. 94). On February 13, 2013, Flores emailed O'Brien, and stated that HMC/CAH would be able to make a $125,000 payment on the hospitals' invoices (Tr. Ex. 98). On May 15, 2013, Flores emailed O'Brien, and stated that "the ACH's [would] hit [her] account tomorrow." (Tr. Ex. 105). This included payments for CAH-Washington and CAH-Yadkin (Tr. Ex. 105).

23. On May 15, 2013, John Power ("Power"), Defendants' attorney, contacted John Hafen ("Hafen"), Plaintiff's attorney, and stated,

> I have talked to my client regarding your offer that ESS will not provide coverage to [CAH-Washington, CAH-Yadkin, and CAH-Haskell] commencing today if we provide you with written assurance that the hospitals will not look to ESS if there are any issues or problems because ESS is not providing the required coverage.

(Tr. Ex. 106 at p. 5). Hafen responded on May 16, 2013, and stated,

> I am preparing a form Termination Agreement to address the terms and conditions of termination at the three facilities. […] Until the parties have a signed termination agreement in place, my client will continue to provide coverage

pursuant to the existing agreements. I trust your clients will continue to comply with their payment obligations for services provided.

(Tr. Ex. 106 at p. 5). Davis testified that he did not believe that there was a written agreement to terminate services between ESS and CAH-Washington. Additionally, Rupe testified that, from ESS's perspective, she did not believe that there was a mutual agreement to terminate the services between ESS and CAH-Washington.

24. On or about May 16, 2013, CAH-Washington instructed ESS's physicians to go home, and instructed ESS that it would no longer be using its services.

25. ESS informed CAH-Washington that it owes money on the CAH-Washington Agreement, and demanded that the outstanding invoices be paid in full. CAH-Washington currently owes $122,881.79, for services rendered under the CAH-Washington Agreement (Tr. Ex. 116).

*CAH-Yadkin's Relationship with ESS*

26. Shortly after February 21, 2012, Cassidy requested hospital information from Soule for ESS' hospital questionnaire. The questionnaire included information pertaining to CAH-Yadkin's payer mix, patient volumes, and patient acuity mix. On February 28, 2012, CAH-Yadkin provided ESS with a completed questionnaire. CAH-Yadkin reported its current emergency department payer mix, over the last twelve months, as follows: 11.7% BCBS, 30.7% Medicaid, 14.8% Medicare, 3.5% Commercial Insurance, 1.5% Workers Compensation, 27.3% Self-Pay, 10.5% HMO/PPO (Tr. Ex. 11). Additionally, it reported that its emergency department received between 6,000 and 7,000 patients annually (Tr. Ex. 11). ESS used the Compensation Variables provided by CAH-Yadkin to create its collection projections, and to set the monthly subsidy. Cassidy testified that HMC/CAH was involved in the process. She believed that HMC/CAH was the decision-maker, as Docking told her he had chosen ESS for

CAH-Yadkin's emergency room staffing and hospitalist needs, and HMC/CAH representatives negotiated the CAH-Yadkin contract.

27. On or about March 8, 2012, Cassidy sent an email to Soule stating that she needed CAH-Yadkin's monthly volumes for the past twelve to twenty-four months so she could accurately put together her proposal. On the same day, Cassidy submitted ESS' proposal for the staffing and management of CAH-Yadkin's emergency department and hospitalist program management to Soule and Docking. On or about March 9, 2012, Soule responded to Cassidy, and stated that he would not be able to provide her with the requested information.

28. Cassidy informed Pope at Intermedix that CAH-Yadkin had 6,500 patient visits per year. Cassidy used that number, because the questionnaire provided by CAH-Yadkin stated that it received between 6,000 and 7,000 patient visits per year.

29. On or about August 1, 2012, ESS and CAH-Yadkin entered into a contract whereby ESS agreed to provide emergency department billing and physician staffing services to CAH-Yadkin in exchange for CAH-Yadkin's agreement to compensate ESS for those services (the "CAH-Yadkin Agreement"). The agreement also stated the obligations that ESS owed to CAH-Yadkin, and the obligations that CAH-Yadkin owed to ESS. It included a monthly subsidy of $56,298, and a fee for the hospitalist program of $4,000 per month (Tr. Ex. 68). The compensation provision also stated that CAH-Yadkin must pay each invoice in full within ten days of receipt, and any invoice not paid within fifteen days of receipt would accrue interest at an annual rate of 18% (Tr. Ex. 68). Additionally, it contained a choice of law provision that stated the agreement would be controlled by North Carolina law (Tr. Ex. 68). The agreement was signed for CAH-Yadkin by HMC/CAH through Docking and for ESS through Weiss (Tr. Ex. 68). After CAH-Yadkin and ESS entered into the agreement,

ESS began providing physicians to staff CAH-Yadkin's emergency department and hospitalist programs.

30. A few months after entering into the CAH-Yadkin Agreement, ESS learned that the actual collections from the CAH-Yadkin emergency department were significantly different from the numbers projected. Intermedix learned of the inaccuracies as it had access to the actual total collections in the CAH-Yadkin emergency department. Rupe testified that ESS learned through Intermedix that CAH-Yadkin's numbers were not accurate. She also stated that ESS told CAH-Yadkin, through HMC/CAH, that it would need to amend the contract, like CAH-Washington.

31. Between October 20, 2012, and May 15, 2013, CAH-Yadkin, through HMC/CAH, worked with ESS to bring its account balance current (Tr. Exs. 89, 92, 93, 94, 98). On October 24, 2012, Flores at HMC/CAH sent an email to O'Brien at ESS, and stated that HMC/CAH would provide payments for CAH-Washington, CAH-Yadkin, and CAH-Haskell (Tr. Ex. 89). On January 16, 2013, Flores emailed O'Brien, and stated that HMC/CAH would be able to make a $75,000 payment on the hospitals' invoices (Tr. Ex. 94). On February 13, 2013, Flores emailed O'Brien, and stated that HMC/CAH would be able to make a $125,000 payment on the hospitals' invoices (Tr. Ex. 98). On May 15, 2013, Flores emailed O'Brien, and stated that "the ACH's [would] hit [her] account tomorrow." (Tr. Ex. 105). This included payments for CAH-Washington and CAH-Yadkin (Tr. Ex. 105).

32. On May 15, 2013, Power contacted Hafen, and stated,

> I have talked to my client regarding your offer that ESS will not provide coverage to [CAH-Washington, CAH-Yadkin, and CAH-Haskell] commencing today if we provide you with written assurance that the hospitals will not look to ESS if there are any issues or problems because ESS is not providing the required coverage.

(Tr. Ex. 106 at p. 5). Hafen responded on May 16, 2013, and stated,

> I am preparing a form Termination Agreement to address the terms and conditions of termination at the three facilities. […] Until the parties have a signed termination agreement in place, my client will continue to provide coverage pursuant to the existing agreements. I trust your clients will continue to comply with their payment obligations for services provided.

(Tr. Ex. 106 at p. 5). Davis testified that he did not believe that there was a written agreement to terminate services between ESS and CAH-Yadkin. Additionally, Rupe testified that, from ESS's perspective, she did not believe that there was a mutual agreement to terminate the services between ESS and CAH-Yadkin.

33. On or about May 16, 2013, CAH-Yadkin instructed ESS's physicians to go home, and instructed ESS that it would no longer be using its services.

34. ESS informed CAH-Yadkin that it owes money on the CAH-Yadkin Agreement, and demanded that the outstanding invoices be paid in full.

*CAH-Haskell's Relationship with ESS*

35. In late 2011, ESS and CAH-Haskell began negotiating an arrangement, wherein ESS would provide physicians to cover CAH-Haskell's emergency department on the weekends. CAH-Haskell and ESS agreed to have ESS provide weekend coverage for CAH-Haskell's emergency department (the "First CAH-Haskell Agreement"). Cassidy testified that the First CAH-Haskell Agreement occurred prior to ESS's relationship with HMC/CAH and Docking. Additionally, she believed that at that time, the CEO for CAH-Haskell contacted ESS on a cold call, and asked ESS to provide emergency department assistance on a part-time basis.

36. On or about September 1, 2012, ESS and CAH-Haskell entered into a contract titled Emergency Department Coverage Services Agreement, wherein ESS agreed to provide certain emergency department services to CAH-Haskell in exchange for CAH-Haskell's agreement to compensate ESS for those services (the "CAH-Haskell Agreement"). The

agreement stated the obligations that ESS owed to CAH-Haskell, and the obligations that CAH-Haskell owed to ESS. It included a monthly subsidy of $50,942 (Tr. Ex. 72). The compensation provision also stated that CAH-Haskell must pay each invoice in full within ten days of receipt, and any invoice not paid within fifteen days of receipt would accrue interest at an annual rate of 18% (Tr. Ex. 72). Additionally, it contained a choice of law provision, which stated that the agreement would be controlled by Oklahoma law (Tr. Ex. 72). The agreement was signed for CAH-Haskell by HMC/CAH's CEO Larry Arthur ("Arthur"), and for ESS through Weiss (Tr. Ex. 72).

37. Between October 20, 2012, and May 15, 2013, CAH-Haskell, through HMC/CAH, worked with ESS to bring its account balance current (Tr. Exs. 89, 92, 93, 94, 98). On October 24, 2012, Flores at HMC/CAH sent an email to O'Brien at ESS, and stated that HMC/CAH would provide payments for CAH-Washington, CAH-Yadkin, and CAH-Haskell (Tr. Ex. 89). On January 16, 2013, Flores emailed O'Brien, and stated that HMC/CAH would be able to make a $75,000 payment on the hospitals' invoices (Tr. Ex. 94). On February 13, 2013, Flores emailed O'Brien, and stated that HMC/CAH would be able to make a $125,000 payment on the hospitals' invoices (Tr. Ex. 98).

38. On May 15, 2013, Power contacted Hafen, and stated,

> I have talked to my client regarding your offer that ESS will not provide coverage to [CAH-Washington, CAH-Yadkin, and CAH-Haskell] commencing today if we provide you with written assurance that the hospitals will not look to ESS if there are any issues or problems because ESS is not providing the required coverage.

(Tr. Ex. 106 at p. 5). Hafen responded on May 16, 2013, and stated,

> I am preparing a form Termination Agreement to address the terms and conditions of termination at the three facilities. [...] Until the parties have a signed termination agreement in place, my clients will continue to provide coverage pursuant to the existing agreements. I trust your clients will continue to comply with their payment obligations for services provided.

(Tr. Ex. 106 at p. 5). Davis testified that he did not believe that there was a written agreement to terminate services between ESS and CAH-Haskell. Additionally, Rupe testified that, from ESS's perspective, she did not believe that there was a mutual agreement to terminate the services between ESS and CAH-Haskell.

39. On or about May 16, 2013, CAH-Haskell instructed ESS's physicians to go home, and instructed ESS that it would no longer be using its services.

40. ESS informed CAH-Haskell that it owes money on the CAH-Haskell Agreement, and demanded that the outstanding invoices be paid in full. CAH-Haskell currently owes $86,467.16, for services rendered under the CAH-Haskell Agreement (Tr. Ex. 116).

*Motion for Sanctions*

41. On April 13, 2013, ESS filed its Original Petition in the 417th District Court of Collin County, Texas (Dkt. #3). The action was removed to this Court on June 6, 2013, on the basis of diversity jurisdiction (Dkt. #1). ESS filed its amended complaint on July 24, 2013 (Dkt. #7).

42. On August 28, 2013, the Court issued its Order Governing Proceedings, which stated that "[c]omplete initial mandatory disclosure[s]" were due twenty-eight days after the Parties' Rule 26(f) conference (Dkt. #13 at p. 1). The Order Governing Proceedings also defined the material that Federal Rule of Civil Procedure 26(a)(1) considers to be included under initial mandatory disclosures (Dkt. #13 at p. 4). The Parties filed their Joint Status Report on October 23, 2013 (Dkt. #15).

43. On November 7, 2013, the Court entered its Scheduling Order (Dkt. #17). The Court's Scheduling Order addressed initial mandatory disclosures, and stated,

The parties are reminded of the requirement, set out in this court's Initial Order Governing Proceedings, to have already disclosed, without awaiting a discovery request, information in addition to that required by Fed. R. Civ. P. 26, including names of persons likely to have, and documents containing, information "relevant to the claim or defense of any party."

If there are any questions about whether information is "relevant to the claim or defense of any party" review Local Rule CV-26(d). A party that fails to timely disclose any of the information required to be disclosed by order of this court or by the Federal Rules of Procedure, will not, unless such failure is harmless, be permitted to use such evidence at trial, hearing or in support of a motion.

(Dkt. #17 at p. 4).

44. On January 21, 2014, Plaintiff filed a notice of its compliance with Federal Rule of Civil Procedure 26(a)(2) (Dkt. #20).

45. On July 9, 2014, the Court entered an amended Scheduling Order, which listed the same requirements regarding initial disclosures (Dkt. #30).

46. On September 29, 2014, ESS filed its Fourth Amended Complaint (Dkt. #31). On October 14, 2014, ESS filed its notice of compliance with Federal Rule of Civil Procedure 26(a)(2) (Dkt. #32).

47. On November 11, 2014, Hafen wrote Power and Buffey Klein ("Klein"), and requested that Defendants provide production for HMC/CAH, CAH-Washington, CAH-Yadkin, and CAH-Haskell (Dkt. #58-2 at p. 1). The letter included the specific documents that ESS sought from CAH-Washington, CAH-Yadkin, CAH-Haskell, and HMC/CAH (Dkt. #58-2 at pp. 1-4). ESS requested that Defendants produce the relevant documents by "no later than November 19, 2014." (Dkt. #58-2 at p. 4).

48. On March 12, 2015, Charles Gearing ("Gearing") wrote Power and Klein a follow-up letter regarding Hafen's November 11, 2014 letter (Dkt. #58-3). Gearing requested that Defendants provide specific documents to ESS by March 18, 2015 (Dkt. #58-3 at p. 1). The letter included specific documents that ESS sought from CAH-Washington, CAH-Yadkin,

CAH-Haskell, and HMC/CAH (Dkt. #58-3 at pp. 2-5). Additionally, it stated that ESS sought production of the following:

1. Production of the remaining unproduced documents required to be produced pursuant to the Court's standing order and the local rules of the Eastern District of Texas;
2. Production of documents responsive to Plaintiff's Requests for Production issued in 2014:
   a. Plaintiff's First Request for Production issued to [CAH-Washington], who has not produced any documents in response to [Plaintiff's] Request;
   b. Plaintiff's First Request for Production issue to [CAH-Yadkin], who has not produced any documents in response to [Plaintiff's] Request;
   c. Plaintiff's First Request for Production issue to [CAH-Haskell], who has not produced any documents in response to [Plaintiff's] Request;
3. Initial disclosures by HMC/CAH, which were due over a month ago; and
4. Responses to Plaintiff's Second Set of Interrogatories, issued to [CAH-Washington] and [CAH-Yadkin], which were due over a month ago.

(Dkt. #58-3 at pp. 1-2).

49. On April 13, 2015, Klein wrote Hafen, and stated that Defendants could not find documents to produce regarding the "source data" relating to the hospitals' decisions to enter into the contracts with ESS (Dkt. #58-4). However, Klein asserted that "though [a document produced within CAH-Yadkin's initial disclosures] favorably supports the values provided to ESS in the Prospective Client Profile, it cannot be identified as a document relied upon by [CAH-Yadkin] to calculate or compile the values in the Prospective Client Profile[,]" as Soule could not remember if he used the document or not (Dkt. #58-4 at p. 1).

50. On April 15, 2015, ESS filed its Motion for Sanctions (Dkt. #58). On May 4, 2015, Defendants CAH-Washington, CAH-Yadkin, CAH-Haskell, and HMC/CAH filed their response (Dkt. #66). On May 14, 2015, ESS filed its reply (Dkt. #79).

51. On July 1, 2015, the Court held its Pre-Trial Conference, where it addressed ESS's Motion for Sanctions. Klein, speaking on behalf of Defendants, stated that Defendants had produced all documents that could have been relied upon when making their decisions. She stated that

the only information not produced was "raw data."  At that time, the Court stated that it would reserve the motion and hold it throughout the trial to determine how the evidence and the testimony were presented.  However, the Court told Defendants' counsel that under the Local Rules of the Eastern District of Texas, if Defendants could not definitively say what they used or relied upon, counsel would be required to go a step further and disclose everything that could have been used or relied upon.

52. At the Pre-Trial Conference, Plaintiff also moved to strike Defendants' Exhibit List, or alternatively, make Defendants go back and re-examine their exhibit list.  Defendants' Exhibit List was thirty-one pages, and contained every document that Defendants had produced within the case (Dkt. #74-2).  Defendants stated that they believed their exhibit list was a good-faith estimate of the exhibits they would use at trial.  The Court ordered Defendants to review their exhibits and file an updated exhibit list by July 6, 2015, that would include only those documents Defendants believed they would need for trial.

53. On July 6, 2015, Defendants submitted their Amended Exhibit List (Dkt. #100).  The Amended Exhibit List was thirty-four pages, and contained 223 possible exhibits (Dkt. #100).  The Amended Exhibit List contained every document that Defendants had produced in the case.

54. During trial, the Court determined that Defendants had produced no evidence that would provide Plaintiff with documentation regarding the corporate structure of the parent company HMC/CAH, and the hospital entities, CAH-Washington, CAH-Yadkin, and CAH-Haskell.  At that time the Court struck the testimony of Defendants' witness Dennis Davis as to any information relating to the corporate structure of either the parent corporation HMC/CAH or the hospital subsidiaries.  Also, Defendants did not produce the evidence that the hospitals

relied upon when they submitted their Compensation Variables to ESS. Additionally, the Court stated that it had concerns regarding the Amended Exhibit List offered by Defendants because Defendants had offered as proposed exhibits all of the documents that they had produced in the case. At the end of trial, Defendants had offered only two exhibits from their Amended Exhibit List into evidence. Based upon the evidence, the Court at that time granted ESS's Motion for Sanctions, but stated that the Court would determine the appropriate type of sanctions at a later time.

## CONCLUSIONS OF LAW

1. This Court has subject matter jurisdiction, specifically diversity jurisdiction, over this action under 28 U.S.C. § 1332(a)(1) because Plaintiff and Defendants are citizens of different states, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

2. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to these claims occurred in this district.

3. Because the agreements cover entities residing in other states, the Court must determine the law that governs each cause of action. "When the laws of two or more states may apply to the various claims in a federal diversity action, the court must apply the choice of law rules of the forum state." *Quicksilver Res., Inc. v. Eagle Drilling, LLC*, 792 F. Supp. 2d 948, 951 (S.D. Tex. 2011) (citing *Mayo v. Hartford Life Ins. Co.*, 354 F.3d 400, 403 (5th Cir. 2004)). Therefore, Texas choice of law rules will determine which law applies to each claim in the present case.

4. Generally, Texas law gives effect to contractual choice of law provisions. *Quicksilver Res., Inc.*, 792 F. Supp. 2d at 951; *see Caton v. Leach Corp.*, 896 F.2d 939, 942 (5th Cir. 1990); *see also* Restatement (Second) of Conflict of Laws § 187 (1971). The Court finds that ESS's

agreements with CAH-Washington and CAH-Yadkin contained a choice of law provision requiring the agreements to be construed under North Carolina law. Therefore, North Carolina law will govern the breach of contract claims against CAH-Washington and CAH-Yadkin. The Court finds that ESS's agreement with CAH-Haskell contained a choice of law provision requiring the agreement be construed under Oklahoma law. Therefore, Oklahoma law will govern the breach of contract claim against CAH-Haskell.

5. "Texas law requires an issue-by-issue choice of law analysis." *Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 727 (5th Cir. 2003). Therefore, the Court must further determine the choice of law that will govern the fraudulent inducement claims against CAH-Washington and CAH-Yadkin, and the piercing the corporate veil claim. "Texas courts use the 'most significant relationship' test to decide choice of law issues." *Red Roof Inns, Inc. v. Murat Holdings, L.L.C.*, 223 S.W.3d 676, 684 (Tex. App.—Dallas 2007, pet. denied) (quoting *Hughes Wood Prods., Inc. v. Wagner*, 18 S.W.3d 202, 205 (Tex. 2000)). Therefore, "a court must consider which state's law has the most significant relationship 'to the particular substantive issue to be resolved.'" *Id.* (quoting *Hughes Wood Prods., Inc.*, 18 S.W.3d at 205).

6. When determining which state's law controls a fraudulent inducement claim, courts look to Restatement § 148, which provides two methods for selecting the applicable law, depending on where the action in reliance occurred. *Quicksilver Res., Inc.*, 792 F. Supp. 2d at 955; *see* Restatement (Second) of Conflict of Laws § 148 (1971). "When the action in reliance occurs in the state where the false representations were made and received, the local law of that state is applied unless another state has a more significant relationship as measured by the factors in Restatements § 6." *Quicksilver Res., Inc.*, 792 F. Supp. 2d at 955; Restatement (Second)

of Conflict of Laws § 148(1). "When the action in reliance occurs at least in part in a state other than that where the false representations were made…courts should apply the law of the state with the most significant relationship to the occurrence and the parties." *Quicksilver Res., Inc.*, 792 F. Supp. 2d at 955; Restatement (Second) Conflict of Laws § 148(2). In those instances, the court should consider the following contacts when conducting its "most significant relationship" test:

(a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations,
(b) the place where the plaintiff received the representations,
(c) the place where the defendant made the representations,
(d) the domicil, residence, nationality, place of incorporation and place of business between the parties,
(e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and
(f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

Restatement (Second) of Conflict of Laws § 148(2).

7. The law of the state with the most relevant contacts will apply, unless some other state has a more significant relationship to the occurrence and the Parties. Restatement (Second) Conflict of Laws § 148, comment b. In that case, the court will look to the Restatement § 6 factors to determine which state has the most significant relationship with the pending action. *Id.* Restatement § 6 sets out the following general principles that are relevant in a choice of law analysis:

(a) the needs of the interstate and international systems,
(b) the relevant policies of the forum,
(c) the relevant policies of the interested states and the relative interests of those states in the determination of the particular issue,
(d) the protection of justified expectations,
(e) the basic policies underlying the particular field of law,
(f) certainty, predictability, and uniformity of result, and
(g) ease in the determination and application of the law to be applied.

Restatement (Second) of Conflict of Laws § 6(2) (1971).

8. After reviewing the relevant pleadings, the Court finds that Texas law should govern Plaintiff's fraudulent inducement claims. Although the Defendants made the representations in North Carolina and the hospitals are located in North Carolina, the remainder of the relevant contacts demonstrate that Texas has the most significant relationship to Plaintiff's fraudulent inducement claims. Plaintiff is a resident of Texas, and Plaintiff received the Defendants' misrepresentations in Texas. For the purposes of Plaintiff's fraud claim, the relevant actions took place in Texas, and any harm incurred took place in Texas to a Texas plaintiff.

9. Finally, in regards to Plaintiff's piercing the corporate veil claim, the Court finds that Texas law should apply. Defendant HMC/CAH is a Delaware corporation with its principle place of business in Kansas City, Missouri. However, "[u]nder Texas law 'an assertion of veil piercing or corporate disregard does not create a substantive cause of action[;]…such theories are purely remedial and serve to expand the scope of potential sources of relief[.]'" *Spring St. Partners-IV, L.P. v. Lam*, 730 F.3d 427, 443 (5th Cir. 2013) (quoting *In re JNS Aviation, LLC*, 376 B.R. 500, 521 (Bankr. N.D. Tex. 2007), *aff'd*, 395 F. App'x 127, 128 (5th Cir. 2010)). Therefore, the Court finds that Texas law will apply for matters of piercing the corporate veil.

**Motion for Sanctions (Dkt. # 58):**

10. The Court will first address Plaintiff's Motion for Sanctions (Dkt. #58). At trial, the Court found that Defendants failed to produce discovery as required under the Federal Rules of Civil Procedure and the Court's Order, and that the motion should be granted; however, the Court told the Parties that it would decide the proper sanctions at a later time.

11. Federal Rule of Civil Procedure 26(a)(1)(D) requires that a party served or joined after the Rule 26(f) conference make initial disclosures within thirty days after they are served or joined. FED. R. CIV. P. 26 (a)(1)(D). Additionally, Rule 26 requires that a party supplement disclosures made under Rule 26, or within interrogatories, requests for productions, or requests for admission, "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other [party]." FED. R. CIV. P. 26(e)(1)(A). Local Rule CV-26(d) requires the disclosure of anything that may hurt or help a plaintiff's case. Local Rule CV-26(d) states:

> The following observations are provided for counsel's guidance in evaluating whether a particular piece of information is "relevant to the claim or defense of any party."
> (1) it includes information that would not support the disclosing parties' contentions;
> (2) it includes those persons who, if their potential testimony were known, might reasonably be expected to be deposed or called as a witness by any of the parties;
> (3) it is information that is likely to have an influence on or affect the outcome of the claim or defense;
> (4) it is information that deserves to be considered in the preparation, evaluation or trial of a claim or defense; and
> (5) it is information that reasonable and competent counsel would consider reasonably necessary to prepare evaluate, or try a claim or defense.

12. "Federal Rule of Civil Procedure 37 authorizes sanctions for failure to comply with discovery orders." *SynQor, Inc. v. Artesyn Techs., Inc.*, No. 2:07-CV-497-TJW-CE, 2011 WL 2683184, at *3 (E.D. Tex. July 11, 2011); *see Chilcutt v. United States*, 4 F.3d 1313, 1319-20 (5th Cir. 1993). Rule 37(b)(2) states, in relevant part:

> If a party or a party's officer, director, or managing agent—or a witness designated under Rule 30(b)(6) or 31(a)(4)—fails to obey an order to provide or permit discovery, including an order under Rule 26(f), 35, or 37(a), the court where the action is pending may issue further just orders. They may include the following: (i) directing that the matters embraced in the order or other designated

facts be taken as established for purposes of the action, as the prevailing party claims; (ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence[.]

FED. R. CIV. P. 37(b)(2)(A)(i)-(ii).  The district court's "discretion in fashioning appropriate sanctions for parties who disobey their orders is quite broad, though not unlimited." *Chilcutt*, 4 F.3d at 1320 (citing *Marshall v. Segona*, 621 F.2d 763, 767 (5th Cir. 1980); *Emerick v. Fenick Indus., Inc.*, 539 F.2d 1379, 1381 (5th Cir. 1976)).

13.  Extreme sanctions are "'remed[ies] of last resort' which should be applied only in extreme circumstances." *Butler v. Cloud*, 104 F. App'x 373, 374 (5th Cir. 2004) (per curiam) (quoting *Batson v. Neal Spelce Assocs., Inc.*, 765 F.2d 511, 515 (5th Cir. 1985)).  The Fifth Circuit has stated that extreme sanctions, such as dismissing a claim or default judgment, are proper when the discovery misconduct resulted from willfulness or bad faith, when the deterrent value of Rule 37 could not be substantially achieved by the use of less drastic sanctions, or when the discovery misconduct was plainly attributable to an attorney rather than a "blameless client," or because of "confusion or a sincere misunderstanding of the court's order." *Batson*, 765 F.2d at 514.

14.  However, for less severe sanctions, including deeming certain facts established for purposes of the litigation, the Fifth Circuit applies a less rigorous standard, and requires that the sanction be "fair" and "just," that it has a "substantial relationship" between the sanction and the facts sought to be established through discovery, and that it "meet[s] the Rule 37 goals of punishing the party which has obstructed discovery and deter[s] others who would otherwise be inclined to pursue similar behavior." *See Chilcutt*, 4 F.3d at 1319-21 (citing *Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694 (1982), *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639 (1976)).

15. Sanctions are appropriate, unless the court determines that the failure to comply with the discovery rules results in harmless error. *See Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 563-64 (5th Cir. 2004). In determining whether a failure to comply resulted in harmless error, the court looks to four factors: "(1) the importance of the evidence; (2) the prejudice to the opposing party of including the evidence; (3) the possibility of curing such prejudice by granting a continuance; and (4) the explanation for the party's failure to disclose." *Primrose Operating Co.*, 382 F.3d at 563-64 (quoting *Tex. A&M Research Found. v. Magna Transp., Inc.*¸ 338 F.3d 394, 402 (5th Cir. 2003)).

16. Plaintiff asserts that Defendants have not produced the following information: (1) the initial disclosures and document production by Defendant HMC/CAH; and (2) documents responsive to ESS's First Requests for Production issued to CAH-Washington, CAH-Yadkin, and CAH-Haskell. Specifically, Plaintiff alleges that Defendants did not produce initial disclosures of the parent corporation HMC/CAH and documents that the hospitals relied upon to create the initial Compensation Variables they submitted to ESS. During the Pre-Trial Conference on July 1, 2015, Defendants asserted that they had fully complied with the Federal Rules of Civil Procedure, as well as the Local Rules, and produced all relevant documents relating to a claim or defense of Plaintiff. At that time, the Court explained the production requirements under the Local Rules to Defendants, and informed Defendants that it would hold Plaintiff's Motion for Sanctions through trial.

17. During the trial, the issue arose that Defendants had not produced documentation pertaining to Plaintiff's piercing the corporate veil contention. Specifically, during the testimony of Defendants' witness, Dennis Davis, regarding the corporate structure of the hospitals and HMC/CAH, Plaintiff asserted that Defendants had never produced any evidence regarding

the corporate structure of the parent corporation or the hospital entities.   Additionally,

Plaintiff presented evidence demonstrating that it requested Defendants to supplement their

initial disclosures regarding HMC/CAH, CAH-Washington, CAH-Yadkin, and CAH-

Haskell, and Defendants refused.   Defendants asserted that they had provided evidence

regarding the corporate structure of the parent corporation or the entities, and that document

had been admitted as Trial Exhibit 80, a document regarding the HMC/CAH bankruptcy.

However, Defendants never asserted that they produced other evidence of the corporate

structure to Plaintiff.  The Court found Defendants' production was insufficient, and granted

Plaintiff's Motion for Sanctions.  At that time, the Court struck the testimony of Davis as to

any information regarding the corporate structure of the parent corporation or the entities, as

Plaintiff had not been provided with any evidence of the corporate structure, and informed

Defendants that it would take up additional sanctions at the appropriate time.

18. In their post-trial brief, Defendants continue to assert that

> the hospital entities provided full disclosure to ESS.   Specifically, […] the
> hospital entities provided ESS with its Joint Disclosure Statement and Proposed
> Plan…With the absolute full disclosure provided by [Defendants], ESS cannot
> claim that [Defendants'] corporate form was the basis of the alleged fraudulent
> inducement.

(Dkt. #106 at p. 20) (emphasis omitted).  The Court has already found that Defendants did

not provide any disclosures to Plaintiff regarding their corporate structure; therefore, the

Court will not address this issue.  For example, Defendants did not provide disclosures

relating to whether HMC/CAH and the hospital entities shared the following:  1) common

stock ownership, 2) common directors or officers, 3) common business departments, 4) the

filing of consolidated financial statements and tax returns, 5) whether HMC/CAH financed

the hospital entities, 6) whether HMC/CAH caused the incorporation of the hospital entities,

7) whether the hospital entities operated with a grossly inadequate capital, 8) whether

HMC/CAH paid the salaries and other expenses of the hospital entities, 9) whether HMC/CAH gave the hospitals all of the business that they generated, 10) whether HMC/CAH used the hospital entities properties as its own, 11) whether the daily operations of HMC/CAH and the hospital entities were not kept separate, 12) whether the hospital entities did not observe basic corporate formalities, such as keeping separate books and records and holding shareholder and board meetings, or 13) whether the directors and officers of the hospital entities acted independently in the interest of that entity, or whether they took their orders from HMC/CAH. *See Smotherman v. Texaco Expl. and Prod., Inc.*, 161 F. Supp. 2d 733, 738 (E.D. Tex. 2001). Additionally, the Court finds that Defendants did not produce documents relating to the evidence that the hospitals relied upon when submitting their Compensation Variables to ESS. Now the Court must determine the appropriate remedy for Defendants' non-disclosure.

19. At trial, the Court struck the testimony from Dennis Davis regarding Defendants' corporate structure because Defendants had not produced any credible evidence to Plaintiff as to their corporate structures. Defendants had been on notice that they needed to disclose all relevant evidence to Plaintiff, and were on notice that if they did not comply with the Court's discovery orders, as well as the discovery rules under Rule 26, they would not "be permitted to use such evidence at trial[.]" (Dkt. #17 at p. 4). The Court will also infer that the undisclosed documents would have supported Plaintiff's alter ego claim.

20. In its Motion for Sanctions (Dkt. #58), Plaintiff requests that the Court make the following inferences for purposes of the litigation:

    a. Defendants [CAH-Washington and CAH-Yadkin] made fraudulent misrepresentations to ESS regarding the Compensation Variables, including the following:

     i. the "Current ED Payer Mix" values provided by [CAH-Washington] on its Prospective Client Profile;

    ii. the "Annual ED Patient Visits" value provided by [CAH-Washington] on its Prospective Client Profile;

   iii. the "ED Patients Admitted" percentage value provided by [CAH-Washington] on its Prospective Client Profile;

   iv. the "Acuity Mix by Evaluation & Management Code" values provided by [CAH-Washington] on its Prospective Client Profile;

    v. the "Current ED Payer Mix" values provided by [CAH-Washington] on its Prospective Client Profile;

   vi. the "Annual ED Patient Visits" value provided by [CAH-Washington] on its Prospective Client Profile;

  vii. the "ED Patients Admitted" percentage value provided by [CAH-Washington] on its Prospective Client Profile;

 viii. the "Current ED Payer Mix" provided by [CAH-Yadkin] on its Prospective Client Profile;

   ix. the "Annual ED Patient Visits" values provided by [CAH-Yadkin] on its Prospective Client Profile;

    x. the "ED Patients Admitted" percentage value provided by [CAH-Yadkin] on its Prospective Client Profile; and

   xi. the "Acuity Mix by Evaluation and Management Code" values provided by [CAH-Yadkin] on its Prospective Client Profile[;]

b. Defendants [CAH-Washington and CAH-Yadkin] knew their misrepresentations were false or they made the misrepresentations recklessly;

c. Defendants [CAH-Washington and CAH-Yadkin] made the misrepresentations with the intent that ESS would rely on them in negotiating the compensation to be paid under the agreements;

d. ESS relied on Defendants [CAH-Washington and CAH-Yadkin's] fraudulent misrepresentations; and

e. Defendants [CAH-Washington and CAH-Yadkin] fraudulently induced ESS into entering the agreements with them.

(Dkt. #58 at pp. 10-11).

21. Although Defendants failed to disclose all of the production required for Plaintiff's fraudulent misrepresentation claim as required by the Rules, the Court finds that Plaintiff's requested relief is too burdensome given the current case. The first time the Court was made aware of Defendants' failure to disclose their required production was in Plaintiff's Motion for Sanctions. Plaintiff never filed a motion to compel or contacted the Court's discovery hotline as outlined within the Party's Scheduling Order (Dkt. #17 at p. 4). If Plaintiff had

contacted the Court prior to trial, the Court could have resolved the matter, and required Defendants to produce the documentation. Additionally, the only credible evidence introduced at trial as to Defendants' fraudulent intent was the testimony of Davis, who acknowledged that HMC/CAH and the hospital entities had made a mistake, and attempted to correct it with ESS. Therefore, although the Court finds that Defendants should have disclosed documents to Plaintiff regarding its fraudulent inducement claim, the Court does not find that Plaintiff's requested sanctions are the appropriate remedy for the harm incurred.

22. If a party fails to comply with a discovery order, the district court "must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney[s'] fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." FED. R. CIV. P. 37(b)(2)(C). Therefore, "under Rule 37, a party and its counsel 'can only be held responsible for the reasonable expenses [including attorneys' fees] caused by their failure to comply with discovery.'" *Tollett v. City of Kemah*, 285 F.3d 357, 368 (5th Cir. 2002) (quoting *Chapman & Cole & CCP, Ltd. v. Itel Container Int'l B.V.*, 865 F.2d 676, 687 (5th Cir. 1989), *cert. denied*, 493 U.S. 872 (1989); *see Batson*, 765 F.2d at 516 (5th Cir. 1985) ("The plain language of Rule 37…provides that only those expenses, including fees, caused by the failure to comply may be assessed against the noncomplying party"). The Court finds that Plaintiff is entitled to have its reasonable expenses, including attorneys' fees, paid by Defendants for those expenses, which were caused by Defendants' failure to disclose production. The Court finds this is an appropriate sanction for Defendants' misconduct.

**Breach of Contract-CAH-Washington and CAH-Yadkin**

23. Under North Carolina law, "[t]he elements of a claim for breach of contract are (1) existence of a valid contract, and (2) breach of the terms of that contract." *Carcano v. JBSS, LLC*, 684 S.E.2d 41, 47-48 (N.C. Ct. App. 2009) (quoting *Poor v. Hill*, 530 S.E.2d 838, 843 (N.C. Ct. App. 2000)). "It is a well-settled principle of contract law that a valid contract exists only where there has been a meeting of the minds as to all essential terms of the agreement." *Id.* (citing *Northington v. Michelotti*, 464 S.E.2d 711, 714 (N.C. Ct. App. 1995)). The Parties stipulate that on or about June 1, 2012, ESS and CAH-Washington entered into the CAH-Washington Agreement. Additionally, the Parties stipulate that on or about August 1, 2012, ESS and CAH-Yadkin entered into the CAH-Yadkin Agreement. Therefore, it is clear that the Parties believe a valid contract exists in the present case, and the question is whether or not one of the Parties breached the terms of the contract, or the agreement was mutually terminated or otherwise cancelled.

24. There is a question in this case about what happened to the original CAH-Washington Agreement after the Parties entered into the 2012 Amendment. "The court is to interpret a contract according to the intent of the parties to the contract, unless [that interpretation] is contrary to law." *Bueltel v. Lumber Mut. Ins. Co.*, 518 S.E.2d 205, 209 (N.C. Ct. App. 1999) (citing *Duke Power v. Blue Ridge Elec. Membership Corp.*, 117 S.E.2d 812 (N.C. 1961)). "Interpreting a contract requires the court to examine the language of the contract itself for indications of the parties' intent at the moment of execution." *State v. Phillip Morris USA Inc.*, 618 S.E.2d 219, 225 (N.C. 2005) (citing *Lane v. Scarborough*, 200 S.E.2d 622, 624 (N.C. 1973)). "'If the plain language of a contract is clear, the intention of the parties is inferred from the words of the contract.'" *Bueltel*, 518 S.E.2d at 209 (quoting *Walton v. City*

*of Raleigh*, 467 S.E.2d 410, 411 (N.C. Ct. App. 1996)). "When the language of the contract is clear and unambiguous, construction of the agreement is a matter of law for the court, and the court cannot look beyond the terms of the contract to determine the intentions of the parties." *Asheville Mall, Inc. v. F.W. Woolworth, Co.*, 331 S.E.2d 772, 773-74 (N.C. Ct. App. 1985). Intent is derived from the contract as a whole, not from a particular contractual term. *State v. Phillip Morris USA Inc.*, 618 S.E.2d at 225 (citing *Jones v. Casstevens*, 23 S.E.2d 303, 305 (N.C. 1942) ("Since the object of construction is to ascertain the intent of the parties, the contract must be considered as an entirety. The problem is not what the separate parts mean, but what the contract means when considered as a whole.") (citation omitted)).

25. The Parties stipulate that on or about October 20, 2012, ESS and CAH-Washington entered into the 2012 Amendment. The 2012 Amendment states,

> 1. The following provision is added to **Exhibit C** of the Agreement, intending it to be effective for the period beginning June 1st, 2012 and expiring October 31st, 2012, and replaces item "A" as originally written which is hereby deleted in its entirety:
>    **A.** Hospital agrees to pay Group $69,426.50 per month for Services related to ED coverage.
> 2. The following provision is added to **Exhibit C** of the Agreement, intending it to be effective November 1st, 2012 and replaces item "A," as amended, which is hereby deleted in its entirety.
>    **A.** Hospital agrees to pay Group $62,464.25 per month for Services related to ED coverage.
> 3. Effective November 1st, 2012, **Exhibit B** and **Exhibit D** and any references thereto in the Agreement are hereby removed and shall have no further effect.

(Tr. Ex. 86). The 2012 Amendment states, "[e]xcept as modified herein, the Agreement between the parties hereto is otherwise hereby ratified, confirmed and approved, and will remain in full force and effect in accordance with its terms." (Tr. Ex. 86). Therefore, based upon the plain language of the 2012 Amendment, it is clear to the Court that the Parties intended to amend the CAH-Washington Agreement. However, the 2012 Amendment does

not cancel or terminate the original CAH-Washington Agreement, except as to those provisions specifically mentioned within the 2012 Amendment. Therefore, the Court finds that the CAH-Washington Agreement was still a valid, enforceable contract that created and imposed duties owed by CAH-Washington to ESS and by ESS to CAH-Washington.

26. The CAH-Washington Agreement and CAH-Yadkin Agreement both contain a provision, which states the following:

> (a) <u>Termination by Agreement.</u>  In the event Hospital and Group *mutually agree in writing*, this Agreement may be terminated on the terms and date stipulated therein.

(Tr. Ex. 47; Tr. Ex. 68) (emphasis added).  The Court finds that there was not a mutual termination of the CAH-Washington Agreement or the CAH-Yadkin Agreement.  It is clear that the Parties communicated via e-mail regarding the possible termination of the CAH-Washington Agreement and the CAH-Yadkin Agreement (Tr. Ex. 106 at pp. 5-6).  Although this e-mail exchange may demonstrate that the Parties negotiated about whether to mutually terminate the CAH-Washington Agreement and the CAH-Yadkin Agreement, the Court finds that it does not constitute acceptance of an agreement to terminate.  At trial, no evidence was presented that a written agreement to terminate was ever signed by the Parties.  Additionally, at trial, evidence was presented that demonstrated that both HMC/CAH and ESS believed there was not a mutual agreement to terminate the CAH-Washington Agreement or the CAH-Yadkin Agreement.  The CAH-Washington Agreement and the CAH-Yadkin Agreement state that mutual termination must be in writing (Tr. Ex. 47; Tr. Ex. 68).  Therefore at most, there was an offer to mutually terminate the agreements, but because there was not a written agreement to terminate the agreements, the Court finds that the CAH-Washington Agreement and the CAH-Yadkin Agreement were not mutually terminated.

27. There is a question as to whether the CAH-Washington Agreement and CAH-Yadkin Agreement were breached by either ESS or CAH-Washington and CAH-Yadkin. The Court finds that ESS did not breach the CAH-Washington Agreement or the CAH-Yadkin Agreement. There is no credible evidence that ESS did not perform its obligations under either agreement. Although issues did arise between ESS and CAH-Washington, ESS resolved those issues to the satisfaction of the hospital. On June 6, 2012, Smith contacted Cassidy to inform her of a problem at CAH-Washington (Tr. Ex. 58 at p. 2) (Smith stating, "This is not working at all. They are discharging patients that should not be discharged…and they are not admitting anyone. They are trying to see patients in between ER patients, and there is no continuity of care."). Cassidy responded to Smith later that day, and stated that ESS was "working to address every concern you have." (Tr. Ex. 58 at p. 2). Smith thanked Cassidy for her help and promised to contact her again if the problem was not fixed (Tr. Ex. 58 at p. 1). Additionally, at trial, Smith testified that that he reported concerns to ESS more than one time, but ESS responded to the hospital's concerns. The Court finds that ESS fulfilled its obligations under the CAH-Washington Agreement and CAH-Yadkin Agreement. It provided staffing for CAH-Washington and CAH-Yadkin, sought hospital approval before assigning doctors to the hospitals, ensured that all of the doctors were qualified to work at the hospitals, ensured that the doctors properly maintained records for CAH-Washington and CAH-Yadkin, named medical directors for the hospitals, billed the hospitals for all required subsidies, and delivered the bills to the hospitals. Therefore, the Court finds that ESS did not breach the CAH-Washington Agreement or the CAH-Yadkin Agreement.

28. However, the Court finds that CAH-Washington and CAH-Yadkin did breach the agreements. On or around May 15, 2013, ESS threatened to terminate services to CAH-Washington and CAH-Yadkin pursuant to the terms of the contract, if it "did not receive confirmation of ACH payments for invoice [number] 29121 and [number] 29122 that were mailed 45 days" before the e-mail communication (Tr. Ex. 106 at p. 6). However, ESS received confirmation of the payments, and stated that it would "maintain coverage at [CAH-Washington, CAH-Yadkin, and CAH-Haskell] pursuant to the terms of the Agreements." (Tr. Ex. 106 at p. 5). On May 16, 2013, the hospitals informed the doctors at CAH-Washington and CAH-Yadkin to not report to work as the agreements were terminated, and informed ESS that it was terminating service. Therefore, the Court finds that CAH-Washington and CAH-Yadkin unilaterally terminated the agreements.

29. Under North Carolina law,

> the general rule is that a party who is injured by breach of contract is entitled to compensation for the injury sustained and is entitled to be placed, as near as this can be done in money, in the same position he would have occupied if the contract had been performed. Stated generally, the measure of damages for the breach of a contract is the amount which would have been received if the contract had been performed as made, which means the value of the contract, including the profits and advantages which are its direct results and fruits.

*Meineke Car Care Ctrs., Inc. v. RLB Holdings, LLC*, 423 F. App'x 274, 281 (4th Cir. 2011) (quoting *Perkins v. Langdon*, 74 S.E.2d 634, 643 (N.C. 1953) (citations omitted)). Therefore, "[d]amages for breach of contract may include loss of prospective profits where the loss is the natural and proximate result of the breach." *Id.* (quoting *Mosley & Mosley Builders, Inc. v. Landin Ltd.*, 361 S.E.2d 608, 613 (N.C. Ct. App. 1987) (citing *Perkins*, 74 S.E.2d at 634)). Under North Carolina law, a party may recover lost profits,

> when it is made to appear (1) that it is reasonably certain that such profits would have been realized except for the breach of contract, (2) that such profits can be ascertained and measured with reasonable certainty, and (3) that such profits may

reasonably be supposed to have been within the contemplation of the parties, when the contract was made, as the probable result of the breach.

*Id.* (quoting *Keith v. Day*, 343 S.E.2d 562, 568 (N.C. Ct. App. 1986)). "[T]he party seeking damages must show that the amount of damages is based upon a standard that will allow the finder of fact to calculate the amount of damages with a reasonable certainty." *J.T. Russell and Sons, Inc. v. Silver Birch Pond L.L.C.*, 721 S.E.2d 699, 704 (N.C. Ct. App. 2011) (quoting *Olivetti Corp. v. Ames Bus. Sys., Inc.*, 356 S.E.2d 578, 586 (N.C. 1987)). Additionally, "the non-breaching party has a duty to mitigate its damages by 'exercis[ing] reasonable care and diligence to avoid or lessen the consequences of [the] wrong.'" *Meineke Car Care Ctrs.*, 423 F. App'x at 281; *see Miller v. Miller*, 160 S.E.2d 65, 74 (N.C. 1968).

30. CAH-Washington failed to pay amounts due to ESS under the CAH-Washington Agreement in the amount of $122,881.79, as identified in Trial Exhibit 116, and this amount remains due and owing.

31. The CAH-Washington Agreement contained a clause that stated, "[a]ny invoice not paid within 15 days of receipt shall accrue interest on the unpaid amount at the annual rate of the 18%." (Tr. Ex. 47). Interest on the amounts CAH-Washington failed to pay to ESS under the CAH-Washington Agreement continues to accumulate at a rate of 18% annum per the terms of the contract. Therefore, interest in the amount $47,885.32, as of July 13, 2015, as identified in Trial Exhibit 119, and in Rupe's testimony, has accrued on the amounts CAH-Washington failed to pay ESS.

32. The CAH-Washington Agreement contained a clause that stated, "[a]fter the conclusion of the initial eighteen (18) months of this Agreement's term (November 30th, 2013) either party may terminate this Agreement, for any reason or no reason, upon the giving of sixty (60) days prior written notice to the other party." (Tr. Ex. 47). ESS suffered lost profits in the

amount of $82,134.48, resulting from CAH-Washington's unilateral termination. The lost profits figure is obtained from Trial Exhibit 119, Table #1, and is calculated by multiplying the monthly lost profits figure of $10,266.81 by 8, as February 1, 2014, reflects the first date on which CAH-Washington could terminate the CAH-Washington Agreement. February 1, 2014, is approximately eight months from CAH-Washington's termination of the contract in May 2013.

33. CAH-Yadkin has failed to pay amounts due to ESS under the CAH-Yadkin Agreement in the amount of $51,619.57, for services rendered under the CAH-Yadkin Agreement. Trial Exhibit 116 states that CAH-Yadkin owes $107,917.57; however, upon the Court's reflection of the invoices sent to CAH-Yadkin, Plaintiff included invoices in its calculation that the Court believes were paid by CAH-Yadkin.

34. The CAH-Yadkin Agreement contained a clause that stated, "[a]ny invoice not paid within 15 days of receipt shall accrue interest on the unpaid amount at the annual rate of the 18%." (Tr. Ex. 68). Interest on the amount CAH-Yadkin failed to pay to ESS under the CAH-Yadkin Agreement continues to accumulate at a rate of 18% rate annum per the terms of the agreement. In Trial Exhibit 119, Table #7, Plaintiff asserts that interest is owed in the amount of $42,176.25, as of July 13, 2015; however, as the Court had to reduce the amount of money owed by CAH-Yadkin, the amount of interest owed by CAH-Yadkin must also be adjusted. Therefore, ESS should update the amount of interest owed by CAH-Yadkin within its proposed judgment in accordance with the Court's findings.

35. The CAH-Yadkin Agreement contained a clause that states, "[a]fter the conclusion of the initial eighteen (18) months of this Agreement's terms either party may terminate this Agreement, for any reason or no reason, upon the giving of sixty (60) days prior written

notice to the other party." (Tr. Ex. 68). ESS suffered lost profits in the amount of $21,035.50, resulting from CAH-Yadkin's unilateral termination. The lost profits figure is obtained from Trial Exhibit 119, Table #2, and is calculated by multiplying the monthly lost profits figure of $2,103.55 by 10, as April 1, 2014, reflects the first date on which CAH-Yadkin could terminate the agreement. April 1, 2014, is approximately ten months from the date when CAH-Yadkin terminated its services with ESS in May 2013.

**Breach of Contract—CAH-Haskell**

36. Under Oklahoma law, a breach of contract suit requires three elements to be proven: formation of a contract, a breach of that contract, and actual damages suffered from that breach. *Dig. Design Grp., Inc. v. Info. Builders, Inc.*, 24 P.3d 834, 843 (Okla. 2001). The Parties stipulate that ESS and CAH-Haskell entered into the CAH-Haskell Agreement on or about September 1, 2012. Therefore, the Court finds that a contract was formed.

37. However, a question remains as to whether there was a breach of the contract, and whether Plaintiff suffered actual damages from the breach. The CAH-Haskell Agreement contains a provision, which states the following:

> (a) <u>Termination by Agreement.</u> In the event Hospital and Group *mutually agree in writing*, this Agreement may be terminated on the terms and date stipulated therein.

(Tr. Ex. 72) (emphasis added). The Court finds that there was not a mutual termination of the CAH-Haskell Agreement. It is clear that the Parties communicated via e-mail regarding the possible termination of the CAH-Haskell Agreement (Tr. Ex. 106 at pp. 5-6). Although this e-mail exchange may demonstrate that the Parties negotiated about mutually terminating the CAH-Haskell Agreement, the Court finds that it does not constitute acceptance of an agreement to terminate. At trial, no credible evidence was presented that a written agreement

was ever signed by the Parties. Additionally, at trial, evidence was presented that demonstrated both HMC/CAH and ESS believed there was not a mutual agreement to terminate the CAH-Haskell Agreement. The CAH-Haskell Agreement states that a mutual termination must be in writing (Tr. Ex. 72). Therefore, at most, there was an offer to mutually terminate the agreement, but because there was not a written agreement, the Court finds that the CAH-Haskell Agreement was not mutually terminated.

38. There is a question as to whether the CAH-Haskell Agreement was breached by either ESS or CAH-Haskell. The Court finds that ESS did not breach the CAH-Haskell Agreement because there is no credible evidence that ESS did not perform its obligations under the agreement. It provided staffing for CAH-Haskell, sought hospital approval before assigning doctors to the hospital, ensured that all of the doctors were qualified to work at the hospital, ensured that the doctors properly maintained records for CAH-Haskell, named medical directors for the hospital, billed the hospital for all required subsidies, and delivered the bills to the hospital. Therefore, the Court finds that ESS did not breach the CAH-Haskell Agreement.

39. However, the Court finds that CAH-Haskell did breach the agreement. On or around May 15, 2013, ESS threatened to terminate services to CAH-Haskell pursuant to the terms of the contract, if it "did not receive confirmation of ACH payments for invoice [number] 29121 and [number] 29122 that were mailed 45 days" before the e-mail communication (Tr. Ex. 106 at p. 6). However, ESS received confirmation of the payments, and stated that it would "maintain coverage at [CAH-Washington, CAH-Yadkin, and CAH-Haskell] pursuant to the terms of the Agreements." (Tr. Ex. 106 at p. 5). On May 16, 2013, CAH-Haskell informed the doctors at CAH-Haskell to not report to work as the agreement was terminated, and

informed ESS that it no longer required its services. Therefore, the Court finds that CAH-Haskell unilaterally terminated the CAH-Haskell Agreement.

40. Under Oklahoma law, damages for breach of contract are determined as follows:

> 1) where no special circumstances distinguish the contract involved from the great mass of contracts of the same kind, the damages recoverable are those as would naturally and generally result from the breach according to the usual course of things, and 2) where there are special circumstances in the contract, damages which result in consequence of the special circumstances are recoverable, if, and only if, the special circumstances were communicated to or known by both parties to the contract at the time they entered the contract.

*Florafax Int'l, Inc. v. GTE Mkt. Res., Inc.*, 933 P.2d 282, 292 (Okla. 1997). Additionally, Oklahoma law states that "[i]n order for damages to be recoverable for breach of contract they must be clearly ascertainable, in both their nature and origin, and it must be made to appear they are the natural and proximate consequence of the breach and not speculative and contingent." *Sw. Stainless, LP v. Sappington*, 582 F.3d 1176, 1184 (10th Cir. 2009) (quoting *Florafax Intern., Inc.*, 933 P.2d at 296).

41. CAH-Haskell has failed to pay amounts due to ESS under the CAH-Haskell Agreement in the amount of $86,467.16, as identified in Trial Exhibit 116, and this amount remains due and owing.

42. The CAH-Haskell Agreement contained a clause that stated, "[a]ny invoice not paid within 15 days of receipt shall accrue interest on the unpaid amount at the annual rate of 18%." (Tr. Ex. 72). Interest on the amounts CAH-Haskell failed to pay to ESS under the CAH-Haskell Agreement continues to accumulate at a rate of 18% annum per the terms of the contract. Therefore, interest in the amount of $17,458.82, as identified in Trial Exhibit 119, Table #7, and in Rupe's trial testimony, has accrued on the amounts CAH-Haskell failed to pay to ESS under the terms of the agreement.

**Fraudulent Inducement of CAH-Washington and CAH-Yadkin Agreements**

43. To state a claim for fraudulent inducement under Texas law,

> a plaintiff must prove the basic elements of fraud: (1) a material misrepresentation; (2) that is false; (3) when the defendant made the representation, the defendant knew it was false or made the statement without any knowledge of its truth; (4) the defendant intended the plaintiff to rely on the representation, and the plaintiff actually relied on the representation; and (5) the defendant's actions caused an injury.

*Kevin M. Ehringer Enter., Inc. v. McData Serv. Corp.*, 646 F.3d 321, 325 (5th Cir. 2011) (citing *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998)). However "[f]raudulent inducement also requires proof of an underlying contract which was induced." *Id.* (citing *Haase v. Glazner*, 62 S.W.3d 795, 798 (Tex. 2001)).

44. "Texas has recognized that, where the damages claimed are…economic loss to the subject of the contract itself, the remedy ordinarily is one of contract alone." *Kevin M. Ehringer Enter., Inc.*, 646 F.3d at 325 (citing *Formosa Plastics*, 960 S.W.2d at 45). Therefore, Texas courts have been reluctant to hold a party liable in tort when the action should be characterized only as a breach of contract. *Id.*; *see Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 306 (Tex. 2006) ("We recognize the need to keep tort law from overwhelming contract law, so that private agreements are not subject to readjustment by judges and juries."). But in *Formosa Plastics*, 90 S.W.2d at 45, the Texas Supreme Court concluded that a fraudulent inducement claim was not barred. The court concluded that "it is well established that the legal duty not to fraudulently procure a contract is separate and independent from the duties established by the contract itself." *Id.* at 46. Therefore, "[t]o be actionable as fraudulent inducement, a breach must be coupled with a showing that the promisor never intended to

perform under the contract." *Kevin M. Ehringer Enter., Inc.*, 646 F.3d at 325 (citing *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986)).

45. "[F]raud does not exist unless the defendant's representations induced the plaintiff to take a particular course of action. It is not necessary that the representations were the sole inducement, but the representations relied upon must have been a material factor in inducing the plaintiff's action." *Coffel v. Stryker Corp.*, 284 F.3d 625, 636 (5th Cir. 2002). "In Texas, a plaintiff must show that his reliance on the defendant's misrepresentations induced him to enter into a contract, not just contractual negotiations." *Bohnsack v. Varco, L.P.*, 668 F.3d 262, 278 (5th Cir. 2012); *see Williams v. Dardenne*, 345 S.W.3d 118, 126-27 (Tex. App.—Houston [1st Dist.] 2011, pet. denied); *see ISG State Operations, Inc. v. Nat'l Heritage Ins. Co.*, 234 S.W.3d 711, 716-18 (Tex. App.—Eastland 2007, pet. denied). Reliance must be a "material factor" in the plaintiff's decision to enter into the contract. *Bohnsack*, 668 F.3d at 278; *see Coffel v. Stryker Corp.*, 284 F.3d 625, 636 (5th Cir. 2002).

46. Defendants do not deny that they misstated the Compensation Variables within their proposals for ESS. However, Defendants allege that the misstatements were mistakes, and they thought that ESS was requesting information regarding the hospital as a whole, instead of only information for the emergency department.

47. Defendants also assert that Plaintiff did not exercise reasonable care when determining whether Defendants had provided the correct data for their Compensation Variables, and therefore, their reliance is not reasonable. However, the Court finds that Plaintiff's reliance was justified for the following reasons:

    a. Before submitting the questionnaires, Smith, Soule, and Docking were aware that ESS needed accurate information in order to put together their proposal.

b. Although Plaintiff had concerns that the Compensation Variables received from CAH-Washington were out of the ordinary, Cassidy called Smith on the phone to confirm the numbers. Smith confirmed the numbers for her, and stated that the "self-pay [was] low," regarding the payer mix numbers (Tr. Ex. 13). On March 8, 2012, Cassidy requested confirmation of the numbers received in the proposals from Soule. Although Cassidy sent the proposals to the hospitals on the same date, the hospitals had adequate notice that ESS was concerned that the numbers seemed unusual prior to entering the agreements.

48. As a result of its reliance, ESS agreed to a compensation amount to be paid under the CAH-Washington Agreement and the CAH-Yadkin Agreement that did not properly reflect the actual number of patients seen at CAH-Washington or CAH-Yadkin, the breakdown of the method of payment of those patients, or the proper acuity mix of the patients. The misrepresentations caused ESS to overestimate the revenue collections per patient by a statistically significant amount. The overestimation of expected collections resulted in ESS charging an unreasonably low subsidy to CAH-Washington and CAH-Yadkin.

49. Additionally, the Parties stipulate that on October 20, 2012, ESS and CAH-Washington executed the 2012 Amendment. The 2012 Amendment provided for an increased monthly payment to ESS for its emergency department services. Additionally, ESS stated that the 2012 Amendment's purpose was to make ESS as whole as possible by raising CAH-Washington's subsidy. This is also demonstrated through conversations the Parties had prior to entering the 2012 Amendment. On October 19, 2012, Davis wrote Weiss and Rupe, wherein he included the "high points" of the 2012 Amendment (Tr. Ex. 84). He stated that it included, "[a] concession on our part that we are obligated to pay your established amount

for the period between June 1st and October 31st, 2012 for services rendered in addition to the [$4,000] for hospitalist management services." (Tr. Ex. 84). He additionally stated,

> [i]n offering this [amendment], we do recognize that the payor [sic] mix provided originally did not reflect the payor [sic] mix for the ER but rather the payor [sic] mix for the hospital. We are committed to resolving the additional amounts owed and will commit to paying that amount off over the next nine months.

(Tr. Ex. 84). After entering into the 2012 Amendment, ESS and CAH-Washington discussed the schedule for the retroactive payments based upon the misstated Compensation Variables. The Court finds that any harm suffered by ESS was resolved when the Parties entered into the 2012 Amendment; and therefore, its damages have been mitigated by the 2012 Amendment. Because ESS has only requested lost profits resulting from CAH-Washington's fraudulent statements, the Court finds that ESS has been repaired by the Parties entering into the 2012 Amendment.

50. The Court finds that CAH-Washington and CAH-Yadkin lacked the intent needed to make a fraudulent inducement. The evidence presented at trial showed that when confronted with the inconsistency of the reported Compensation Variables and the actual Compensation Variables, CAH-Washington and CAH-Yadkin, through HMC/CAH, owned up to the mistake that was made. HMC/CAH informed ESS that it had submitted Compensation Variables for the entire hospital, instead of the emergency department numbers. Additionally, the evidence presented at trial showed that CAH-Washington and CAH-Yadkin, through HMC/CAH, worked with ESS to correct the mistakes. Therefore, the Court finds that neither CAH-Washington nor CAH-Yadkin fraudulently induced ESS to enter into the CAH-Washington Agreement and CAH-Yadkin Agreement.

**Piercing the Corporate Veil:**

51. "A bedrock principle of corporate law is that 'a parent corporation…is not liable' for actions taken by its subsidiaries." *Bridas S.A.P.I.C. v. Gov't of Turkm.*, 447 F.3d 411, 416 (5th Cir. 2006) ("*Bridas II*") (quoting *United States v. Bestfoods*, 524 U.S. 51, 61 (1998)). Under Texas law, "the alter ego doctrine allows the imposition of liability on a corporation for the acts of another corporation when the subject corporation is organized or operated as a mere tool or business conduit." *Smotherman v. Texaco Expl. and Prod., Inc.*, 161 F. Supp. 2d 733, 738 (E.D. Tex. 2001). The Fifth Circuit has developed "a laundry list of factors to be used in determining whether a subsidiary is the alter ego of its parent." *Id.*; *see United States v. Jon-T Chem., Inc.*, 768 F.2d 686, 692 (5th Cir. 1985). The factors include:

> (1) common stock ownership; (2) common directors or officers; (3) common business departments; (4) filing of consolidated financial statements and tax returns; (5) the parent finances the subsidiary; (6) the parent caused the incorporation of the subsidiary; (7) the subsidiary operates with grossly inadequate capital; (8) the parent pays the salaries and other expenses of the subsidiary; (9) the subsidiary receives no business except that given to it by the parent; (10) the parent uses the subsidiary's property as its own; (11) the daily operations of the two corporations are not kept separate; (12) the subsidiary does not observe the basic corporate formalities, such as keeping separate books and records and holding shareholder and board meetings; or (13) the directors and officers of the subsidiary act independently in the interest of that company, or whether they take their orders from the parent and act in the parent's interest.

*Smotherman*, 161 F. Supp. 2d at 738 (citing *United States v. Jon-T Chem., Inc.*, 768 F.2d at 691-92). No one factor is determinative. *Id.* (citing *United States v. Jon-T Chem., Inc.*, 768 F.2d at 694).

52. The Court finds that there is sufficient evidence to pierce the corporate veil and hold HMC/CAH liable for the relevant conduct of the hospital entities. Evidence has shown the following:

a. The major operations of all of the hospital entities, including accounting and negotiating contracts for the hospital entities, were conducted by HMC/CAH.

b. HMC/CAH, through its COO, Docking, determined the need for a new provider of emergency department billing and physician staffing services at CAH-Washington and CAH-Yadkin, and had actively searched for a new provider for CAH-Washington and CAH-Yadkin.

c. Docking and Lagergren negotiated directly with ESS regarding the proposed contracts, and HMC/CAH provided the necessary information and statistics related to the Compensation Variables upon which ESS ultimately relied on to create its proposals.

d. HMC/CAH maintained direct contact with ESS during the performance of the CAH-Washington Agreement, CAH-Yadkin Agreement, and the CAH-Haskell Agreement.

e. HMC/CAH was responsible for assessing, negotiating, and signing the Agreements, as well as paying the invoices due under the Agreements to ESS.

Additionally, evidence was presented at trial that Smith believed Docking, as COO of HMC/CAH, was his boss. Smith also believed that HMC/CAH was the primary contact with ESS for negotiating the CAH-Washington Agreement, and ESS was paid directly from HMC/CAH. Smith also testified at trial that he believed that he would need HMC/CAH's approval before he entered into a contract with ESS. Cassidy also testified that she perceived HMC/CAH to be the decision-maker in the process because Docking told her that he had chosen ESS for CAH-Washington's emergency department and hospitalist staffing needs, and HMC/CAH negotiated the hospitals' agreements. Other credible evidence that came in during trial was that HMC/CAH representatives, through Docking and Arthur, signed the

CAH-Washington, CAH-Yadkin, and CAH-Haskell Agreements, and HMC/CAH reviewed the proposed agreements. ESS also worked directly with HMC/CAH to resolve the payment deficiencies on the hospitals' accounts.

53. Other relevant information that could help the Court determine whether HMC/CAH and its hospital entities were in fact separate entities was not properly disclosed by Defendants, as discussed in the Plaintiff's Motion for Sanctions (Dkt. #58). Therefore, the Court will find that the Defendants did not disclose those documents because they would have been harmful to Defendants' case, as they would have shown that HMC/CAH and its hospital entities were not separate entities. The Court will further find as a sanction, and infer that: 1) HMC/CAH and the hospital entities shared common stock ownership; 2) HMC/CAH and the hospital entities shared common directors or officers; 3) HMC/CAH and the hospital entities shared common business departments; 4) HMC/CAH and the hospital entities filed consolidated financial statements and tax returns; 5) HMC/CAH financed the hospital entities; 6) HMC/CAH caused the incorporation of the hospital entities; 7) the hospital entities operated with a grossly inadequate capital; 8) HMC/CAH paid the salaries and other expenses of the hospital entities; 9) HMC/CAH gave the hospitals all of the business that they generated; 10) HMC/CAH used the hospital entities properties as its own; 11) the daily operations of HMC/CAH and the hospital entities were not kept separate; 12) the hospital entities did not observe basic corporate formalities, such as keeping separate books and records and holding shareholder and board meetings; and 13) the directors and officers of the hospital entities did not act independently in the interest of that hospital entity, but rather took their orders from HMC/CAH. The Court finds that injustice would result if HMC/CAH is not held liable for CAH-Washington's, CAH-Yadkin's, and CAH-Haskell's acts.

**Attorneys' Fees:**

54. Under North Carolina law, "[i]t appears to be well established that ordinarily attorneys' fees are recoverable only when expressly authorized by statute." *Hicks v. Clegg's Termite and Pest Control, Inc.*, 512 S.E.2d 85, 87 (N.C. Ct. App. 1999) (quoting *Yeargin Constr. Co. v. Futren Dev. Corp.*, 225 S.E.2d 623, 625 (N.C. Ct. App. 1976), *disc. review denied*, S.E.2d 459 (N.C. 1976)). North Carolina law does not establish recovery of attorneys' fees for breach of contract claims. *See Hicks*, 512 S.E.2d at 87. Therefore, the Court finds that Plaintiff cannot recovery attorneys' fees under its breach of contract claims for the CAH-Washington Agreement or the CAH-Yadkin Agreement.

55. "Oklahoma follows the American Rule—each litigant is responsible for its own attorney fees unless that rule is modified by statute or contractual provision." *Okla. Nat. Gas Co. v. Apache Corp.*, 355 F. Supp. 2d 1246, 1252 (N.D. Okla. 2004) (citing *State ex rel. Dept. of Transp. v. Norman Indus. Dev. Corp.*, 41 P.3d 960, 962 (Okla. 2001)). Oklahoma law states:

> In any civil action to recover for labor or services rendered, or on an open account, a statement of account, account stated, note, bill, negotiable instrument, or contract relating to the purchase or sale of goods, wares, or merchandise, unless otherwise provided by law or the contract which is the subject of the action, the prevailing party shall be allowed a reasonable attorney fee to be set by the court, to be taxed and collected as costs.

Okla. Stat. tit. 12 § 936. "Section 936 reflects the Legislature's intent to mandate prevailing party attorney fees *in actions to collect money promised*, however evidenced—promissory note, negotiable instrument, account for property, labor or services or a bill or contract for goods." *Okla. Nat. Gas Co.*, 355 F. Supp. 2d at 1252-53 (citing *Kay v. Venez. Sun Oil Co.*, 806 P.2d 648, 651, n. 11 (Okla. 1991)). An award under section 936 is mandatory, but the amount must be reasonable. *Id.* The determination of reasonableness and the amount of the fee award are generally left to the sound discretion of the district court. *Id.* Therefore, the

Court finds that Plaintiff is entitled to a reasonable amount of its attorneys' fees stemming from the CAH-Haskell Agreement. The Court will determine the reasonable amount to be awarded at the appropriate time.

**Declaratory Judgment:**

56. Federal courts have broad discretion to grant or refuse a declaratory judgment. *Kougl v. Xspedius Mgmt. Co of Dall./Fort Worth, L.L.C.*, No. Civ. A. 3:04CV2518-D, 2005 WL 1421446, at *4 (N.D. Tex. June 1, 2005); *see Torch, Inc. v. LeBlanc*, 947 F.2d 193, 194 (5th Cir. 1991). "Since its inception, the Declaratory Judgment Act has been understood to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995). However, this section is "an authorization, not a command." *Pub. Affairs Assocs., Inc. v. Rickover*, 369 U.S. 111, 112 (1962) (per curiam). "Although 'the district court's discretion is broad, it is not unfettered.'" *St. Paul Ins. Co. v. Trejo*, 39 F.3d 585, 590 (5th Cir. 1994) (quoting *Traveler's Ins. Co. v. La. Farm Bureau Fed'n, Inc.*, 996 F.2d 774, 778 (5th Cir. 1993)). Therefore, the Fifth Circuit has established factors to guide the court's decision in determining whether to dismiss a declaratory judgment action. *Kougl*, 2005 WL 1421446, at *4.

> These factors are: whether (1) there is a pending state action in which all of the matters in controversy may be fully litigated; (2) plaintiff filed suit in anticipation of a lawsuit filed by defendant; (3) plaintiff engaged in forum-shopping in bringing the action; (4) possible inequities exist in allowing plaintiff to maintain the action; (5) federal court is a convenient forum for parties and witnesses; (6) retaining the lawsuit in federal court would further judicial economy; and (7) the federal court must construe a state judicial decree involving the same parties and entered by the court before whom the parallel state suit between the parties is pending.

*Id.* (quoting *St. Paul Ins.*, 39 F.3d at 590-91) (quoting *Travelers*, 996 F.2d at 778).

57. Defendants seek a declaration that the "September 1 Agreement and its Amendment are no longer valid and they are unenforceable," and that the "Hospitals are no longer bound and have not been bound since at least January of 2013 to comply with the terms or conditions of the Agreements or their Amendments." Having considered the factors, the Court declines to consider Defendants' declaratory judgment actions. The core issues of the controversy concern whether there was a breach of the agreements. The Defendants' questions are resolved in the context of the breach of contract actions. Therefore, a separate declaratory judgment action is redundant. *See Landscape Design & Constr., Inc. v. Transp. Leasing/Contract, Inc.*, No. Civ. A. 3:00-CV-0906-D, 2002 WL 257573, at *11 (N.D. Tex. Feb. 19, 2002) (dismissing declaratory judgment action that sought resolution of substantive claims that were already basis of lawsuit).

**Estoppel**

58. Defendants also contend that Plaintiff is estopped under the doctrine of equitable estoppel from asserting its claims against the hospital. At trial, however, no evidence was admitted to demonstrate why the application of equitable estoppel would be warranted in the present case. Therefore, the Court finds that Plaintiff is not equitably estopped from asserting its claims against the hospitals.

The Court further **ORDERS** Plaintiff to submit a form for final judgment within seven days in accordance with these findings and conclusions.

**SIGNED this 10th day of December, 2015.**

_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE